**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

JAN 0 8 2019

JAMES W. McCORMACK, CLERK
By:

|  |  |
|---|---|
| AMERICAN ATHEISTS, INC.;<br>BETTY JO FERNAU;<br>CATHERINE SHOSHONE;<br>ROBERT BARRINGER; and<br>KAREN DEMPSEY,<br><br>         Plaintiffs,<br><br>    v.<br><br>STANLEY JASON RAPERT, *in his<br>individual and official capacity,*<br><br>         Defendant. | Civil Action No. 4:19cv17-KGB<br><br>**JURY TRIAL**<br><br><br>**COMPLAINT FOR DECLARATORY<br>RELIEF, INJUNCTIVE RELIEF,<br>NOMINAL DAMAGES, AND<br>PUNITIVE DAMAGES** |

This case assigned to District Judge Baker
and to Magistrate Judge

## INTRODUCTION

1.      Social media platforms like Facebook and Twitter have become vital tools for Americans to obtain news and information about government activities, as well as important public forums for discussions with and about elected officials. Lawmakers who hope to capitalize on their positions in order to impose their religious beliefs on others take advantage of the tools provided by social media platforms in order to silence constituents who speak out in defense of the separation between religion and government. Defendant Stanley Jason Rapert has repeatedly deleted the comments of critics and restricted the participation of individuals critical of his statements and policy positions in public forums on social media such as Facebook and Twitter. This practice constitutes viewpoint discrimination in violation of the Free Speech Clause of the First Amendment and violates other constitutional and statutory protections.

2.      As the Supreme Court has recognized, platforms like Facebook and Twitter provide "the most powerful mechanisms available to a private citizen to make his or her voice heard." *Packingham v. North Carolina*, ___ U.S. ___, 137 S.Ct. 1730, 1737 (2017). As a result

of such platforms, civic engagement has skyrocketed and government transparency has been emphasized more than ever before. Governors in all 50 states and almost every Member of Congress have set up accounts on Twitter or Facebook for the purpose of enabling ordinary citizens to participate in the process of discussing, listening to, and offering different viewpoints, much like a public discussion in a town hall, city council meeting, or even a public park or sidewalk.

3.      Plaintiffs are individuals, as well as American Atheists, Inc. on behalf of its members, who were censored and blocked by Defendant Stanley Jason Rapert on his Facebook and Twitter accounts, which are accessible to all other citizens. Plaintiffs were blocked after voicing criticism of his attacks on members of the LGBTQ community, his support of a bill to require the display of the divisive and exclusionary phrase "In God We Trust" in all Arkansas public school classrooms and libraries, and his support for a Ten Commandments display on the grounds of the Arkansas State Capitol, among other issues.

4.      The voices of atheists and other advocates for the separation of religion and government provide valuable contributions to the public discourse, and to deny citizens access to public forums based on their viewpoint silences individuals and violates free speech rights guaranteed by the First Amendment, the equal protection of the laws as guaranteed by the Fourteenth Amendment, Article 2 § 6 of the Arkansas Constitution, and the Arkansas Religious Freedom Restoration Act.

5.      Plaintiffs respectfully ask the Court to declare that the viewpoint-based exclusion of the individual Plaintiffs from public forums by the Defendant violates the First Amendment, order the Defendant to restore their access, and grant the Plaintiffs nominal and punitive damages, among other relief.

## JURISDICTION AND VENUE

6.      This is an action arising under 42 U.S.C. §§ 1983 and 1988 to redress the

deprivation, under color of state law, of rights secured by the First and Fourteenth Amendments

to the United States Constitution and under Ark. Code Ann. § 16-123-105(a) to redress the

deprivation, under color of state law, of rights secured by Article 2 § 6 of the Arkansas

Constitution, and the Arkansas Religious Freedom Restoration Act.

7.      Declaratory relief is authorized by Rule 57 of the Federal Rules of Civil

Procedure and 28 U.S.C. § 2201 and 2202.

8.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 (federal

question jurisdiction) and 1343 (civil rights jurisdiction).

9.      This Court has supplemental jurisdiction over Plaintiffs' state claims under 28

U.S.C. § 1367.

10.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) and (b)(2). The

defendant resides within the district and a substantial part of the events giving rise to this claim

occurred in this District.

## PARTIES

11.     American Atheists, Inc. ("American Atheists") is a 501(c)(3) nonprofit

corporation based in Cranford, New Jersey. American Atheists is dedicated to the separation of

religion and government and elevating atheists and atheism in our nation's public and political

discourse. American Atheists has more than 350,000 members and supporters across the country,

including in Arkansas Senate District 35.

12.     Plaintiff Betty Jo Fernau ("Betty"), who resides in Conway, Arkansas, operates a

Facebook account under the username Bettyf and Twitter accounts under the handles @bfernau

and @BettyFernau.

13.     Plaintiff Catherine Shoshone ("Cathey"), who resides in Maumelle, Arkansas, operates a Facebook account under the username cathey.noe and two Twitter accounts under the handles @cshoshone and @reeseisqueen.

14.     Plaintiff Robert Barringer, who resides in Conway, Arkansas, operates a Facebook account under the username Bartsutra.

15.     Plaintiff Karen Dempsey, who resides in Rogers, Arkansas, operates a Facebook account under the username karen.dempsey4.

16.     Defendant Stanley Jason Rapert ("Defendant" or "Defendant Rapert") is the state senator for Arkansas Senate District 35. Defendant Rapert operates and/or oversees the operation of a Twitter account under the handle @jasonrapert and a Facebook page titled "Sen. Jason Rapert." Senator Rapert and/or his subordinates have blocked all of the Plaintiffs except American Atheists from at least one of these accounts.

<div align="center">

**FACTUAL ALLEGATIONS**

</div>

**Facebook**

17.     Facebook is a social media platform with more than 2 billion active users worldwide, including around 200 million users in the United States. This platform allows users to establish personal profiles and post status updates. Facebook also allows celebrities, businesses, government agencies, elected officials, and other entities to establish public profiles called "pages." Unlike personal profiles, pages gain "likes" and "followers" instead of "friends." A private profile can only have 5,000 friends at maximum, while a page can have an unlimited number of fans. The Facebook page of a government official provides a public forum for citizens to instantly receive news that affects them and their community and freely debate issues of public concern.

18.     Profiles. A profile is a customizable personal webpage attached to the user's account. By default, status updates on a profile are only visible to the user's "friends" on Facebook. A typical profile shows the user's name, profile picture and header image, the user's biographical description, the photos and videos uploaded by the user, and all the status updates that the user has posted.

19.     Pages. A page is a customizable public webpage on Facebook that is administered by one or more individual users. A user can create a page for a business, brand, community, public figure, agency, or other entity. Unlike profiles, pages gain "likes" and "followers" instead of "friends." A user's personal profile can only have 5,000 friends at maximum. In contrast, a page can have an unlimited number of likes and followers. By default, status updates on a "page" are visible to everyone with internet access, including those who are not Facebook users. Although non-users can view users' pages, they cannot interact with users on the Facebook platform. Similar to profiles, a typical page shows the name of the entity, a page picture and header image, the entity's biographical description, the photos and videos uploaded by the administering users ("administrators"), and all the status updates that the administrators have posted.

20.     Verification. Facebook permits users to establish pages under their real names or pseudonyms. Users who want to establish that they are who they claim to be can ask Facebook to verify their pages. When a page is verified, a blue badge with a check mark appears next to the user's name on his or her Facebook page.

21.     Status Updates. An individual "status update" comprises the posted content (i.e., the message, including any embedded photographs, video, or link), the user's name (with a link to the user's Facebook profile or page), the user's profile or page picture, the date and time the

status update was generated, and how many times this status updates has been commented on, liked, and shared. Thus, a recent status update on Defendant's page looks like this:



*Fig. 1*

22.     By default, status updates on a personal profile are only visible to the user's "friends" on Facebook, while status updates on a "page" are visible to everyone with internet access, including those who are not Facebook users. Although non-users can view users' pages, they cannot interact with users on the Facebook platform.

23.     Friending. Users send friend requests to friends, family and other people on Facebook they know and trust, an action referred to as "friending." If the recipient of the request accepts, the two users are marked as friends. Friends automatically receive each other's status updates, comments, likes, and shares.

24.     Commenting. A Facebook user can comment on other users' status updates. When a user comments on a status update, the comment will appear in a "comment thread" under the status update that prompted the comment. Other users' comments to the same status update will appear in the same comment thread.

25.     Liking. A Facebook user can also "like" another user's status update by clicking on the thumb icon that appears under the status update. By "liking" a status update, a user may mean to convey approval or to acknowledge having seen the status update.

26.     Sharing. A Facebook user can also share status updates of other users. When a user shares a status update to his or her page, it is republished on the page's timeline in the same form as it appeared in the original user's timeline, but with a sentence indicating that the status update was shared. Each post displays a tally of "shares" it has garnered.

27.     Following. Facebook users can subscribe to updates from particular pages by "following" those pages. Posts and other updates shared by a page appear in the feeds of users who have chosen to follow it.

28.     Banning. A page administrator who wants to prevent a particular user from interacting with the page can do so by "banning" that user. A page administrator who bans a user from the page he or she administers prevents the banned user from using the Facebook platform to like or comment on posts published to the page. A banned user can still view the banning page but is prevented from using the Facebook platform to search for or reply to posts or other updates on the banning page. The administrator can still see the comments posted by the user prior to being banned, but the administrators can also remove those comments by deleting them.

29.     At any time, an administrator of a Facebook page can access the list of users that are banned from interacting with the page by accessing the "Settings" page associated with the

Facebook page, selecting "People and other Pages" from the sidebar, and selecting "Banned people and Pages" from the drop-down menu.

**The "Sen. Jason Rapert" Facebook page**

30.    The Defendant established the "Sen. Jason Rapert" Facebook page on January 25, 2010, with the name "Jason Rapert for Arkansas Senate."

31.    The "Sen. Jason Rapert" Facebook page reports conflicting information about the date on which it was established. The "About" section of the page states that it was "launched on 10 March 2010." In contrast, the "page information" portion of the "Info and ads" section of the page states that the page was "created on 25 January 2010."

32.    On or around January 10, 2011, when Defendant Rapert began his first term as a state senator, he began to use the account as an instrument of his Arkansas Senate office.

33.    On or about July 25, 2015, the name of the page was changed to "Sen. Jason Rapert."

34.    The Defendant presents the "Sen. Jason Rapert" page to the public as one that he operates in his official capacity rather than as a personal account. As shown in this image captured from the page on September 24, 2018, the "Impressum" portion of the "About" section of the page declares:

**O** Impressum
> This page is for communication with constituents and citizens as a courtesy. Anyone who engages in bullying, intimidation, personal attacks, uses profanity or attempts to mislead others with false information, will find their privilege to post on the page revoked. Thank you for respecting others.

*Fig. 2*

35.     The Defendant has used the page to deliver public safety messages:



*Fig. 3*



*Fig. 4*



*Fig. 5*

36.     The Defendant has used the page to inform his constituents of government job openings in his district:



*Fig. 6*

37.     The "Sen. Jason Rapert" page is accessible to the public at large without regard to political affiliation or any other limiting criteria. The account has approximately 24,000 likes and a similar number of followers. Users who are banned by the Defendant cannot participate in

public discourse by responding to the Defendant's posts and events on the "Sen. Jason Rapert" page.

38.     The comment threads associated with posts on the "Sen. Jason Rapert" page are important forums for discussion and debate about community events, as well as the Defendant's policy positions and official acts. Posts to the "Sen. Jason Rapert" Facebook page regularly generate dozens of comments and shares, some of which generate numerous replies in turn. The Defendant's Facebook page is a digital town hall where individual users receive information about Arkansas government and exchange their views on matters of public concern.

**Twitter**

39.     Twitter is a social media platform with more than 300 million active users worldwide, including some 70 million in the United States. The platform allows users to publish short messages, to republish or respond to others' messages, and to interact with other Twitter users in relation to those messages. Speech posted on Twitter ranges from personal insult to poetry, but particularly relevant here is that a significant amount of speech posted on the platform is speech by, to, or about the government.

40.     Users. A Twitter "user" is an individual or entity that has created an account on the platform. A user can post "tweets," up to 280 characters in length, to a webpage on Twitter that is attached to the user's account. Tweets can include photographs, videos, and links. Some Twitter users do not tweet—i.e., publish messages—at all. Others publish hundreds of messages a day.

41.     Timelines. A Twitter user's webpage displays all tweets generated by the user, with the most recent tweets appearing at the top of the page. This display is known as a user's "timeline." When a user generates a tweet, the timeline updates immediately to include that

tweet. Anyone who can view a user's public Twitter webpage can see the user's timeline. Below

is a screenshot of part of the timeline associated with the @jasonrapert account:



*Fig. 7*

42.     A Twitter user must have an account name, which is an @ symbol followed by a

unique identifier (e.g., @jasonrapert), and a descriptive name (e.g., "Sen. Jason Rapert"). The

account name is often referred to as the user's "handle." A user may change the handle

associated with an account at any time. Alongside the handle, a user's webpage will display the

date the user joined Twitter and a button that invites others to "Tweet to" the user. (This button is

visible only to other Twitter users.) A user's Twitter webpage may also include a short

biographical description; a profile picture, such as a headshot; a "header" image, which appears

as a banner at the top of the webpage; the user's location; a button labeled "Message," which

allows two users to correspond privately; and a small sample of photographs and videos posted

to the user's timeline, which link to a full gallery. Thus, part of the webpage for @jasonrapert

recently looked like this:



*Fig. 8*

43.     Tweets. An individual "tweet" comprises the tweeted content (i.e., the message,

including any embedded photograph, video, or link), the user's account name (with a link to the

user's Twitter webpage), the user's profile picture, the date and time the tweet was generated, and the number of times the tweet has been replied to ( ♡ ), retweeted by ( ♺ ), or liked by ( ♡ ) other users. Thus, a recent tweet from @jasonrapert looks like this:



*Fig. 9*

44.     By default, Twitter webpages and their associated timelines are visible to everyone with internet access, including those who are not Twitter users. However, although non-users can view users' Twitter webpages, they cannot interact with users on the Twitter platform.

45.     Following. Twitter users can subscribe to other users' messages by "following" those users' accounts. Users see all tweets posted or retweeted by accounts they have followed. This display is labeled "Home" on Twitter's site, but it is often referred to as a user's "feed."

46.     Protected tweets. Although tweets are public by default, a user can choose to "protect" his or her tweets, allowing only select users to view them. A person who wishes to view the protected tweets of the user must request to follow the user. The user may approve or deny the person's request.

47.     Verification. Twitter permits users to establish accounts under their real names or pseudonyms. Users who want to establish that they are who they claim to be can ask Twitter to "verify" their accounts. When an account is verified, a blue badge with a checkmark appears next to the user's name on his or her Twitter page and on each tweet the user posts.

48.     Retweeting. Beyond publishing tweets to their followers, Twitter users can engage with one another in a variety of ways. For example, they can "retweet"—i.e., republish— the tweets of other users, either by publishing them directly to their own followers or by "quoting" them in their own tweets. When a user retweets a tweet, it appears on the user's timeline in the same form as it did on the original user's timeline, but with a notation indicating that the post was retweeted. This is a recent retweet by @jasonrapert:



*Fig. 10*

49.     Replying. A Twitter user can also reply to other users' tweets. Like any other tweet, a reply can be up to 280 characters in length and can include photographs, videos, and links. When a user replies to a tweet, the reply appears on the user's timeline under a tab labeled "Tweets & replies." The reply will also appear on the original user's feed in a "comment thread" under the tweet that prompted the reply. Other users' replies to the same tweet will appear in the same comment thread. Reply tweets by verified users, reply tweets by users with a large number

of followers, and tweets that are "favorited" and retweeted by large numbers of users generally appear higher in the comment threads.

50. Comment threads. A Twitter user can also reply to other replies. A user whose tweet generates replies will see the replies below his or her original tweet, with any replies-to-replies nested below the replies to which they respond. The collection of replies and replies-to-replies is sometimes referred to as a "comment thread." Twitter is called a "social" media platform in large part because of comment threads, which reflect multiple overlapping conversations among and across groups of users. Below is a recent @jasonrapert tweet that prompted dozens of comments:



*Fig. 11*

51. Favoriting. A Twitter user can also "favorite" or "like" another user's tweet by clicking on the heart icon that appears under the tweet. By "favoriting" a tweet, a user may mean to convey approval or to acknowledge having seen the tweet.

52. Mentioning. A Twitter user can also "mention" another user by including the other user's Twitter handle in a tweet. A Twitter user mentioned by another user will receive a "notification" that he or she has been mentioned in another user's tweet.

53.     Tweets, retweets, replies, likes, and mentions are controlled by the user who generates them. No other Twitter user can alter the content of any retweet or reply, either before or after it is posted. Twitter users cannot prescreen tweets, replies, likes, or mentions that reference their tweets or accounts.

54.     Protected tweets. Because all Twitter webpages are by default visible to all Twitter users and to anyone with access to the internet, users who wish to limit who can see and interact with their tweets must affirmatively "protect" their tweets. Other users who wish to view "protected" tweets must request access from the user who has protected her tweets. "Protected" tweets do not appear in third-party search engines, and they are searchable only on Twitter, and only by the user and her approved followers.

55.     Blocking. A user whose account is public (i.e. not protected) but who wants to make his or her tweets invisible to another user can do so by "blocking" that user. (Twitter provides users with the capability to block other users, but, importantly, it is the users themselves who decide whether to make use of this capability.) A user who blocks another user prevents the blocked user from interacting with the first user's account on the Twitter platform. A blocked user cannot see or reply to the blocking user's tweets, view the blocking user's list of followers or followed accounts, or use the Twitter platform to search for the blocking user's tweets. The blocking user will not be notified if the blocked user mentions her; nor will the blocking user see any tweets posted by the blocked user.

56.     If the blocked user attempts to follow the blocking user, or to access the Twitter webpage from which the user is blocked, the user will see a message indicating that the other user has blocked him or her from following the account and viewing the tweets associated with

the account. This is an example of a notification from Twitter that a user has been blocked:



*Fig. 12*

57.     At any time, a Twitter user can access the list of other users that he or she has chosen to block by accessing the "Settings and privacy" page associated with his or her account and selecting "Blocked accounts."

58.     Muting. A Twitter user can mute another user's account, removing the muted user's tweets from the muting user's timeline without unfollowing or blocking the muted user. Muted users will not know that they have been muted and can still view and interact with the muting user's tweets.

59.     Deleting. A Twitter user can "delete" their own tweet or retweet, removing it from the user's feed. However, a user cannot delete another user's tweet, even if the offending tweet was directed to their handle.

### The @jasonrapert Twitter account

60.     Defendant Rapert maintains a Twitter account, @jasonrapert, to communicate with his constituents, promote businesses and events in his district, and perform other duties

intrinsic to his role as a state legislator:



*Fig. 13*

61.     Defendant Rapert established the @jasonrapert account in June 2010,

approximately seven months before he took office. The only tweet remaining from the period

before Defendant Rapert was elected to the Arkansas Senate was sent on June 8, 2010. That

tweet declares, "Welcome to the Jason Rapert for Arkansas Senate Twitter page!" However,

beginning in November 2011, Defendant Rapert established a separate Twitter account,

@RapertSenate, as his campaign account:



*Fig. 14*

62.    On or about January 10, 2011, when he began his first term in the Arkansas

Senate, the Defendant began to use the @jasonrapert account as an instrument of his office.

Because of the way he uses the account, his tweets have become an important source of news

and information for his constituents about Arkansas state government, and the comment threads

associated with the tweets have become important forums for speech by his constituents.

63.    Defendant Rapert presents the account to the public as one that he operates in his

official capacity rather than his personal one, using it as a channel for communicating with his

constituents about his activities in the legislature, promoting local businesses, and honoring the

accomplishments of constituents. The Twitter page associated with the account is registered to

"Sen. Jason Rapert," "Arkansas State Senator | President of http://www.ncoil.org |

http://www.rapertfinancialassociates.com | http://www.jasonrapertforsenate.com/donate." In the

space provided for the user to link to their website, the @jasonrapert account links to Rapert's

official profile on the Arkansas State Senate's website: http://www.arkleg.state.ar.us/assembly

/2017/2017R/Pages/MemberProfile.aspx?member=Rapert. On August 8, 2018, the header

displayed a picture of the Defendant at a volunteer event with constituents from Conway, AR.

64.     Defendant Rapert's staff assists him in maintaining the @jasonrapert account, as

he has indicated through the account itself:



*Fig. 15*

65.     The @jasonrapert account is accessible to the public at large without regard to

political affiliation or any other limiting criteria. The Defendant has not "protected" his tweets,

and anyone who wants to follow the account can do so. The account has approximately 8,875

followers—approximately 6,000 more than his campaign account. The only users who cannot

follow @jasonrapert are those whom the Defendant has blocked.

**Defendant's discriminatory censorship of social media users**

66.     The "Sen. Jason Rapert" Facebook page and @jasonrapert Twitter account

constitute Defendant's official social media accounts.

67.     In response to a May 16, 2018, letter, pursuant to the Arkansas Freedom of

Information Act (Arkansas FOIA), A.C.A. § 25-19-101, et seq., requesting that his office

produce, among other things, lists of users banned or blocked from his official social media

accounts, the Defendant did not claim that the accounts in question were non-governmental and

therefore not within the scope of the statute. Instead, he stated through Arkansas Senate Chief

Counsel Steve Cook that his Senate office had no such records and that the Arkansas FOIA does

not require government officials to "create new records or formulate information." See ¶¶ 102-

104, below.

68.     Defendant Rapert provides facially neutral rules for participating in discussion on

his "Sen. Jason Rapert" Facebook page, stating that any user who engages in "bullying,

intimidation, personal attacks, uses profanity or attempts to mislead others with false

information" will be blocked.

69.     Despite stating that neutral rules are applied to his social media accounts,

Defendant Rapert regularly blocks users who have not violated these rules.

70.     The Defendant has stated that he blocks people whom he considers "liberal

extremists":



*Fig. 16*

71. ' The Defendant has stated that he blocks people who make what the Defendant

considers to be "ad hominem attacks":



*Fig. 17*

72. The Defendant has stated that he maintains a "watch list for blocking":

Guneev Sharma @GuneevSharma  30 Jan 2017
that's funny...Sen. Rapert blocks his own constituents and suppresses their voices.

○ 1    ↑↓ 1    ♡ 11    ✉    ☑

Sen. Jason Rapert @jasonrapert  31 Jan 2017
not true. We block those who engage in ad hominem attacks, defamation or
threatening communications. @Arkansas_Watch @mcookAR

○ 1    ↑↓    ♡    ✉    ☑

Sen. Jason Rapert
@jasonrapert                                    ( Follow )   ⌄

Replying to @jasonrapert @GuneevSharma

if you keep lying I might block you too.
You've been on the watch list for blocking of
course. @Arkansas_Watch @mcookAR

12 16 AM - 31 Jan 2017

2 Retweets  1 Like

○ 3    ↑↓ 2    ♡ 1    ✉    ☑

*Fig. 18*

73. The Defendant threatens people with being blocked when they make statements that he claims "spread[] false information":

Hatta in Arkansas @HMHatta · 13 Jan 2017
Remember when #ARLeg Republicans cut funds for public libraries and #ArkDems worked to get it back? I do. @arhousedems

Sen. Jason Rapert @jasonrapert
Very proud of Jamille Rogers' recognition! Congratulations! @ConwaySchools twitter.com/arkansased/sta...

1 5

Sen. Jason Rapert @jasonrapert · 13 Jan 2017
fake news. False narrative. Me and others did not want a cut to libraries. @arhousedems @ConwaySchools

3

Beth Lambert
@BethieLambert
Follow

Replying to @jasonrapert @HMHatta and 2 others

let's hear some facts.prove it.

1:10 AM - 14 Jan 2017

*Fig. 19*

Hatta in Arkansas @HMHatta · 14 Jan 2017
Below is all it took for #ARLeg Sen @jasonrapert to block my friend & art teacher @BethieLambert who teaches many of his constituents.

Beth Lambert @BethieLambert
Replying to @jasonrapert @HMHatta and 2 others
let's hear some facts.prove it.

3 6 2

Sen. Jason Rapert @jasonrapert · 14 Jan 2017
I have civil conversations with people everyday who disagree on issues and seek understanding. #MutualRespect

1 1 1

Sen. Jason Rapert
@jasonrapert
Follow

Replying to @jasonrapert @HMHatta

I actually suppose I should have blocked you for spreading false information in the first place. #arpx @BethieLambert

1:52 PM - 14 Jan 2017

1 Retweet 1 Like

1 1

*Fig. 20*

74.     The Defendant has not banned, or deleted the comments of, users who include

profanity in their comments to his "Sen. Jason Rapert" Facebook page when the commenter

supports the Defendant. The following comment was made by one of Defendant's supporters in

response to a post regarding the destruction of a monument on the grounds of the Arkansas State

Capitol:



*Fig. 21*

75.     The Defendant has not banned, or deleted the comments of, users who disparage

others or accuse others of crimes on his "Sen. Jason Rapert" Facebook page when the commenter

supports the Defendant. The following comments were made by Defendant's supporters in

response to a post regarding Maxine Waters:



*Fig. 22*

*Fig. 23*

*Fig. 24*



Tess Doland Get a life Maxine disrespect the President you are a cow
Like  Reply  5w
↳ 1 Reply

*Fig. 25*

76.     The Defendant has not banned, or deleted the comments of, users who encourage

others to commit criminal acts when the commenter supports the Defendant. The following

comment was made by one of Defendant's supporters in response to a post regarding a

restaurant, the Red Hen, refusing to serve Sarah Huckabee Sanders:



James Bishop SOMEBODY SHOULD BURN IT DOWN,I WOULDN'T BUT SOMEBODY COULD
Like  Reply  8w

*Fig. 26*

77.     The Defendant has not banned, or deleted the comments of, users who disparage

others for their religious views when the commenter supports the Defendant. The following

comment was made by one of Defendant's supporters in response to a post regarding a restaurant

refusing to serve Sarah Huckabee Sanders:



Nick Tschepikow truly ugly human beings  must be atheists
Like  Reply  8w
↳ 1 Reply

*Fig. 27*

78.     At all relevant times, Defendant Rapert has acted with the knowledge that the

First Amendment extends to speech on social media platforms.

79.     At all relevant times, Defendant Rapert has acted with the knowledge that his

"Sen. Jason Rapert" Facebook page and @jasonrapert Twitter account constituted designated

public forums created for the purpose of "communication with constituents and citizens."

80.     At all relevant times, Defendant Rapert has acted with animus and malice when

blocking, banning, deleting the comments of, and otherwise chilling the speech of atheists and

those who support the separation between religion and government, whom he labels "liberal extremists."

81.     At all relevant times, Defendant Rapert has acted with animus and malice when selectively enforcing the facially neutral rules he established for participation, including the prohibition of "bullying, intimidation, personal attacks, . . . profanity[,] or attempts to mislead others with false information."

**Individual Plaintiffs**

82.     The Individual Plaintiffs are Twitter and Facebook users who have been blocked by the Defendant from one or both of his official social media platforms because of their beliefs and the viewpoints they expressed. Defendant's blocking of the Individual Plaintiffs prevents them from commenting on the Defendant's posts and events on his "Sen. Jason Rapert" Facebook page and prevents them from viewing the Defendant's tweets, or replying to these tweets, or using the @jasonrapert timeline to view the comment threads associated with these tweets, as long as the Individual Plaintiffs are logged into their blocked accounts. While alternative means exist to *view* the Defendant's tweets, they cannot reply to @jasonrapert tweets, participate in discussions or comment threads on the "Sen. Jason Rapert" Facebook page, nor can they see the original @jasonrapert tweets themselves when signed in to their blocked Twitter accounts, and in many instances it is difficult to understand the reply tweets without the context of the original @jasonrapert tweets.

Betty Fernau

83.     Plaintiff Betty Jo Fernau ("Betty") is a financial analyst and serves as Treasurer of Arkansans for Equality, a community group advocating that all individuals, regardless of race, religion, sexual orientation, or gender identity should be treated equally under the law. She

operates a Facebook account under the username Bettyf and a Twitter account under the handle @abfernau.

84.     Betty is an atheist who believes that there is insufficient evidence to support claims which assert the existence of any deity. As a result of her belief about that fundamental religious question, she feels a moral imperative to oppose any and all government actions that compel her or other individuals to conform to the religious beliefs of others.

85.     Betty began interacting with the @jasonrapert Twitter account on December 12, 2012, when she criticized the Defendant for a tweet he published praising Andrew Jackson. Then, on April 28, 2013, Betty criticized Defendant Rapert for blocking people who disagree with him and sent him two quotes from Mahatma Gandhi.

86.     Betty became aware of the "Sen. Jason Rapert" Facebook page in approximately May of 2014, when another Facebook user called her attention to one of his posts.

87.     On May 18, 2014, Defendant Rapert posted to his Facebook page to thank a few individuals for their support of his opposition to Pulaski County Circuit Judge Chris Piazza's decision declaring Arkansas's same-sex marriage ban unconstitutional:



*Fig. 28*

88.     In response to Rapert's post, Betty posted a comment containing a lengthy list of conduct that the Bible prohibits but which Rapert and others did not oppose:

**Betty Fernau**
The Bible bans a lot of things. Just ask right-wingers when they use it to defend their incessant attempts to discriminate against the LGBT community. As we all know, putting one's devil stick in another man's hell-hole is forbidden by the Bible–but other stuff is, as well. Like, umm…OK, that's pretty much the extent of right-wingers' understanding of the Bible.

Did you know, though, that there is more to the book than the wildly-misrepresented same-sex boom-boom verses in Leviticus? It's true–we checked! The Bible says "no" to a lot of other things, too. Yes, it's true that Jesus' sacrifice on the cross means that we are no longer under the particular set of laws that covers many of them but the thing about cherry-picking verses from Leviticus and the rest of the Old Testament is that if one irrational, invalid, and downright stupid "law" is valid the rest must be, as well!

Here's a short list of some other things the Bible bans — but Bible-thumpers often do anyway!

14. Cheeseburgers

Leviticus 3:17

It shall be a perpetual statute for your generations throughout all your dwellings, that ye eat neither fat nor blood.

Cheeseburgers are full of fat, which is a no-no according to Leviticus!

13. Bacon

Leviticus 11:7

And the swine, though he divide the hoof, and be clovenfooted, yet he cheweth not the cud; he is unclean to you.

Who doesn't love bacon, right? Well, the Bible doesn't!

12. Blended Fabrics

Leviticus 19:19

Ye shall keep my statutes. Thou shalt not let thy cattle gender with a diverse kind: thou shalt not sow thy field with mingled seed: neither shall a garment mingled of linen and woollen come upon thee.

Like polyester blends? Well, God doesn't. You're going to Hell, sinner!

11. Tearing Your Clothes

Leviticus 10:6

And Moses said unto Aaron, and unto Eleazar and unto Ithamar, his sons, Uncover not your heads, neither rend your clothes; lest ye die, and lest wrath come upon all the people: but let your brethren, the whole house of Israel, bewail the burning which the LORD hath kindled.

*Fig. 29*

Sometimes, you get the urge to pop down to your local tattoo artist and show your love for Jesus by getting his image forever imprinted on your chest. Well, we have some news for you...

6. Mistreating Foreigners

Leviticus 19:33

And if a stranger sojourn with thee in your land, ye shall not vex him.

Boy, if only right-wing Christians actually read their Bibles...

5. Rounded Haircuts

Leviticus 19:27

Ye shall not round the corners of your heads, neither shalt thou mar the corners of thy beard.

Hey Ben Shapiro...you're going to burn for all eternity...for more than just your haircut.

4. Remarrying After a Divorce

 Mark 10:11

And he saith unto them, Whosoever shall put away his wife, and marry another, committeth adultery against her.

Hey Newt...we have some bad news for you....

3. Pulling Out

Genesis 38:9

And Onan knew that the seed should not be his; and it came to pass, when he went in unto his brother's wife, that he spilled it on the ground, lest that he should give seed to his brother.

Genesis 38:10

And the thing which he did displeased the LORD: wherefore he slew him also.

Not everyone wears a condom...but if you choose not to, you'd better be willing to go all the way with it or you're gonna BURRRRNNNN.

2.Wearing Gold

1 Timothy 2:9

"Likewise, I want women to adorn themselves with proper clothing, modestly and discreetly, not with braided hair and gold or pearls or costly garments."

Ladies, pack up your gold and pearls...because Jesus no likie!

1. No Alcohol in Church

*Fig. 30*

Leviticus 10:9

Do not drink wine nor strong drink, thou, nor thy sons with thee, when ye go into the tabernacle of the congregation, lest ye die.

OK, God, you're confusing us now. Is Communion OK, or not?

I don't have "beliefs", I have reason, critical thinking, the scientific method, and so on, none of which require or desire acceptance.

I might be ok with religious freedom if said freedom was ONlY a personally held belief, but when you force indoctrinate children, when you pray instead of doing something, when you scapegoat, when you tell a child they are born with sin, when you tell a child they are going to go to hell and their skin will burn off and they will be tortured forever, when you do faith healing, when you influence public policy and elections, when you fight wars because you disagree with another religion, when you deform and harm your children because of religious traditions like circumcision, when you start enacting holy laws, when you do all of this and so much more, THAT is why this is no longer a love and let live situation and you must stand up against civil rights abuses.

EVERY post about deities are harmful to everyone involved. The bible is pro slavery, pro incest, pro murder, pro rape, pro genocide, pro subjugation of women and children, anti-scientific thought, anti-equality, anti-science, and so on.

That is why I argue against these "opinions". They aren't opinions by the way, they are core held beliefs that change the way people feel, act and treat each other.

It's like WWII Germany, people SHOULD stand up against large groups of people doing horrible things. How many people looked the the other way when nazi's were doing horrible things, changing laws, influencing elections and policy, and so on. "Oh, to each their own, the Jews aren't my concern".

If you don't like the nazi relation, fine, take African Americans, take slavery, take women's rights, take LGBT rights, take sexism, take racism, take homophobia, etc all as examples instead.

I will NEVER accept any civil rights abuses just because they are a "personal belief" when it is anything but.

*Fig. 31*

89.   A few minutes later, she posted an additional comment:



**Betty Fernau**
I would like to point out that in America, there is separation of church and state. Therefore, stating that laws that affect the whole public should be based on one religion in inherently unconstitutional.

*Fig. 32*

90.   Betty's comments in response to posts on the Defendant's Facebook page complied with all neutral rules of conduct imposed by the Defendant.

91.   Within 24 hours of Betty posting these two comments, motivated by Betty's expression of her beliefs regarding Christianity and the separation between religion and government, the Defendant deleted Betty's comments and banned her from the Facebook page.

92.     At the time the Defendant banned Betty from his Facebook page, it was still titled

"Jason Rapert for Arkansas Senate," but the Defendant had been utilizing the page in the course

of performing his duties as a member of the Arkansas State Senate for several years.

93.     Betty remained banned from accessing the page after it was renamed "Sen. Jason

Rapert."

94.     On May 19, 2014, Betty tweeted:

**Betty** @BettyFornai
@jasonrapert BLOCKING me from commenting is NOT how a politician
should act when someone disagrees  Did I call you names or be hateful?
No

*Fig. 33*

95.     To support her claim that she had not been hateful or engaged in name-calling,

Betty then tweeted screenshots of her Facebook comments.

96.     In response to Betty's criticism of Defendant banning her from his "Sen. Jason

Rapert" Facebook page, the Defendant blocked Betty from his @jasonrapert Twitter account on

or around May 20, 2014.

97.     After the Defendant blocked Betty from the @jasonrapert account, the plaintiff

was prevented from viewing the Defendant's tweets, replying to these tweets, or using the

@jasonrapert webpage to view the comment threads associated with these tweets, as long as she

is logged into her blocked accounts.

98.     On October 13, 2016, Betty emailed the Defendant to request that he remove her

from the list of users banned from accessing the "Sen. Jason Rapert" page:

**Betty Fernau**     10/13/16     
To: Jason.Rapert@senat... **Details**

Mr. Rapert,

Since you now have me blocked
on your personal Facebook
profile AND your senator page,
along with Twitter, I suppose I will
have to email you if I need the
help of the senator in MY district.

For the record, I never messaged
you anything irate. I commented
with bible verses on your senator
page years ago. I will include
screenshots below.

For you to block people you are
supposed to represent is
extremely low.

*Fig. 34*

99.     She initially received an automated response:

**Jason Rapert**     10/13/16    JR
To: Betty Fernau     **Details**

What issue can I assist you with?

Sen. Jason Rapert
Arkansas Senate
District 35

P.O. Box 10388
Conway, AR  72034

Office 501-336-0918
senator.jason.rapert@gmail.com

Sent from my iPhone

*Fig. 35*

100.    After receiving the automated response, Betty further clarified her request:



**Betty Fernau**        10/13/16
To: Jason Rapert        Details

**I am requesting that you unblock
me from your Sen Jason Rapert
page so that I may participate in
discussions where my opinion
will be heard.**

**Betty Fernau**

*Fig. 36*

101.    In response to her second message, Defendant claimed that the "Sen. Jason

Rapert" page was a "private platform" and that he was permitted to "delete comments or block

someone who repeatedly violates" the page's standards:



**Jason Rapert**        10/13/16
To: Betty Fernau        Details

**Ms. Fernau,**

**If I can help you with an issue
please contact my office again.**

**My personal social media sites
are private platforms. When
anyone attempts to commandeer
the sites and spread
misinformation, attacks others
with ad hominem attacks or uses
vulgarities, my campaign and site
administrators have permission
to delete comments or block
someone who repeatedly violates
our standards.**

**Thanks for contacting my office.**

*Fig. 37*

102.    On May 16, 2018, Betty sent a letter to the Defendant, pursuant to the Arkansas

Freedom of Information Act (Arkansas FOIA), A.C.A. § 25-19-101, *et seq.*,, requesting that his

office produce:

a.     All policies and procedures currently in effect in his Arkansas Senate office governing the use of social media by the Defendant and members of his staff.

b.     All web pages, profile pages, and other documents identifying his Arkansas Senate office's official social media accounts.

c.     All web pages, profile pages, and other documents identifying officers or employees of his Arkansas Senate office whose official duties include updating, administering, moderating, or otherwise exercising control over his office's official social media accounts.

d.     All web pages, profile pages, and other documents identifying officers or employees of his Arkansas Senate office authorized to access his office's official social media accounts.

e.     All web pages, profile pages, and other documents identifying users that have been blocked or otherwise prevented from interacting with his Arkansas Senate office's social media accounts.

103.     In response to these requests, the Defendant did not state that the accounts in question were private and therefore outside the scope of the Arkansas FOIA.

104.     Instead, Arkansas Senate Chief Counsel Steve Cook, in a letter dated May 30, 2018, merely stated that the Arkansas FOIA does not require government officials to "create new records or formulate information" and that the Defendant did not "have records of the items" Betty requested.

105.     According to the Arkansas FOIA, "public records" includes "computer-based information, or data compilations in any medium required by law to be kept or otherwise kept and that constitute a record of the performance or lack of performance of official functions that are or should be carried out by a public official or employee." A.C.A. § 25-19-103(7)(a).

106.     The Defendant provides his "Sen. Jason Rapert" Facebook account and @jasonrapert Twitter account as a means of communicating with his constituents, an activity that is integral to the performance of his official functions as the state senator for Arkansas' 35th Senate District.

107. The lists of users blocked from interacting with the Defendant's "Sen. Jason Rapert" Facebook page and @jasonrapert Twitter account constitute computer-based information or data compilations that are automatically maintained during the course of the Defendant's performance of his duties as a public official and are within his control.

Cathey Shoshone

108. Plaintiff Catherine Shoshone ("Cathey") is a medical technologist and serves as co-chairperson of Arkansans for Equality, a community group advocating that all individuals, regardless of race, religion, sexual orientation, or gender identity should be treated equally under the law. She operates a Facebook account under the username cathey.noe and two Twitter accounts under the handles @cshoshone and @reeseisqueen.

109. Cathey is an atheist who believes that there is insufficient evidence to support claims which assert the existence of any deity. As a result of her belief about that fundamental religious question, she feels a moral imperative to oppose any and all government actions that compel her or others to conform to the religious beliefs of others.

110. Cathey began visiting the "Sen. Jason Rapert" Facebook page in 2014, when she was serving as co-chair of Arkansans for Equality and was actively involved in that organization's campaign to repeal the state constitution's prohibition of same-sex marriage. She criticized Rapert for his religiously motivated opposition to same-sex marriage.

111. Although her comments in response to posts on the Defendant's Facebook page were highly critical, they complied with all neutral rules of conduct imposed by the Defendant.

112. The Defendant banned Cathey from his Facebook page on May 22, 2014, at approximately 4:00 pm. His decision to ban Cathey from the page and delete her comments was

motivated by her criticism of him, her beliefs regarding Christianity, and her support of the separation between religion and government.

113.    Cathey's comments in response to posts on the Defendant's Facebook page complied with all neutral rules of conduct imposed by the Defendant.

114.    At the time the Defendant banned Cathey from his Facebook page, it was still titled "Jason Rapert for Arkansas Senate," but the Defendant had been utilizing the page in the course of performing his duties as a member of the Arkansas State Senate for several years.

115.    Cathey began viewing the @jasonrapert Twitter account on or around June 25, 2014, while she was serving as co-chair of Arkansans for Equality. She utilized Twitter to ask the Defendant to cite sources for claims he asserted in a speech he delivered opposing same-sex marriage:



*Fig. 38*

116.    In response to his criticism of other members of the Arkansas legislature for accepting money from Planned Parenthood, Cathey pointed out that he accepted donations from

tobacco companies:

**Sen. Jason Rapert** @jasonrapert · 4 Jul 2014

@DavidMeeks verified details-My democrat opponent @jtylerpearson took $1,000 blood money from baby killers-wow #arleg

| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
|---|---|---|---|---|
| 05/14/2014 | Little Rock Family Planning Services<br>4 Office Park Dr<br>Little Rock, AR 72211-[illegible] | N/A | ☑ Primary ☐ Run-Off ☐ General ☐ Debt<br>$1,000.00 | $1,000.00 |
| 05/12/2014 | Travis Love<br>5109 C St<br>Little Rock, AR 72205-3634 | Velp / Director of Gov't Affairs | ☑ Primary ☐ Run-Off ☐ General ☐ Debt<br>$250.00 | $250.00 |
| 05/20/2014 | Julie McDonald<br>144 Elliott Rd<br>Greenbrier, AR 72058-[illegible] | Retired / Retired | ☑ Primary ☐ Run-Off ☐ General ☐ Debt<br>$50.00 | $150.00 |
| 05/19/2014 | Margaret Miller<br>102 E Green Meadows Rd<br>Apt 6<br>Columbia, MO 65203-3626 | Retired / Retired | ☑ Primary ☐ Run-Off ☐ General ☐ Debt<br>$50.00 | $100.00 |
| 05/05/2014 | JoAnne Willis<br>1505 Winslow Dr<br>Little Rock, AR 72207-[illegible] | Self-Employed / AR Hunger Relief Alliance (Contract | ☑ Primary ☐ Run-Off ☐ General ☐ Debt<br>$100.00 | $300.00 |
| 05/06/2014 | Terri Murdock<br>11 Berwyn Dr<br>Little Rock, AR 72227-[illegible] | Self-Employed / Artist | ☑ Primary ☐ Run-Off ☐ General ☐ Debt<br>$100.00 | $100.00 |
| 05/05/2014 | Kerry E. Newbern<br>416 Ridgeway Dr<br>Little Rock, AR 72205-4253 | PLANNED PARENTHOOD HEARTLAND / POLICY ANALYST | ☑ Primary ☐ Run-Off ☐ General ☐ Debt<br>$100.00 | $100.00 |
| 05/05/2014 | Donna Overgaard<br>112 Devon Cv<br>Jacksonville, AR 72076-3463 | Planned Parenthood of the Heartland / Event | ☑ Primary ☐ Run-Off ☐ General ☐ Debt<br>$50.00 | $100.00 |
| | | Subtotal of Contributions This Page | $1,700.00 | |

17 · 1

**Cathey** @cshoshone · Follow

Replying to @jasonrapert

@jasonrapert @RapertSenate @DavidMeeks @jtylerpearson interesting, since you accepted > $3000 from the tobacco industry. Hypocritical?

12:25 PM · 4 Jul 2014

**4** Retweets **3** Likes

1 · 4 · 3

*Fig. 39*

117.   In response to the Defendant tweeting in opposition to a woman's right to choose, Cathey pointed out that birth control prevents abortion:



**Cathey**
@cshoshone

Follow

Replying to @jasonrapert

@jasonrapert @AR_RTL @FCGOP support easy access to bc. That's how you show down abortion. How do you not see that?

12:24 PM   5   2014

*Fig. 40*

118.   In response to a tweet in which Defendant stated he saw examples of "an all out [sic] assault on the Christian faith" "everyday," [sic] she asked him to cite a single example:

**James Robison** @revjamesrobison   2   Aug 2014
There is an all out assault on the Christian faith, biblical absolutes and any mention of God in the public square.

♡ 8   t⏋ 26   ♡ 25

**Sen. Jason Rapert** @jasonrapert · 22 Aug 2014
@revjamesrobison I see it everyday.

♡ 4   t⏋   ♡ 1

**Cathey**
@cshoshone

Follow

Replying to @jasonrapert

@jasonrapert @revjamesrobison One example. Please,  just one.

10:35 PM   22 Aug 2014

*Fig. 41*

119.   In response to Defendant's criticism of President Barack Obama for taking a

"selfie," she responded with a captioned selfie that Rapert took:



*Fig. 42*

120.    In response to Cathey's criticism of him, expression of her views on religion, and opposition to his attempts to impose his religious beliefs on others, the Defendant blocked Cathey from his @jasonrapert account on or around February 26, 2015.

121.    After the Defendant blocked Cathey from the @jasonrapert account, she was rendered unable to view the Defendant's tweets, reply to these tweets, or use the @jasonrapert Twitter page to view the comment threads associated with these tweets, as long as she was logged into her blocked account.

Robert Barringer

122.    Plaintiff Robert Barringer is a driver and retired Army signals intelligence analyst. He operates a Facebook account under the username Bartsutra.

123.    Robert is an atheist who believes that there is insufficient evidence to support claims which assert the existence of any deity. As a result of his belief about that fundamental religious question, he feels a moral imperative to oppose any and all government actions that compel him or other individuals to conform to the religious beliefs of others.

124.    Robert began viewing the "Sen. Jason Rapert" Facebook page in roughly 2015, upon learning that he lived in Defendant's district.

125.    In response to a post from the Defendant opposing a woman's right to choose, Robert replied with a comment pointing out the Bible's "Test for an Unfaithful Wife," Numbers 5:11-29. As its name suggests, this is a biblical passage which provides step-by-step instructions on how to determine whether a wife has been unfaithful to her husband. This is accomplished by administering a concoction purported to induce miscarriages (i.e., abortions) in women who are unfaithful.

126.     In response to Robert's criticism of him, expression of his views on religion, and opposition to his attempts to impose his religious beliefs on others, the Defendant banned Robert from interacting with the "Sen. Jason Rapert" Facebook page.

127.     After the Defendant banned Robert from the "Sen. Jason Rapert" Facebook page, he was rendered unable to interact with the page by commenting on or reacting to posts and events published to the page.

Karen Dempsey

128.     Plaintiff Karen Dempsey is a retiree and former business owner. She serves as Assistant State Director for American Atheists in Arkansas, a volunteer position. She operates a Facebook account under the username karen.dempsey4.

129.     Karen is an atheist who believes that there is insufficient evidence to support claims which assert the existence of any deity. As a result of her belief about that fundamental religious question, she feels a moral imperative to oppose any and all government actions that compel her or other individuals to conform to the religious beliefs of others.

130.     She began visiting the "Sen. Jason Rapert" Facebook page in August of 2018 after American Atheists offered to donate to an Arkansas school district framed posters containing historical information about the national motto.

131.     On August 28, 2018, the Defendant shared on the "Sen. Jason Rapert" Facebook page a post from his personal Facebook account, complaining of having to encounter an attorney

from the ACLU while at the Arkansas capitol building:



**Sen. Jason Rapert** shared a post
28 August at 22 09 ✿                                      •••



**Jason Rapert**
28 August at 22 08

Today at the Arkansas Code Revision Commission meeting, I had to endure an
ACLU Attorney and liberal activist attorney attacking an Arkansas statute passed to
protect and honor Israel. Oh by the way, they are very active DEMOCRATS - don't
vote for Democrats.

 22                                      6 Comments  1 Share

*Fig. 43*

132.    In response, Karen commented that the statute in question violated the First

Amendment:


**Karen Dempsey** You get into office and you work with the party of
your choice. But once in office you should represent ALL the people.
Not just the ones that agree with you.

Like   Reply   18h


**Karen Dempsey** The particular statute you reference removes the
freedom to protest against Israel via boycott. Why does the country
of Israel need a SPECIAL STATUTE to protect it from American
Citizens who want to boycott it? Why is Israel entitled to limit the first
amendment rights of American Citizens. I'm so sorry you had to
endure an ACLU attorney and liberal activist who want to protect the
good citizens of AR from selling their FIRST AMENDMENT RIGHTS
to another country! I don't care if it was a baboon that pointed out
that the statute is WRONG. You should be looking out for US and
not for ISRAEL!

Like   Reply   1m

                                      ☺ 😝

*Fig. 44*

133.    Defendant subsequently deleted Karen's comments.

134.    On August 29, 2018, the Defendant posted a news story about a lawsuit

concerning the use of the national motto on currency:



**Sen. Jason Rapert**
August 29 at 11:53 PM  ⚙

This is a wonderful decision. Atheists lose this battle in their war on the
National Motto. I have been advised my opponent is a public member of the
atheist groups "Conway Freethinkers" and "Arkansas Society of
Freethinkers" - I wonder how she will respond to this decision halting the
atheists' attack on our National Motto?



DAILYWIRE.COM
**'In God We Trust' Motto On Currency Deemed Constitutional
By Court After Atheists Complain**

👍❤️😮 53                                        6 Comments  6 Shares

*Fig. 45*

135.    In response to the post, Karen commented that the motto sent the message that

atheists are second-class citizens:



**Karen Dempsey** As an atheist, please understand, I am not
opposed to people who believe in gods. I understand that their faith
is important to them and I defend their right to practice their religion.
I have issue with people like you denigrating people with a different
philosophy on life. We are not evil. We are moral, ethical citizens of
our country. We don't like being told we are less-than, second class
citizens. The government was set up as secular so that ALL
PEOPLE would be equal. Please don't diminish others in order to
make yourself look good. Every class, race, and belief of people
contains a bad element - such is human nature. Why do you feel the
sy-dillon need to be mean-spirited to others? Why are you so prejudiced?

*Fig. 46*

Page **44** of **57**

136.   Defendant subsequently deleted Karen's comment and banned her from interacting with the "Sen. Jason Rapert" Facebook page.

137.   After the Defendant banned Karen from the "Sen. Jason Rapert" Facebook page, she was rendered unable to interact with the page by commenting on or reacting to posts and events published to the page.

138.   Hereinafter, Betty Fernau, Cathey Shoshone, Robert Barringer, and Karen Dempsey are referred to as the "Individual Plaintiffs."

139.   On July 12, 2018, American Atheists, on behalf of the Individual Plaintiffs, sent a demand letter to the Defendant requesting that the restrictions he had placed on their ability to interact with his official social media accounts be lifted.

140.   The Defendant did not respond to that request and, as of January 2, 2019, the Defendant continues to restrict the Individual Plaintiffs' ability to engage in expressive activity by engaging with his official social media accounts.

American Atheists, Inc.

141.   Plaintiff American Atheists, Inc. ("American Atheists") is a 501(c)(3) civil rights organization that is dedicated to the separation of religion and government and elevating atheists and atheism in our nation's public and political discourse. American Atheists operates a Twitter account under the handle @AmericanAtheist and a Facebook page entitled "American Atheists."

142.   American Atheists' members hold numerous sincerely-held philosophies and worldviews. These guiding principles share the belief that there is insufficient evidence to support claims which assert the existence of any deity.

143.   This shared belief about a fundamental religious question motivates American Atheists' members to speak out against government advancement of religion in general and any

specific religious viewpoint in particular. American Atheists' members believe it is morally imperative that government must treat all individuals equally, without regard to religious viewpoint, and that government action must not be motivated by religious claims.

144.   Although American Atheists is not itself blocked by the Defendant from interacting with his social media accounts, he has blocked members and volunteers of American Atheists who reside in his district and across Arkansas.

145.   Defendant has, on multiple occasions, singled out American Atheists and its members for opprobrium and derision because of their religious viewpoint.

146.   Defendant's derogatory comments toward American Atheists and its members were motivated by the Defendant's animus toward American Atheists and its members because of their religious viewpoint.

147.   The members of American Atheists who have been censored by the Defendant have standing to sue in their own right as a result of the Defendant, acting under color of state law, restricting their ability to engage publicly in expressive speech.

148.   The censorship of atheists for their views on religion and maintaining the separation between religion and government is germane to the organizing purposes of American Atheists.

149.   Neither the claims asserted by American Atheists on behalf of its members, nor the relief requested, requires the participation of individual members in this lawsuit.

**Prior Related Proceeding**

150.   On October 2, 2018, Plaintiffs previously filed a complaint substantially identical to this Complaint, except that this Complaint has added a claim under Art. 2 § 6 of the Arkansas Constitution. *American Atheists, Inc., et al. v. Jason Rapert*, No. 4:18-cv-729-KGB (E.D. Ark.

filed Oct. 2, 2018) (the "Related Complaint"). The prior matter, Case No. 4:18-cv-729-KGB, was assigned to the Honorable Kristine G. Baker.

151.    Due to prior counsel's inaction which was outside the control of the Plaintiffs, Plaintiffs were unable to attempt service of process on the Defendant prior to December 28, 2018.

152.    On December 28, 2018, Plaintiffs attempted to serve the Defendant with process at his home but were unable to do so.

153.    Plaintiffs were unable to serve the Defendant with process prior to the deadline to that passed on December 31, 2018.

154.    Plaintiffs voluntarily withdrew the Related Complaint on January 3, 2019.

## LEGAL CLAIMS

**Claim 1: Violation of the Plaintiffs' Right to Free Speech Pursuant to the First Amendment of the United States Constitution and Article 2 § 6 of the Arkansas Constitution.**

155.    Plaintiffs reassert all previous paragraphs.

156.    The First Amendment to the United States Constitution, as incorporated and made applicable to the states by the Fourteenth Amendment, provides that "Congress shall make no law . . . abridging the freedom of speech. . ."; Article 2 § 6 of the Arkansas Constitution provides that "[t]he free communication of thoughts and opinions is one of the invaluable rights of man; and all persons may freely write and publish their sentiments on all subjects."

157.    This provision severely restricts the government from limiting a person's ability to engage in speech based on the content of that speech. "Viewpoint discrimination is . . . an egregious form of content discrimination. The government must abstain from regulating speech when the . . . opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of the Univ. of VA.*, 515 U.S. 819, 829 (1995). This extends to

speech on social media platforms, which "provide perhaps the most powerful mechanisms available to private citizen to make his or her voice heard." *Packingham v. North Carolina*, ___ U.S. ___, 137 S.Ct. 1730, 1737 (2017). That right is violated when public officials block social media users from engaging in speech on government-maintained social media accounts without justification. *Knight First Amendment Institute at Columbia University v. Trump*, 302 F.Supp.3d 541 (S.D.N.Y. 2018); *Davison v. Loudoun Cty. Bd. of Supervisors*, 267 F.Supp.3d 702 (E.D. Va. 2017).

158.    Defendant Rapert restricted the Individual Plaintiffs' ability to engage in public discussions through his official Facebook page and Twitter account. By doing so, he imposed viewpoint-based restrictions on their participation in two public forums, on their ability to view and comment on official statements the Defendant otherwise makes available to the general public, and on their ability to petition the government for a redress of grievances.

159.    Defendant Rapert chilled the speech of American Atheists' members by singling out atheist Facebook and Twitter users for opprobrium on his "Sen. Jason Rapert" Facebook page and @jasonrapert Twitter account, threatening to block those he labeled "liberal extremists," and stating that he maintains a "watch list for blocking."

160.    Defendant Rapert restricted the ability of American Atheists' members to engage in public discussions through his official Facebook page and/or Twitter account. By doing so, he imposed viewpoint-based restrictions on its participation in two public forums, on its access to official statements the Defendant otherwise makes available to the general public, and on its ability to petition the government to for a redress of grievances.

161.    The actions of Defendant, a public official acting under color of state law and whose actions are attributable to the State, constitute violations of the Individual Plaintiff's and American Atheists' First Amendment right to freedom of speech.

162.    Defendant Rapert knowingly violated the free speech right of the Individual Plaintiffs and American Atheists' members out of animus and with malicious intent.

163.    The Individual Plaintiffs seek declaratory relief stating that the Defendant's conduct violated their right to free speech pursuant to the First Amendment to the United States Constitution and Article 2 § 6 of the Arkansas Constitution.

164.    The Individual Plaintiffs seek an injunction directing the Defendant to lift any and all restrictions imposed by him on their ability to interact with his official social media accounts and therein engage in public speech.

165.    American Atheists seeks declaratory relief stating that the Defendant's conduct violated its members' right to free speech pursuant to the First Amendment to the United States Constitution.

166.    American Atheists seeks an injunction directing the Defendant to lift any and all restrictions imposed by him on the ability of any Facebook or Twitter users to interact with his official social media accounts and therein engage in public speech.

167.    The Individual Plaintiffs and American Atheists also seek an injunction prohibiting the Defendant from engaging in viewpoint discrimination and directing that he, or his office, maintain records documenting the basis for any future decision to restrict a Facebook or Twitter user's ability to interact with his official social media accounts and therein engage in public speech.

**Claim 2: Violation of the Plaintiffs' Right to Petition the Government Pursuant to the First Amendment of the United States Constitution and Remonstrate Pursuant to Art. 2, Sec. 4 of the Constitution of the State of Arkansas.**

168.    Plaintiffs reassert all previous paragraphs.

169.    The First Amendment, as incorporated and made applicable to the states by the Fourteenth Amendment, prohibits the government from abridging "the right of the people...to petition the Government for a redress of grievances."

170.    Article 2, § 4 of the Constitution of the State of Arkansas states, "The right of the people peaceably to assemble, to consult for the common good; and to petition, by address or remonstrance, the government, or any department thereof, shall never be abridged."

171.    Social media platforms "can provide perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard." *Packingham v. North Carolina*, ___ U.S. ___, 137 S.Ct. 1730, 1737 (2017).

172.    American Atheists' members and the Individual Plaintiffs residing in Arkansas Senate District 35 utilize social media to communicate with Defendant Rapert about existing laws and pending legislation which impact their lives, their families, and their businesses.

173.    Defendant Rapert prohibited the Individual Plaintiffs and American Atheists' members from engaging in the form of speech most effective for petitioning him to address their concerns.

174.    Defendant Rapert's actions were not justified by any legitimate, compelling, or overriding government interest.

175.    Defendant Rapert's actions were not narrowly tailored to achieve any legitimate, compelling, or overriding government interest.

176.    The actions of Defendant Rapert, a public official acting under color of state law and whose actions are attributable to the State, constitute violations of the Individual Plaintiffs'

and American Atheists' right to remonstrate and petition the government for a redress of grievances.

177.     Defendant Rapert knowingly violated the right of the Individual Plaintiffs and American Atheists' members, in violation of the First Amendment to the United States Constitution and the Constitution of the State of Arkansas, out of animus and with malicious intent.

**Claim 3: Violation of Plaintiffs' Right to the Free Exercise of Religion Pursuant to the First Amendment of the United States Constitution**

178.     Plaintiffs reassert all previous paragraphs.

179.     The First Amendment to the United States Constitution, as incorporated and made applicable to the states by the Fourteenth Amendment, provides that "Congress shall make no law . . . prohibiting the free exercise [of religion]. . . ."

180.     Government actions which burden an individual's ability to exercise his or her sincerely held religious beliefs violate the Free Exercise Clause unless the government action is facially neutral and of generally applicability. *Employment Div. v. Smith*, 434 U.S. 872, 878-81 (1990); *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 542-43 (1993).

181.     Adverse action by a government official violates the Free Exercise Clause if that action is motivated by religious hostility, even where the action is otherwise facially neutral and of general applicability. *Masterpiece Cakeshop, Ltd. V. Colo. Civil Rights Comm'n*, ___ U.S. ___, 138 S. Ct. 1719, 1732 (2018).

182.     Defendant Rapert's practice of blocking atheists, supporters of the separation between religion and government, and others whom he labeled "liberal extremists" burdened the Plaintiffs' ability to exercise their religious beliefs by speaking out in opposition to policies which impose particular religious beliefs on others.

183.   Defendant imposed restrictions on the Individual Plaintiffs' ability to express their sincerely held beliefs in a public forum by restricting their ability to interact with his official social media accounts and therein engage in public speech, which are otherwise available to the general public.

184.   Defendant imposed restrictions on the ability of American Atheists' members' ability to express their sincerely held beliefs in a public forum by censoring and blocking them from interacting with his Facebook page and/or Twitter account, which are otherwise available to the general public.

185.   Defendant used his official social media accounts to single out atheists for opprobrium and derision.

186.   The actions of Defendant Rapert, a public official acting under color of State law and whose actions are attributable to the State, constitute violations of the Individual Plaintiffs' and American Atheists' First Amendment right to freely exercise their sincerely held beliefs.

187.   Defendant Rapert knowingly violated the free exercise right of the Individual Plaintiffs and American Atheists' members out of animus and with malicious intent.

188.   The Plaintiffs seek declaratory relief stating that the Defendant's conduct and statements on his official social media accounts violated their right to freely exercise their religious views.

189.   The Plaintiffs seek injunctive relief prohibiting the Defendant from using his official social media accounts to disparage any particular beliefs regarding religion, discriminate against users on the basis of their beliefs regarding religion, and single users out for opprobrium and derision on the basis of their beliefs regarding religion.

**Claim 4: Violation of Plaintiffs' Fourteenth Amendment Right to the Equal Protection of the Laws**

190.    Plaintiffs reassert all previous paragraphs.

191.    The Fourteenth Amendment to the United States Constitution provides that "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

192.    With animus and with malicious intent, Defendant Rapert selectively targeted the Individual Plaintiffs based on their atheist beliefs. None of the Individual Plaintiffs engaged in bullying, intimidation, or personal attacks while participating in public forums under the control of the Defendant, nor did they use profanity or attempt to mislead others with false information. There is no justifiable rationale behind Defendant's blocking and censoring the Individual Plaintiffs. The only explanation behind Defendant's actions is discrimination based on religious beliefs and/or expressed viewpoints.

193.    With animus and with malicious intent, Defendant Rapert selectively targeted American Atheists' members based on their atheist beliefs. The Defendant blocked users who did not engage in bullying, intimidation, or personal attacks and who did not use profanity or attempt to mislead others with false information. There is no justifiable rationale behind Defendant's blocking and censoring these members of American Atheists. The only explanation behind Defendant's actions is discrimination based on religious beliefs and/or expressed viewpoints.

194.    The actions of Defendant Rapert, a public official acting under color of state law and whose actions are attributable to the state, constitute violations of Individual Plaintiffs' and American Atheists' members' Fourteenth Amendment right to the equal protection of the laws.

195.    Defendant Rapert knowingly violated the free exercise right of the Individual Plaintiffs and American Atheists' members out of animus and with malicious intent.

196.    The Plaintiffs seek declaratory relief stating that the Defendant's conduct on his official social media accounts violated their right to the equal protection of the laws.

197.    The Plaintiffs seek injunctive relief prohibiting the Defendant from engaging in religious discrimination and directing that he, or his office, maintain records documenting the basis for any future decision to restrict a Facebook or Twitter user's ability to interact with his official social media accounts and therein engage in public speech.

**Claim 5: Violation of the Arkansas Religious Freedom Restoration Act, Ark. Code Ann. § 16-123-404**

198.    Plaintiffs reassert all previous paragraphs.

199.    The Individual Plaintiffs and American Atheists' members exercise their sincerely held beliefs by speaking out against government actions that violate the separation between religion and government.

200.    Defendant Rapert's deleting of comments and blocking or banning of the Individual Plaintiffs and American Atheists' members from his official social media accounts substantially burdened their ability exercise their religious belief by preventing them from advocating against actions taken by him which advance his own unsubstantiated religious views.

201.    Defendant Rapert knowingly substantially burdened the sincerely held beliefs of the Individual Plaintiffs and American Atheists' members out of animus and with malicious intent.

202.    The Individual Plaintiffs seek an injunction directing the Defendant to lift any and all restrictions imposed by him on their ability to interact with his official social media accounts.

203.    American Atheists seeks an injunction directing the Defendant to lift any and all restrictions imposed by him on the ability of any Facebook or Twitter users to interact with his official social media accounts and therein engage in public speech.

204.    The Plaintiffs seek injunctive relief prohibiting Defendant Rapert from using his official social media accounts to disparage any particular beliefs regarding religion, discriminate against users on the basis of their beliefs regarding religion, and single users out for opprobrium and derision on the basis of their beliefs regarding religion and directing that he, or his office, maintain records documenting the basis for any future decision to restrict a Facebook or Twitter user's ability to interact with his official social media accounts and therein engage in public speech.

<u>**REQUEST FOR RELIEF**</u>

WHEREFORE, Plaintiffs request that this Court:

A.    Declare that Defendant Rapert's conduct and statements:

   i.    Constituted viewpoint discrimination in violation of the Individual Plaintiffs' right to free speech pursuant to the First Amendment of the United States Constitution and Article 2 § 6 of the Arkansas Constitution.;

   ii.    Constituted viewpoint discrimination in violation American Atheists' members' right to free speech pursuant to the First Amendment of the United States Constitution;

   iii.    Constituted a violation of the Plaintiffs' right to freely exercise their religious views;

   iv.    Constituted discrimination based on religion in violation of the Equal Protection Clause of the Fourteenth Amendment;

B.    Issue an injunction requiring Defendant to:

   i.    Remove any and all restrictions placed on the Individual Plaintiffs' ability to interact with Defendant's @jasonrapert Twitter account and "Sen. Jason Rapert" Facebook page;

ii.     Remove any and all restrictions placed on users' ability to interact with Defendant's @jasonrapert Twitter account and "Sen. Jason Rapert" Facebook page;

iii.    Refrain from engaging in viewpoint discrimination;

iv.     Maintain records documenting the basis for any future decision to restrict any Facebook or Twitter user's ability to interact with his official social media accounts and therein engage in public speech; and

v.      Refrain from using the @jasonrapert Twitter account and "Sen. Jason Rapert" Facebook page to disparage any particular beliefs about religion, discriminate against users on the basis of their beliefs about religion, and single users out for opprobrium and derision on the basis of their beliefs about religion;

C.      Award Plaintiffs reasonable attorney's fees and costs, pursuant to 42 U.S.C. §1988(b);

D.      Award nominal damages to each Plaintiff;

E.      Award punitive damages in an amount to be determined to the Plaintiffs; and

F.      Grant any additional relief as may be just and proper.

Dated January 8, 2019.

Respectfully submitted,


_____
Philip E. Kaplan (Ark. Bar No. 68026)
Bonnie Johnson (Ark. Bar No. 2005165)
Williams & Anderson PLC
111 Center St., Ste. 2200
Little Rock, AR 72201
P: (501) 372-0800
F: (501) 372-6453
*Counsel for Plaintiffs*

Of Counsel:
Geoffrey T. Blackwell
N.J. Bar No. 120332014
Pa. Bar No. 319778
American Atheists, Inc.
718 7th St. NW
Washington, D.C. 20001