**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**

**AMERICAN ATHEISTS, INC.;**
**BETTY JO FERNAU;**
**CATHERINE SHOSHONE;**
**ROBERT BARRINGER; and**
**KAREN DEMPSEY,** **Plaintiffs,**

**v.** **Case No. 4:19cv17-KGB**

**STANLEY JASON RAPERT,**
***in his individual and official capacity,*** **Defendant.**

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND REQUEST FOR EXPEDITED HEARING**

## I. INTRODUCTION

Defendant Senator Stanley Jason Rapert's social media platforms resemble digital town hall meetings in which the Senator presides, raising topics and commenting on matters related to his official responsibilities and of importance to his constituents and other members of the public. Senator Rapert offers information or opinion. Participants respond to him and to each other, engaging in that very American exercise, public debate. This case arose because Senator Rapert selects certain attendees who disagree with his religious and political viewpoint and has them ejected from the digital town hall. He threatens the remaining attendees with ejection if their comments fail to meet his religious and political

criteria. Clearly, his ejection or blocking of participants he disfavors is viewpoint discrimination impermissible under federal and state law.

Plaintiffs seek immediate injunctive and declaratory relief under 42 U.S.C. §§ 1983 and 1988 and ARK. CODE ANN. § 16-123-105(a) against Senator Rapert for his blocking and banning of users critical of his statements and policy positions from his official Facebook page and Twitter account. This practice constitutes viewpoint discrimination in violation of the United States and Arkansas constitutions and violates other constitutional protections and the Arkansas Religious Freedom Restoration Act. Plaintiffs' need for relief is particularly urgent because, if the Court fails to provide immediate relief, Plaintiffs will suffer irreparable harm compounded by the convening of the 92nd Arkansas General Assembly on January 14, 2019.

All of the relevant factors weigh heavily in favor of granting Plaintiffs' motion. Injunctive relief will not harm Senator Rapert. Plaintiffs are very likely to succeed on the merits of their claims under 42 U.S.C. §§ 1983 and 1988, the Fourteenth Amendment, and ARK. CODE ANN. § 16-123-105(a) for violation of the United States and Arkansas Constitutions and the Arkansas Religious Freedom Restoration Act. It is in the public interest to prevent the violation of Plaintiffs' constitutional and statutory rights.

## II. STATEMENT OF FACTS

Facebook

Facebook is a social media platform with about 200 million users in the United States that allows users to establish personal profiles and post status updates. Facebook also allows elected officials, among others, to establish public profiles called "pages," which can have an unlimited number of "followers." A government official's Facebook page provides a public forum for citizens to instantly receive news that affects them and their community and freely debate issues of public concern. A typical page shows the name of the entity, a page picture and header image, the entity's biographical description, the photos and videos uploaded by the administering users ("administrators"), and all the status updates that the administrators have posted.

An individual "status update" comprises the posted content (i.e., the message, including any embedded photographs, video, or link), the user's name (with a link to the user's Facebook profile or page), the user's profile or page picture, the date and time the status update was generated, and how many times this status updates has been commented on, liked, and shared.

By default, status updates on a "page" are visible to everyone with internet access, including those who are not Facebook users. Although non-users can view users' pages, they cannot interact with users on the Facebook platform. A

Facebook user can comment on other users' status updates. When a user comments on a status update, the comment will appear in a "comment thread" under the status update that prompted the comment. Other users' comments to the same status update will appear in the same comment thread. A Facebook user can also "like" another user's status update by clicking on the thumb icon that appears under the status update. By "liking" a status update, a user may mean to convey approval or to acknowledge having seen the status update. Additionally, a Facebook user can share status updates of other users. When a user shares a status update to his or her page, it is republished on the page's timeline in the same form as it appeared in the original user's timeline, but with a sentence indicating that the status update was shared. Each post displays a tally of "shares" it has garnered. Finally, Facebook users can subscribe to updates from particular pages by "following" those pages. Posts and other updates shared by a page appear in the feeds of users who have chosen to follow it.

A page administrator who wants to prevent a particular user from interacting with the page can do so by "banning" that user. A page administrator who bans a user from the page he or she administers prevents the banned user from using the Facebook platform to like or comment on posts published to the page. A banned user can still view the banning page but is prevented from using the Facebook platform to search for or reply to posts or other updates on the banning page. The

administrator can still see the comments posted by the user prior to being banned, but the administrators can also remove those comments by deleting them.

The "Sen. Jason Rapert" Facebook page

Senator Rapert established the "Sen. Jason Rapert" Facebook page (the "Page") on January 25, 2010, with the name "Jason Rapert for Arkansas Senate." On or around January 10, 2011, when Senator Rapert began his first term as a state senator, he began to use the Page as an instrument of his Arkansas Senate office. On or about July 25, 2015, the name of the Page was changed to "Sen. Jason Rapert."

Senator Rapert presents the Page to the public as one that he operates in his official capacity rather than as a personal account. The Page is accessible to the public at large without regard to political affiliation or any other limiting criteria. The account has approximately 24,000 followers. Users who are banned by Senator Rapert cannot participate in public discourse by responding to Senator Rapert's posts and events on the Page.

The comment threads associated with posts on the Page are important forums for discussion and debate about community events, as well as Senator Rapert's policy positions and official acts. For example, Senator Rapert has used the Page to deliver public safety messages and inform his constituents of government job openings in his district.







Complaint, ¶¶ 35-36. Posts to the Page regularly generate dozens of comments and shares, some of which generate numerous replies in turn. The Page is essentially a

digital town hall where individual users receive information about Arkansas government and exchange their views on matters of public concern.

Twitter

Twitter is a social media platform with some 70 million users in the United States. The platform allows users to publish short messages, to republish or respond to others' messages, and to interact with other Twitter users in relation to those messages. A significant amount of speech posted on Twitter is speech by, to, or about the government.

A Twitter "user" is an individual or entity that has created an account on the platform. A user can post "tweets," up to 280 characters in length, to a webpage on Twitter that is attached to the user's account. Tweets can include photographs, videos, and links. A Twitter user's webpage displays all tweets generated by the user, with the most recent tweets appearing at the top of the page. This display is known as a user's "timeline." When a user generates a tweet, the timeline updates immediately to include that tweet. Anyone who can view a user's public Twitter webpage can see the user's timeline.

An individual "tweet" comprises the tweeted content (i.e., the message, including any embedded photograph, video, or link), the user's account name (with a link to the user's Twitter webpage), the user's profile picture, the date and time

the tweet was generated, and the number of times the tweet has been replied to ( ), retweeted by ( ), or liked by ( ) other users.

Twitter users can subscribe to other users' messages by "following" those users' accounts. Users see all tweets posted or retweeted by accounts they have followed. This display is often referred to as a user's "feed." Although tweets are public by default, a user can choose to "protect" his or her tweets, allowing only select users to view them. A person who wishes to view the protected tweets of the user must request to follow the user. The user may approve or deny the person's request. Beyond publishing tweets to their followers, Twitter users can engage with one another in a variety of ways. For example, they can "retweet" (republish) the tweets of other users, either by publishing them directly to their own followers or by "quoting" them in their own tweets. When a user retweets a tweet, it appears on the user's timeline in the same form as it did on the original user's timeline, but with a notation indicating that the post was retweeted.

A Twitter user can also reply to other users' tweets. Like any other tweet, a reply can be up to 280 characters in length and can include photographs, videos, and links. When a user replies to a tweet, the reply appears on the user's timeline under a tab labeled "Tweets & replies." The reply will also appear on the original user's feed in a "comment thread" under the tweet that prompted the reply. Other users' replies to the same tweet will appear in the same comment thread. Reply

tweets by verified users, reply tweets by users with a large number of followers, and tweets that are "favorited" and retweeted by large numbers of users generally appear higher in the comment threads.

A Twitter user can also reply to other replies. A user whose tweet generates replies will see the replies below his or her original tweet, with any replies-to-replies nested below the replies to which they respond. The collection of replies and replies-to-replies is sometimes referred to as a "comment thread." Twitter is called a "social" media platform in large part because of comment threads, which reflect multiple overlapping conversations among and across groups of users.

A Twitter user can also "favorite" or "like" another user's tweet by clicking on the heart icon that appears under the tweet. By "favoriting" a tweet, a user may mean to convey approval or to acknowledge having seen the tweet. A Twitter user can also "mention" another user by including the other user's Twitter handle in a tweet. A Twitter user mentioned by another user will receive a "notification" that he or she has been mentioned in another user's tweet.

Tweets, retweets, replies, likes, and mentions are controlled by the user who generates them. No other Twitter user can alter the content of any retweet or reply, either before or after it is posted. Twitter users cannot prescreen tweets, replies, likes, or mentions that reference their tweets or accounts.

Because all Twitter webpages are by default visible to all Twitter users and to anyone with access to the internet, users who wish to limit who can see and interact with their tweets must affirmatively “protect” their tweets. Other users who wish to view “protected” tweets must request access from the user who has protected her tweets. “Protected” tweets do not appear in third-party search engines, and they are searchable only on Twitter, and only by the user and her approved followers.

A user whose account is public (i.e. not protected) but who wants to make his or her tweets invisible to another user can do so by “blocking” that user. (Twitter provides users with the capability to block other users, but, importantly, it is the users themselves who decide whether to make use of this capability.) A user who blocks another user prevents the blocked user from interacting with the first user’s account on the Twitter platform. A blocked user cannot see or reply to the blocking user’s tweets, view the blocking user’s list of followers or followed accounts, or use the Twitter platform to search for the blocking user’s tweets. The blocking user will not be notified if the blocked user mentions her; nor will the blocking user see any tweets posted by the blocked user.

If the blocked user attempts to follow the blocking user, or to access the Twitter webpage from which the user is blocked, the user will see a message

indicating that the other user has blocked him or her from following the account and viewing the tweets associated with the account.




Complaint, ¶ 56. At any time, a Twitter user can access the list of other users that he or she has chosen to block by accessing the "Settings and privacy" page associated with his or her account and selecting "Blocked accounts."

A Twitter user can mute another user's account, removing the muted user's tweets from the muting user's timeline without unfollowing or blocking the muted user. Muted users will not know that they have been muted and can still view and interact with the muting user's tweets.

A Twitter user can "delete" their own tweet or retweet, removing it from the user's feed. However, a user cannot delete another user's tweet, even if the offending tweet was directed to their handle.

<u>The @jasonrapert Twitter account</u>

On or about January 10, 2011, when he began his first term in the Arkansas Senate, Senator Rapert began to use the @jasonrapert Twitter account as an instrument of his office. Because of the way he uses the account, his tweets have become an important source of news and information for his constituents about Arkansas state government and the comment threads associated with the tweets have become important forums for speech by his constituents. Senator Rapert presents the account to the public as one that he operates in his official capacity rather than his personal one, using it as a channel for communicating with his constituents about his activities in the legislature, promoting local businesses, and honoring the accomplishments of constituents. The Twitter page associated with the account is registered to "Sen. Jason Rapert." In the space provided for the user to link to their website, the @jasonrapert account links to Senator Rapert's official profile on the Arkansas State Senate's website: www.arkleg.state.ar.us/assembly/2017/2017R/Pages/MemberProfile.aspx?member=Rapert . On August 8, 2018, the header displayed a picture of Defendant at a volunteer event with constituents from Conway, Arkansas. Senator Rapert's staff assists him in maintaining the @jasonrapert account.

The @jasonrapert account is accessible to the public at large without regard to political affiliation or any other limiting criteria. Senator Rapert has not "protected" his tweets and anyone who wants to follow the account can do so. The

account has approximately 8,875 followers. The only users who cannot follow @jasonrapert are those whom Senator Rapert has blocked.

Senator Rapert's discriminatory censorship of social media users

The "Sen. Jason Rapert" Facebook page and @jasonrapert Twitter account constitute Senator Rapert's official social media accounts. In response to a May 16, 2018, letter, pursuant to the Arkansas Freedom of Information Act (Arkansas FOIA), A.C.A. § 25-19-101, et seq., requesting that his office produce, among other things, lists of users banned or blocked from his official social media accounts, Senator Rapert did not claim that the accounts in question were non-governmental and therefore not within the scope of the statute. Instead, he stated through Arkansas Senate Chief Counsel Steve Cook that his Senate office had no such records and that the Arkansas FOIA does not require government officials to "create new records or formulate information."

Senator Rapert provides facially neutral rules for participating in discussion on the Page, stating that any user who engages in "bullying, intimidation, personal attacks, uses profanity or attempts to mislead others with false information" will be blocked. Despite stating that neutral rules are applied to his social media accounts, Senator Rapert regularly blocks or bans users who have not violated these rules. In fact, he has stated that he blocks people whom he considers "liberal extremists" and people who make what he considers to be "ad hominem attacks."




Complaint, ¶¶ 70-71. Senator Rapert has stated that he maintains a "watch list for blocking" and threatens people with being blocked when they make statements that he claims "spread[] false information."






*Id*. at ¶¶ 72-73.

Senator Rapert has not banned, or deleted the comments of, users who disparage others, accuse others of crimes, and/or include profanity in their comments to the Page when the commenter supports Senator Rapert and his views. For example, the following comment was made by one of Senator Rapert's supporters in response to a post regarding the destruction of a monument on the grounds of the Arkansas State Capitol: "Bonnie Carpenter: the dumb shit destroyed property and the only reason poor him isn't in jail is because his pathetic lawyers Told him to scream he's nuts is because it's the only way they could keep his sorry ASS out Of jail What matters is he'll get in there be a model nut job and he'll be out my guess is in 30 days . . . ."




Complaint, ¶ 74. The following comments were made by Senator Rapert's supporters in response to a post regarding Maxine Waters: "Arrest this traitor!" "she is stupid"




"She is a domestic terrorist!" "Terrorism at its worst what is wrong with these people?"




*Id.* at ¶75. Senator Rapert has not banned, or deleted the comments of, users who encourage others to commit criminal acts or disparage the religious views of others when the commenter supports Senator Rapert and his views. The following comments were made by one of Senator Rapert's supporters in response to a post regarding a restaurant refusing to serve Sarah Huckabee Sanders: "SOMEBODY SHOULD BURN IT DOWN"




"truly ugly human beings must be atheists."




*Id*. at ¶¶76-77.

Individual Plaintiffs

The Individual Plaintiffs are Twitter and Facebook users who have been blocked by Senator Rapert from one or both of his official social media platforms because of their beliefs and the viewpoints they expressed. Senator Rapert's blocking of the Individual Plaintiffs prevents them from commenting on the posts and events on the Page and prevents them from viewing Senator Rapert's tweets, or replying to these tweets, or using the @jasonrapert timeline to view the comment threads associated with these tweets, as long as the Individual Plaintiffs are logged into their blocked accounts. While alternative means exist to *view* Senator Rapert's tweets, they cannot reply to @jasonrapert tweets, participate in discussions or comment threads on the Page, nor can they see the original @jasonrapert tweets themselves when signed in to their blocked Twitter accounts, and in many instances it is difficult to understand the reply tweets without the context of the original @jasonrapert tweets.

*Betty Fernau*

Plaintiff Betty Jo Fernau is a financial analyst and serves as Treasurer of Arkansans for Equality, a community group advocating that all individuals, regardless of race, religion, sexual orientation, or gender identity should be treated equally under the law. She operates a Facebook account under the username Bettyf and a Twitter account under the handle @abfernau. Fernau is an atheist who believes that there is insufficient evidence to support claims which assert the existence of any deity. As a result of her belief about that fundamental religious question, she feels a moral imperative to oppose any and all government actions that compel her or other individuals to conform to the religious beliefs of others.

Fernau began interacting with the @jasonrapert Twitter account on December 12, 2012, when she criticized Senator Rapert for a tweet he published praising Andrew Jackson. Then, on April 28, 2013, Fernau criticized Senator Rapert for blocking people who disagree with him and sent him two quotes from Mahatma Gandhi.

Fernau became aware of the Page in approximately May of 2014, when another Facebook user called her attention to one of his posts. On May 18, 2014, Senator Rapert posted to the Page to thank individuals for their support of his opposition to Pulaski County Circuit Judge Chris Piazza's decision declaring Arkansas's same-sex marriage ban unconstitutional.




*See* Complaint, ¶ 87. In response to Senator Rapert's post, Fernau posted a comment containing a lengthy list of conduct that the Bible prohibits but which Senator Rapert and others did not oppose.

[continued next page]

**Betty Fernau**
The Bible bans a lot of things. Just ask right-wingers when they use it to defend their incessant attempts to discriminate against the LGBT community. As we all know, putting one's devil stick in another man's hell-hole is forbidden by the Bible–but other stuff is, as well. Like, umm…OK, that's pretty much the extent of right-wingers' understanding of the Bible.

Did you know, though, that there is more to the book than the wildly-misrepresented same-sex boom-boom verses in Leviticus? It's true–we checked! The Bible says "no" to a lot of other things, too. Yes, it's true that Jesus' sacrifice on the cross means that we are no longer under the particular set of laws that covers many of them but the thing about cherry-picking verses from Leviticus and the rest of the Old Testament is that if one irrational, invalid, and downright stupid "law" is valid the rest must be, as well!

Here's a short list of some other things the Bible bans — but Bible-thumpers often do anyway!

14. Cheeseburgers

Leviticus 3:17

It shall be a perpetual statute for your generations throughout all your dwellings, that ye eat neither fat nor blood.

Cheeseburgers are full of fat, which is a no-no according to Leviticus!

13. Bacon

Leviticus 11:7

And the swine, though he divide the hoof, and be clovenfooted, yet he cheweth not the cud; he is unclean to you.

Who doesn't love bacon, right? Well, the Bible doesn't!

12. Blended Fabrics

Leviticus 19:19

Ye shall keep my statutes. Thou shalt not let thy cattle gender with a diverse kind: thou shalt not sow thy field with mingled seed: neither shall a garment mingled of linen and woollen come upon thee.

Like polyester blends? Well, God doesn't. You're going to Hell, sinner!

11. Tearing Your Clothes

Leviticus 10:6

And Moses said unto Aaron, and unto Eleazar and unto Ithamar, his sons, Uncover not your heads, neither rend your clothes; lest ye die, and lest wrath come upon all the people: but let your brethren, the whole house of Israel, bewail the burning which the LORD hath kindled.

Sometimes, you get the urge to pop down to your local tattoo artist and show your love for Jesus by getting his image forever imprinted on your chest. Well, we have some news for you…

6. Mistreating Foreigners

Leviticus 19:33

And if a stranger sojourn with thee in your land, ye shall not vex him.

Boy, if only right-wing Christians actually read their Bibles…

5. Rounded Haircuts

Leviticus 19:27

Ye shall not round the corners of your heads, neither shalt thou mar the corners of thy beard.

Hey Ben Shapiro…you're going to burn for all eternity…for more than just your haircut.

4. Remarrying After a Divorce

Mark 10:11

And he saith unto them, Whosoever shall put away his wife, and marry another, committeth adultery against her.

Hey Newt…we have some bad news for you….

3. Pulling Out

Genesis 38:9

And Onan knew that the seed should not be his; and it came to pass, when he went in unto his brother's wife, that he spilled it on the ground, lest that he should give seed to his brother.

Genesis 38:10

And the thing which he did displeased the LORD: wherefore he slew him also.

Not everyone wears a condom…but if you choose not to, you'd better be willing to go all the way with it or you're gonna BURRRRNNNN.

2.Wearing Gold

1 Timothy 2:9

"Likewise, I want women to adorn themselves with proper clothing, modestly and discreetly, not with braided hair and gold or pearls or costly garments."

Ladies, pack up your gold and pearls…because Jesus no likie!

1. No Alcohol in Church

[continued next page]


Leviticus 10:9

Do not drink wine nor strong drink, thou, nor thy sons with thee, when ye go into the tabernacle of the congregation, lest ye die.

OK, God, you're confusing us now. Is Communion OK, or not?

I don't have "beliefs", I have reason, critical thinking, the scientific method, and so on, none of which require or desire acceptance.

I might be ok with religious freedom if said freedom was ONlY a personally held belief, but when you force indoctrinate children, when you pray instead of doing something, when you scapegoat, when you tell a child they are born with sin, when you tell a child they are going to go to hell and their skin will burn off and they will be tortured forever, when you do faith healing, when you influence public policy and elections, when you fight wars because you disagree with another religion, when you deform and harm your children because of religious traditions like circumcision, when you start enacting holy laws, when you do all of this and so much more, THAT is why this is no longer a love and let live situation and you must stand up against civil rights abuses.

EVERY post about deities are harmful to everyone involved. The bible is pro slavery, pro incest, pro murder, pro rape, pro genocide, pro subjugation of women and children, anti-scientific thought, anti-equality, anti-science, and so on.

That is why I argue against these "opinions". They aren't opinions by the way, they are core held beliefs that change the way people feel, act and treat each other.

It's like WWII Germany, people SHOULD stand up against large groups of people doing horrible things. How many people looked the the other way when nazi's were doing horrible things, changing laws, influencing elections and policy, and so on. "Oh, to each their own, the Jews aren't my concern".

If you don't like the nazi relation, fine, take African Americans, take slavery, take women's rights, take LGBT rights, take sexism, take racism, take homophobia, etc all as examples instead.

I will NEVER accept any civil rights abuses just because they are a "personal belief" when it is anything but.
29 minutes ago · Like · 4

*Id.* at ¶88. A few minutes later, she posted an additional comment that reflected on the separation of church and state.


Betty Fernau
I would like to point out that in America, there is separation of church and state. Therefore, stating that laws that affect the whole public should be based on one religion in inherently unconstitutional.
3 minutes ago · Like

*Id.* at ¶89. Fernau's comments in response to posts on Senator Rapert's Facebook page complied with all neutral rules of conduct imposed by Senator Rapert.

Within 24 hours of Fernau posting these two comments, motivated by Fernau's expression of her beliefs regarding Christianity and the separation between religion and government, Senator Rapert deleted Fernau's comments and banned her from the Page. At the time Senator Rapert banned Fernau from the Page, Senator Rapert had been utilizing the page in the course of performing his duties as a member of the Arkansas State Senate for several years.

On May 19, 2014, Fernau tweeted: "BLOCKING me from commenting is NOT how a politician should act when someone disagrees. Did I call you names or be hateful? No."




*Id.* at ¶94. To support her claim that she had not been hateful or engaged in name-calling, Fernau then tweeted screenshots of her Facebook comments. In response to Fernau's criticism of Senator Rapert banning her from the Page, Senator Rapert blocked Fernau from his @jasonrapert Twitter account on or around May 20, 2014. After Senator Rapert blocked Fernau from the @jasonrapert account, she was prevented from viewing Senator Rapert's tweets, replying to these tweets, or using the @jasonrapert webpage to view the comment threads associated with these tweets, as long as she is logged into her blocked accounts.

On October 13, 2016, Fernau emailed Senator Rapert to request that he remove her from the list of users banned from accessing the "Sen. Jason Rapert" page.



Betty Fernau 10/13/16
To: Jason.Rapert@senat... Details

Mr. Rapert,

Since you now have me blocked on your personal Facebook profile AND your senator page, along with Twitter, I suppose I will have to email you if I need the help of the senator in MY district.

For the record, I never messaged you anything irate. I commented with bible verses on your senator page years ago. I will include screenshots below.

For you to block people you are supposed to represent is extremely low.

*Id.* at ¶98. Initially, she received an automated response.


Jason Rapert 10/13/16
To: Betty Fernau Details

What issue can I assist you with?

Sen. Jason Rapert
Arkansas Senate
District 35

P.O. Box 10388
Conway, AR 72034

Office 501-336-0918
senator.jason.rapert@gmail.com

Sent from my iPhone

*Id.* at ¶99. After receiving the automated response, Fernau further clarified her request.


Betty Fernau 10/13/16
To: Jason Rapert Details

I am requesting that you unblock me from your Sen Jason Rapert page so that I may participate in discussions where my opinion will be heard.

Betty Fernau

*Id.* at ¶100. In response to her second message, Senator Rapert claimed that the "Sen. Jason Rapert" page was a "private platform" and that he was permitted to "delete comments or block someone who repeatedly violates" the Page's standards.


Jason Rapert 10/13/16
To: Betty Fernau Details

Ms. Fernau,

If I can help you with an issue please contact my office again.

My personal social media sites are private platforms. When anyone attempts to commandeer the sites and spread misinformation, attacks others with ad hominem attacks or uses vulgarities, my campaign and site administrators have permission to delete comments or block someone who repeatedly violates our standards.

Thanks for contacting my office.

*Id.* at ¶101.

*Cathey Shoshone*

Plaintiff Catherine Shoshone is a medical technologist and serves as co-chairperson of Arkansans for Equality, a community group advocating that all individuals, regardless of race, religion, sexual orientation, or gender identity should be treated equally under the law. She operates a Facebook account under the username cathey.noe and two Twitter accounts under the handles @cshoshone and @reeseisqueen. Shoshone is an atheist who believes that there is insufficient evidence to support claims which assert the existence of any deity. As a result of her belief about that fundamental religious question, she feels a moral imperative to oppose any and all government actions that compel her or others to conform to the religious beliefs of others.

Shoshone began visiting the Page in 2014, when she was serving as co-chair of Arkansans for Equality and was actively involved in that organization's campaign to repeal the state constitution's prohibition of same-sex marriage. She criticized Senator Rapert for his religiously motivated opposition to same-sex marriage. Although her comments in response to posts on Senator Rapert's Facebook page were highly critical, they complied with all neutral rules of conduct imposed by Senator Rapert. Senator Rapert banned Shoshone from the Page on May 22, 2014, at approximately 4:00 pm. His decision to ban Shoshone from the page and delete her comments was motivated by her criticism of him, her beliefs

regarding Christianity, and her support of the separation between religion and government. At the time Senator Rapert banned Shoshone from the Page, Senator Rapert had been utilizing the page in the course of performing his duties as a member of the Arkansas State Senate for several years.

Shoshone began viewing the @jasonrapert Twitter account on or around June 25, 2014, while she was serving as co-chair of Arkansans for Equality. She utilized Twitter to ask Senator Rapert to cite sources for claims he asserted in a speech he delivered opposing same-sex marriage.




Complaint, ¶115. In response to his criticism of other members of the Arkansas legislature for accepting money from Planned Parenthood, Shoshone pointed out that he accepted donations from tobacco companies.



Sen. Jason Rapert @jasonrapert · 4 Jul 2014

@DavidMeeks verified details-My democrat opponent @jtylerpearson took $1,000 blood money from baby killers-wow #arleg

(Use Additional Copies Of This Page If Necessary)

| Date | Full Name And Mailing Address Of Contributor | Place Of Business/Employer/ Occupation | Amount of Contribution | Cumulative Total From This Contributor |
|---|---|---|---|---|
| 05/14/2014 | Little Rock Family Planning Services 4 Office Park Dr Little Rock, AR 72211-3896 | N/A | ☑Primary ☐Run-Off ☐General ☐Debt $1,000.00 | $1,000.00 |
| 05/12/2014 | Travis Lowe 5109 C St Little Rock, AR 72205-3634 | Yelp / Director of Gov't Affairs | ☑Primary ☐Run-Off ☐General ☐Debt $250.00 | $250.00 |
| 05/20/2014 | Julie McDonald 144 Elliott Rd Greenbrier, AR 72058-9213 | Retired / Retired | ☑Primary ☐Run-Off ☐General ☐Debt $50.00 | $150.00 |
| 05/19/2014 | Margaret Miller 102 E Green Meadows Rd Apt 6 Columbia, MO 65203-3626 | Retired / Retired | ☑Primary ☐Run-Off ☐General ☐Debt $50.00 | $100.00 |
| 05/05/2014 | JoAnne Mills 1505 Winslow Dr Little Rock, AR 72207-6119 | Self-Employed / AR Hunger Relief Alliance (Contract | ☑Primary ☐Run-Off ☐General ☐Debt $100.00 | $300.00 |
| 05/06/2014 | Terri Murdoch 11 Berwyn Dr Little Rock, AR 72227-2201 | Self-Employed / Artist | ☑Primary ☐Run-Off ☐General ☐Debt $100.00 | $100.00 |
| 05/05/2014 | Murry E. Newbern 478 Ridgeway Dr Little Rock, AR 72205-4253 | PLANNED PARENTHOOD HEARTLAND / POLICY ANALYST | ☑Primary ☐Run-Off ☐General ☐Debt $100.00 | $100.00 |
| 05/05/2014 | Donna Overgaard 112 Devon Cv Jacksonville, AR 72076-3443 | Planned Parenthood of the Heartland / Event | ☑Primary ☐Run-Off ☐General ☐Debt $50.00 | $100.00 |
| | | Subtotal of Contributions This Page | $1,700.00 | |

The law provides for a maximum penalty of $2,000 per violation and/or imprisonment for not more than one year for any person who knowingly or willfully fails to comply with the provisions of A.C.A § 7-6-201 through §7-6-227. This report constitutes a public record.

17 1

Cathey
@cshoshone
Follow

Replying to @jasonrapert

@jasonrapert @RapertSenate @DavidMeeks @jtylerpearson interesting, since you accepted > $3000 from the tobacco industry. Hypocritical?

12:25 PM - 4 Jul 2014

4 Retweets 3 Likes

1 4 3

*Id.* at ¶116.

In response to Senator Rapert tweeting in opposition to a woman's right to choose, Shoshone pointed out that birth control prevents abortion.



Cathey
@cshoshone
Follow

Replying to @jasonrapert

@jasonrapert @AR_RTL @FCGOP support easy access to bc. That's how you show down abortion. How do you not see that?

12:24 PM - 5 Jul 2014

*Id.* at ¶117. In response to a tweet in which Senator Rapert stated he saw examples of "an all out assault on the Christian faith" "everyday," she asked him to cite a single example.




*Id.* at ¶118. In response to Defendant's criticism of President Barack Obama for taking a "selfie," she responded with a captioned selfie that Senator Rapert took.




*Id.* at ¶119.

In response to Shoshone's criticism of him, expression of her views on religion, and opposition to his attempts to impose his religious beliefs on others, Senator Rapert blocked Shoshone from his @jasonrapert account on or around February 26, 2015. After Senator Rapert blocked Shoshone from the @jasonrapert account, she was rendered unable to view Senator Rapert's tweets, reply to these tweets, or use the @jasonrapert Twitter page to view the comment threads associated with these tweets, as long as she was logged into her blocked account.

*Robert Barringer*

Plaintiff Robert Barringer is a driver and retired Army signals intelligence analyst. He operates a Facebook account under the username Bartsutra. Barringer is an atheist who believes that there is insufficient evidence to support claims which assert the existence of any deity. As a result of his belief about that fundamental religious question, he feels a moral imperative to oppose any and all government actions that compel him or other individuals to conform to the religious beliefs of others. Barringer began viewing the Page in roughly 2015, upon learning that he lived in Senator Rapert's district.

In response to a post from Senator Rapert opposing a woman's right to choose, Barringer replied with a comment pointing out the Bible's "Test for an Unfaithful Wife," Numbers 5:11-29. As its name suggests, this is a biblical passage which provides step-by-step instructions on how to determine whether a wife has

been unfaithful to her husband. This is accomplished by administering a concoction purported to induce miscarriages (i.e., abortions) in women who are unfaithful.

In response to Barringer's criticism of him, expression of his views on religion, and opposition to his attempts to impose his religious beliefs on others, Senator Rapert banned Barringer from interacting with the Page. After Senator Rapert banned Barringer from the Page, he was rendered unable to interact with the page by commenting on or reacting to posts and events published to the Page.

*Karen Dempsey*

Plaintiff Karen Dempsey is a retiree and former business owner. She serves as Assistant State Director for American Atheists in Arkansas, a volunteer position. She operates a Facebook account under the username karen.dempsey4. Dempsey is an atheist who believes that there is insufficient evidence to support claims which assert the existence of any deity. As a result of her belief about that fundamental religious question, she feels a moral imperative to oppose any and all government actions that compel her or other individuals to conform to the religious beliefs of others. She began visiting the Page in August of 2018 after American Atheists offered to donate to an Arkansas school district framed posters containing historical information about the national motto. On August 28, 2018, Senator Rapert shared on the Page a post from his personal Facebook account, complaining

of having to "endure an ACLU Attorney and liberal activist attorney attacking an Arkansas Statute" in a meeting of the Arkansas Code Revision Commission.




*Id.* at ¶131. In response, Dempsey commented that the statute in question violated the First Amendment.




*Id.* at ¶132. Senator Rapert subsequently deleted Dempsey's comments. On August 29, 2018, Senator Rapert posted a news story about a lawsuit concerning the use of the national motto on currency.




*Id.* at ¶134. In response to the post, Dempsey commented that the motto sent the message that atheists are second-class citizens.




*Id.* at ¶135. Senator Rapert subsequently deleted Dempsey's comment and banned her from interacting with the Page. After Senator Rapert banned Dempsey from the Page, she was rendered unable to interact with the page by commenting on or reacting to posts and events published to the page.

On July 12, 2018, American Atheists, on behalf of the Individual Plaintiffs Furneau, Shoshone, Barringer, and Dempsey, sent a demand letter to Senator Rapert requesting that the restrictions he had placed on their ability to interact with

his official social media accounts be lifted. Senator Rapert did not respond to that request and, as of January 8, 2019, continues to restrict the Individual Plaintiffs' ability to engage in expressive activity by engaging with his official social media accounts.

## III. PRELIMINARY INJUNCTION STANDARD

In deciding whether to grant a motion for preliminary injunction, a district court considers: (1) the threat of irreparable harm to the movant; (2) the probability that the movant will succeed on the merits; (3) the balance of harm to the movant compared to the injury an injunction would cause other interested parties; and (4) the public interest. *Heartland Acad. Cmty. Church v. Waddle*, 335 F.3d 684, 690 (8th Cir. 2003); *Dataphase Sys. Inc. v. CL Sys.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc); *Olin Water Services. v. Midland Research Laboratories, Inc.*, 596 F.Supp. 412, 413 (E.D. Ark. 1984). No single factor is determinative. *Dataphase,* 640 F.2d at 113. The focus is on "whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Id.* "[W]here the movant has raised a substantial question and the equities are otherwise strongly in his favor, the showing of success on the merits can be less." *Id.* "[A] preliminary injunction may issue if movant has raised questions so serious and difficult as to call for more deliberate investigation." *Id.*

## IV. LAW AND ARGUMENT

### A. Plaintiffs will suffer irreparable harm if the injunction is not granted.

Irreparable harm occurs "when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Rogers Group, Inc. v. City of Fayetteville*, 629 F.3d 784, 789 (8th Cir. 2010) (quoting *GMC v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009)). The moving party must show "the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *GMC*, 563 F.3d at 319.

It is well settled that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Lowry v. Watson Chapel Sch. Dist.*, 540 F.3d 752, 763 (8th Cir. 2008) (citing *Elrod v. Burns* regarding irreparable injury caused by loss of First Amendment freedoms), *Phelps-Roper v. Nixon*, 509 F.3d 480, 484-485 (8th Cir. 2007) (reversing denial of preliminary injunction against statute prohibiting picketing in front or about funeral location or procession), *Marcus v. Iowa Public Television*, 97 F.3d 1137, 1140-1141 (8th Cir. 1996) (violation of First Amendment rights constitutes an irreparable harm); *Bronx Household of Faith v. Bd. of Educ. of City of N.Y.*, 331 F.3d 342, 349 (2d Cir. 2003) ("irreparable harm may be presumed" where plaintiffs challenge government limitations on speech).

Unless enjoined immediately, Senator Rapert will continue to impede the Individual Plaintiffs from viewing his statements on Facebook and Twitter, from responding to them, and from discussing and debating them with other subscribers. Plaintiffs' injuries will be compounded with the convening of the General Assembly on January 14, 2019. The months during and immediately preceding the General Assembly are rife with political discourse. Without preliminary relief, Plaintiffs will continue to suffer irreparable injury to their constitutional and statutory rights during the pendency of this litigation.

**B. Plaintiffs are very likely to succeed on the merits of their claims.**

The likelihood of a plaintiff's success on the merits is the most significant factor of the *Dataphase* test. *Laclede Gas Co. v. St. Charles County*, 713 F.3d 413, 2013 U.S. App. LEXIS 8378, *16 (8th Cir. 2013). Here, there is a substantial likelihood that Plaintiffs will prevail on their claim that Senator Rapert has imposed an impermissible burden on their participation in two public forums, the @jasonrapert Twitter account and the "Sen. Jason Rapert" Facebook page. These venues are public forums under the First Amendment because they are "channel[s] of communication" designated by the government "for use by the public at large for . . . speech." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 802 (1985). While public officials' use of Facebook and Twitter to engage with constituents is a relatively new phenomenon, it is well-settled that a public forum

may consist of a metaphysical space rather than a physical one. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 830 (1995). The Supreme Court recently observed that social media platforms like Facebook and Twitter offer "perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard" by permitting citizens to "engage with [their elected representatives] in a direct manner." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017). Because Senator Rapert's Facebook and Twitter accounts are public forums, the Senator's exclusion of Plaintiffs from that forum based on their viewpoints violates the First Amendment.

Plaintiffs are also substantially likely to prevail on their claim that Senator Rapert's blocking of them from his social media accounts imposes an unconstitutional burden on their access to official statements that he otherwise makes available to the public at large. *See Matal v. Tam*, 137 S. Ct. 1744, 1760–61 (2017) ("[T]he Government may not deny a benefit to a person on a basis that infringes [the First Amendment] even if he has no entitlement to that benefit." (internal quotation marks omitted)). Even if Senator Rapert's Facebook and Twitter accounts did not constitute public forums, Senator Rapert would be violating the First Amendment by denying Plaintiffs access to this official communications channel based on their viewpoints.

Plaintiff American Atheists, Inc. has not been blocked from Senator Rapert's accounts. However, it asserts its claim on behalf of its membership whose right to hear Senator Rapert's speech have been blocked because of their viewpoints. Its membership will suffer irreparable harm if the Court fails to grant an injunction.

**1. Senator Rapert is acting under color of law.**

In order to maintain their claim under 42 U.S.C. §1983 and Arkansas Code Annotated §16-123-105, Plaintiffs must show that the challenged actions were taken under color of law and deprived them of a right secured by the Fourteenth Amendment and the Arkansas Constitution. 42 U.S.C. §1983; Ark. Code Ann. §16-123-105(a). A defendant has acted under color of law when s/he has "exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *West v. Atkins*, 487 U.S. 42, 49 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)). "[W]e "insist [ ]" as a prerequisite to liability "that the conduct allegedly causing the deprivation of a federal right be fairly attributable to the State." *Holly v. Scott*, 434 F.3d 287, 292 (4th Cir. 2006) (quoting *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 937 (1982)). The inquiry "is a matter of normative judgment, and the criteria lack rigid simplicity." *Id.* (internal quotation marks omitted).

The Fourth Circuit, in a case decided **yesterday**, January 7, 2019, found that the chair of a County Board of Supervisors acted under color of law in

circumstances very similar to those before the Court in this case when she blocked one of her constituents from her Facebook page. *Davison v. Randall*, ___F.3d ____, Case No. 17-2002, 2003 (4th Cir. 2019). Affirming the lower court, the Fourth Circuit held that the defendant acted under color of law when she used her Facebook account as a "tool of governance" by providing information about her official activities and soliciting input from the public on policy issues. *Id*. at pp. 19-20.

In *Knight First Amend. Inst. at Columbia Univ. v. Trump*, 302 F.Supp.3d 541 (S.D.N.Y. 2018), the Court held that President Trump violated the speech rights of Twitter users that he blocked from his account. The defendants argued that the President's Twitter account was private and that blocking is "a functionality made available to every Twitter user and is therefore not a power possessed by virtue of state law." *Id.* at 568. The Court disagreed, holding that because the President uses his Twitter account for governmental functions, the control he exercises over it is governmental in nature. *Id*. at 569; *see also, Leuthy v. LePage*, No. 17-cv-296 (D. Me. Aug. 29, 2018) (denying motion to dismiss claim over blocking on Maine Gov. LePage's Facebook page based on allegation that page was official rather than personal in nature).

There is no question that Senator Rapert acted under color of law when he blocked the Individual Plaintiffs from participating in the Facebook and Twitter

accounts he uses for governmental functions and therefore may be held liable under 42 U.S.C. §1983 and Arkansas Code Annotated §16-123-105. Nor can it be challenged that Senator Rapert adopted a practice that resulted in the deprivation of Plaintiffs' rights under the U.S. Constitution, the Arkansas Constitution, and the Arkansas Religious Freedom Restoration Act. This establishes the statutory requirement of acting "under color of law" for 42 U.S.C. §1983 and ARK. CODE ANN. §16-123-105(a).

**2. Senator Rapert is violating the Plaintiffs' right to free speech pursuant to the First Amendment of the United States Constitution and Article 2 Section 6 of the Arkansas Constitution.**

The First Amendment to the United States Constitution, as incorporated and made applicable to the states by the Fourteenth Amendment, provides that "Congress shall make no law . . . abridging the freedom of speech. . . ." U.S. Const. amend. I. This provision severely restricts the government from limiting a person's ability to engage in speech based on the content of that speech. "Viewpoint discrimination is . . . an egregious form of content discrimination. The government must abstain from regulating speech when the . . . opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of the Univ. of VA.*, 515 U.S. 819, 829 (1995). This extends to speech on social media platforms, which "provide perhaps the most powerful mechanisms available to private citizen to make his or her voice heard."

*Packingham v. North Carolina*, ___ U.S. ___, 137 S.Ct. 1730, 1737 (2017). That right is violated when public officials block social media users from engaging in speech on government-maintained social media accounts without justification. *Knight First Amendment Institute at Columbia University v. Trump*, 302 F.Supp.3d 541 (S.D.N.Y. 2018); *Davison v. Randall,* ___F.3d ____, Case No. 17-2002, 2003 (4th Cir. 2019).[1]

The *Knight* Court discussed this point at length, concluding that the President's use of his Twitter account and its function as an "'interactive space' where Twitter users may directly engage with the content of the President's tweets" warranted treating certain aspects of the account as a "designated public forum" for the purposes of a First Amendment claim against the President. *Knight*, 302 F.Supp.3d at 549. The court determined that Trump blocked users based on the critical viewpoints they expressed. *Id.* It further held that because a block not only prevents Trump from seeing a user's tweets but also actively prevents a user from seeing or responding to Trump's tweets, it exceeded whatever discretion Trump might possess to ignore particular speakers. *Id*. Accordingly, the court granted a declaratory judgment that Trump's practice of blocking users for the viewpoints they expressed violates the First Amendment.

[1] Note that the Arkansas Supreme Court looks to interpretations of the U.S. Constitution when interpreting similar provisions of the Arkansas Constitution. *See, e.g*. *Stout v. State*, 320 Ark. 552, 898 S.W.2d 457 (1995); *Mullinax v. State*, 327 Ark. 41, 47, 938 S.W.2d 801, 804–05 (1997).

Several other recent cases have challenged the blocking of users on social media forums. *See, e.g. Dingwell v. Cossette*, No. 17-cv-1531 (D. Conn. June 7, 2018), slip op. at 8-11 (plaintiff stated claim for violation of First Amendment rights by police department which blocked him from posting on its Facebook page); *Haw. Def. Found. v. City & County of Honolulu*, 2014 U.S. Dist. LEXIS 83871 (D. Haw. June 19, 2014) (awarding attorneys' fees to plaintiff on claim that Honolulu Police Department violated plaintiffs' First Amendment rights by deleting posts from department's Facebook page); Notice of Dismissal, *Morgaine v. Gosar*, No. 18-cv-8080 (D. Ariz. Aug. 3, 2018), following agreement by Rep. Paul Gosar (R-AZ) to administer his Facebook page consistently with First Amendment standards (*see* Howard Fischer, *ACLU drops lawsuit after Gosar implements new social media policy*, CAPITOL MEDIA SERVICES, Aug. 4, 2018, available at https://azcapitoltimes.com/news/2018/08/04/aclu-drops-lawsuit-after-gosar-implements-new-social-media-policy/); *Leuthy v. LePage*, No. 17-cv-296 (D. Me. Aug. 29, 2018) (denying motion to dismiss claim over blocking on Maine Gov. LePage's Facebook page based on allegation that page was official rather than personal in nature); *Rummel v. Pan*, No. 18-cv-2067 (E.D. Cal. July 27, 2018) (suit against state senator for Twitter blocking); *Garnier v. Poway Unified School District*, No. 17-cv-2215 (S.D. Cal. May 24, 2018) (denying motion to dismiss claim against school district over blocking of critics on Facebook and Twitter);

*One Wisconsin Now v. Kremer*, No. 17-cv-820 (W.D. Wis. Oct. 31, 2017) (suit against three state representatives for Twitter blocking).

Senator Rapert chilled the speech of American Atheists' members by singling out atheist Facebook and Twitter users for opprobrium on his Facebook and Twitter accounts, threatening to block those he labeled "liberal extremists," and stating that he maintains a "watch list for blocking." He restricted the ability of the Individual Plaintiffs, American Atheists' members, to engage in public discussions through his official Facebook page and/or Twitter account. In doing so, he imposed viewpoint-based restrictions on their participation in two public forums, on their ability to view and comment on official statements that Senator Rapert otherwise makes available to the general public, and on their ability to petition the government for a redress of grievances.

**3. Senator Rapert is violating the Plaintiffs' right to petition the government pursuant to the First Amendment of the United States Constitution and to remonstrate pursuant to Art. 2, Sec. 4 of the Constitution of the State of Arkansas.**

The First Amendment, as incorporated and made applicable to the states by the Fourteenth Amendment, prohibits the government from abridging "the right of the people...to petition the Government for a redress of grievances." U.S. Const. amend. I. Article 2, § 4 of the Constitution of the State of Arkansas states, "The right of the people peaceably to assemble, to consult for the common good; and to

petition, by address or remonstrance, the government, or any department thereof, shall never be abridged."

American Atheists' members and the Individual Plaintiffs residing in Arkansas Senate District 35 utilize social media to communicate with Senator Rapert about existing laws and pending legislation which impact their lives, their families, and their businesses. Senator Rapert prohibited the Individual Plaintiffs and American Atheists' members from engaging in the form of speech most effective for petitioning him to address their concerns. His actions were not justified by any legitimate, compelling, or overriding government interest and were not narrowly tailored to achieve any legitimate, compelling, or overriding government interest. The actions of Senator Rapert, a public official acting under color of state law and whose actions are attributable to the State, constitute violations of the Individual Plaintiffs' and American Atheists' right to remonstrate and petition the government for a redress of grievances.

**4. Senator Rapert is violating Plaintiffs' right to the free exercise of religion pursuant to the First Amendment of the United States Constitution and the Arkansas Religious Freedom Restoration Act, Ark. Code Ann. § 16-123-404.**

The First Amendment to the United States Constitution, as incorporated and made applicable to the states by the Fourteenth Amendment, provides that "Congress shall make no law . . . prohibiting the free exercise [of religion]. . . ."

U.S. Const. amend. I. Government actions which burden an individual's ability to exercise his or her sincerely held religious beliefs violate the Free Exercise Clause unless the government action is facially neutral and of generally applicability. *Employment Div. v. Smith*, 434 U.S. 872, 878-81 (1990); *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 542-43 (1993). Adverse action by a government official violates the Free Exercise Clause if that action is motivated by religious hostility, even where the action is otherwise facially neutral and of general applicability. *Masterpiece Cakeshop, Ltd. V. Colo. Civil Rights Comm'n*, ___ U.S. ___, 138 S. Ct. 1719, 1732 (2018).

The Arkansas Religious Freedom Restoration Act provides: "A government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless that burden is "[i]n furtherance of a compelling governmental interest" and is "[t]he least restrictive means of furthering that compelling governmental interest." Ark. Code Ann. § 16-123-404.

Senator Rapert's practice of banning and blocking atheists, supporters of the separation between religion and government, and others whom he labeled "liberal extremists" burdened the Plaintiffs' ability to exercise their religious beliefs by speaking out in opposition to policies which impose particular religious beliefs on others. He imposed restrictions on the Individual Plaintiffs' and American Atheists' members' ability to express their sincerely held beliefs in a public forum,

benefits otherwise available to the general public, by restricting their ability to interact with his official social media accounts and therein engage in public speech, which are otherwise available to the general public.

Senator Rapert used his official social media accounts to single out atheists for opprobrium and derision. The actions of Senator Rapert, a public official acting under color of State law and whose actions are attributable to the State, constitute violations of the Individual Plaintiffs' and American Atheists' First Amendment right to freely exercise their sincerely held beliefs. His actions also violate the Arkansas Religious Freedom Restoration Act.

**5. Senator Rapert is violating Plaintiffs' Fourteenth Amendment Right to the Equal Protection of the Laws**.

In *Sunday Lake Iron Co. v. Wakefield*, the United States Supreme Court stated that "[t]he purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the state's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Sunday Lake Iron Co*, 247 U.S. 350, 352-53 (1918); *see also Willowbrook v. Olech,* 528 U.S.562, 564 (2000) (successful equal protection claims may be brought by a "class of one" where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and there is no rational basis for the difference in treatment).

Senator Rapert selectively targeted the Individual Plaintiffs, American Athiests' members, based on their atheist beliefs. None of the Individual Plaintiffs engaged in bullying, intimidation, or personal attacks while participating in public forums under the control of the Senator Rapert, nor did they use profanity or attempt to mislead others with false information. There is no justifiable rationale behind Senator Rapert's blocking and censoring the Individual Plaintiffs. The only explanation behind his actions is discrimination based on religious beliefs and/or expressed viewpoints. The actions of Senator Rapert, a public official acting under color of state law and whose actions are attributable to the state, constitute violations of Individual Plaintiffs' and American Atheists' members' Fourteenth Amendment right to the equal protection of the laws.

### C. The balance of equities weighs strongly in favor of granting the plaintiffs' motion for a preliminary injunction.

The balance of equities "requires a district court to consider the balance between the harm to the movant and the injury that granting the injunction will inflict on other interested parties." *Sanborn Mfg. Co. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 489 (8th Cir. 1993). Here, the balance of equities weighs strongly in favor of granting Plaintiff's Motion. Senator Rapert's ongoing exclusion of the Individual Plaintiffs from his Facebook and Twitter accounts imposes a continuing burden on Plaintiffs' constitutional rights. Plaintiffs need immediate relief in order to participate fully in the imminent General Assembly

session. Based on the facts and the law, they are likely to succeed on the merits of their claims. If the Court fails to enjoin Senator Rapert, the harm to Plaintiffs and other Facebook and Twitter users who have been and may be blocked from constitutionally protected public forums will far outweigh any potential harm to Senator Rapert that could result from granting an injunction. Senator Rapert has no legitimate interest in protecting himself from criticism. *See, e.g., N.Y. Times Co. v Sullivan*, 376 U.S. 254, 269 (1967) (emphasizing First Amendment's protection of "vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials"). Moreover, the entry of preliminary relief would not affect Senator Rapert's ability to block Plaintiffs from his social media accounts at the conclusion of this litigation, should he prevail.

**D. The public interest is served by granting Plaintiffs' motion for preliminary injunction.**

The Eighth Circuit has held that "it is always in the public interest to protect constitutional rights." *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008). The State of Arkansas recognizes that the right to a free speech and free exercise of religion are constitutionally protected fundamental rights of its citizens. *See* Ark. Const. Article 2, Section 6; Ark. Code Ann. § 16-123-404.

It is against the public interest and the policies of the State of Arkansas to allow a government official to silence the voices of those whose religious and/or political viewpoints differ from his own. Conversely, it is in the public interest to

uphold our constitutional rights to free speech, freedom of religion, and our right to petition our government for redress of grievances.

Senator Rapert is violating plaintiffs' constitutional and statutory rights by excluding Plaintiffs from participation in his Facebook page and Twitter account. These claims are likely to be successful and warrant the entry of a TRO and a preliminary injunction.

## V. CONCLUSION

All of the relevant factors favor the granting of a TRO and an injunction in this case. This Court immediately should enjoin Senator Rapert from restricting Plaintiffs' and other users' ability to interact with his @jasonrapert Twitter account and "Sen. Jason Rapert" Facebook page based on their political and/or religious viewpoints; enjoin Senator Rapert from using the @jasonrapert Twitter account and "Sen. Jason Rapert" Facebook page to disparage any particular beliefs about religion, discriminate against users on the basis of their beliefs about religion, and/or single users out for opprobrium and derision on the basis of their beliefs about religion; require Senator Rapert to maintain records documenting the basis for any future decision to restrict a Facebook or Twitter user's ability to interact with his official social media accounts and therein engage in public speech; and establish an expedited briefing period and hearing on this matter; and

Respectfully submitted,

Philip E. Kaplan
Ark. Bar No. 68026
*pkaplan@williamsanderson.com*
Bonnie Johnson
Ark. Bar No. 2005165
*bjohnson@williamsanderson.com*
Williams & Anderson, PLC
111 Center St.
Little Rock, AR 72201
P: (501) 859-0575
F: (501) 372-6453

*Counsel for Plaintiffs*

Of Counsel:
Geoffrey T. Blackwell
N.J. Bar No. 120332014
Pa. Bar No. 319778
American Atheists, Inc.
718 7th St. NW
Washington, D.C. 20001

## CERTIFICATE OF SERVICE

I hereby certify that on January 9, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system and have served the Defendant in his official and individual capacities through counsel via electronic mail:

Dylan L. Jacobs
Assistant Solicitor General
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, Arkansas 72201
dylan.jacobs@arkansasag.gov

Paul Byrd
Paul Byrd Law Firm, PLLC
415 N. McKinley St. Ste. 210
Little Rock, AR 72205
paul@paulbyrdlawfirm.com

Philip E. Kaplan (AR68026)
Attorney for Plaintiffs
Williams & Anderson PLC
111 Center Street, Ste. 2200
Little Rock, AR 72201
501-372-0800
pkaplan@williamsanderson.com