```
 1                    IN THE UNITED STATES DISTRICT COURT
                         EASTERN DISTRICT OF ARKANSAS
 2                            WESTERN DIVISION

 3

     AMERICAN ATHEISTS, INC.;
 4   BETTY JO FERNAU; CATHERINE          No. 4:19CV00017 KGB
     SHOSHONE; ROBERT BARRINGER
 5   and KAREN DEMPSEY,

 6                         Plaintiffs,
                                         Tuesday, January 15, 2019
 7   v.                                  Little Rock, Arkansas
                                         9:00 a.m.
 8   STANLEY JASON RAPERT, in his
     individual and official
 9   capacity,
                         Defendant.
10
        TRANSCRIPT OF HEARING ON MOTION FOR TEMPORARY RESTRAINING
11                  ORDER/PRELIMINARY INJUNCTION
            BEFORE THE HONORABLE KRISTINE G. BAKER,
12                UNITED STATES DISTRICT JUDGE

13

14   APPEARANCES:

15   On Behalf of the Plaintiffs:

16       MR. GEOFFREY T. BLACKWELL, Attorney at Law
            American Atheists, Inc.
17          718 7th Street NW
            Washington  DC 20001
18

19       MR. PHILIP E. KAPLAN, Attorney at Law
         MS. BONNIE JOAN JOHNSON, Attorney at Law
20          Williams & Anderson
            111 Center Street, Suite 2200
21          Little Rock, Arkansas  72201-2413

22

23

24

25   APPEARANCES CONTINUED ON NEXT PAGE
```

```
1    APPEARANCES CONTINUED:

2

3    On Behalf of the Defendant:

4         MR. DYLAN L. JACOBS, Assistant Attorney General
          MR. NICHOLAS JACOB BRONNI, Assistant Attorney General
5         MR. WILLIAM C. BIRD III, Assistant Attorney General
            Arkansas Attorney General's Office
6           323 Center Street, Suite 200
            Little Rock, Arkansas  72201-2610
7

8         MR. JOHN PAUL BYRD, Attorney at Law
            Paul Byrd Law Firm
9           415 North McKinley Street, Suite 210
            Little Rock, Arkansas  72205
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

          Proceedings reported by machine stenography; transcript
25   prepared utilizing computer-aided transcription.
```

1

**I N D E X**

2

Opening Statement
3     By Mr. Kaplan........................................6
      By Mr. Jacobs.......................................8
4     By Mr. Byrd........................................10

5

**PLAINTIFFS' WITNESSES:**    **Direct**    **Cross**    **Redirect**

6

Karen Dempsey                11        26
7   Catherine Shoshone           31        38           42
    Robert Barringer             44        48

8

9   **EXHIBITS RECEIVED:**

10  Plaintiffs' 1.........................................15
    Plaintiffs' 2.........................................16
11  Plaintiffs' 3.........................................18
    Plaintiffs' 5.........................................20
12  Plaintiffs' 6.........................................21
    Plaintiffs' 7.........................................23
13  Plaintiffs' 8.........................................24
    Plaintiffs' 9.........................................25
14  Plaintiffs' 10........................................26
    Plaintiffs' 11........................................34
15  Plaintiffs' 12........................................34
    Plaintiffs' 13........................................35
16  Plaintiffs' 14........................................36
    Plaintiffs' 15........................................38
17  Plaintiffs' 16........................................54
    Plaintiffs' 17........................................55
18
    Defendant's 1.........................................56
19  Defendant's 2, 3 and 4................................59
    Defendant's 5.........................................61
20

21

22

23

24

25

1    P R O C E E D I N G S

2         THE COURT:  Good morning.  We are here this morning in

3    Case No. 4:19CV17, American Atheists, Inc.; Betty Jo Fernau;

4    Catherine Shoshone; Robert Barringer and Karen Dempsey versus

5    Stanley Jason Rapert in his individual and official capacity.

6         Counsel for plaintiffs, if you would, please introduce

7    yourselves, Mr. Kaplan, and the folks that you have with you at

8    the table.

9         MR. KAPLAN:  Yes.  Your Honor, Philip Kaplan, Williams

10   & Anderson, and Bonnie Johnson for plaintiffs.  I have with me

11   Geoffrey Blackwell, who is counsel at American Atheists.  He

12   will shortly be filing a pro hac vice motion.  But I did want to

13   introduce him to the Court.  And I have Allison Gladden, who is

14   also with me.  She is a lawyer with Williams & Anderson and

15   helping with some technical problems.

16        THE COURT:  All right.  Thank you, Mr. Kaplan.

17        Mr. Bronni and Mr. Jacobs, good morning.  If you all would,

18   please introduce yourselves and the folks that you have with

19   you.

20        MR. JACOBS:  Thank you, Your Honor.  Dylan Jacobs with

21   the Attorney General's Office.  With me is Billy Bird and

22   Nicholas Bronni.  We represent Senator Rapert in his official

23   capacity.

24        THE COURT:  Thank you.

25        MR. BYRD:  Thank you.  Your Honor, this is Paul Byrd.

1   And I represent Jason Rapert in his individual capacity.

2            THE COURT:  Good morning.  Thank you.

3       All right.  We're here today.  I appreciate everyone being

4   here today.  I know we had back-and-forth email exchanges in an

5   effort to try to set this on a convenient date for everyone,

6   which is hard to do, especially when we have this many folks

7   involved.  So I appreciate everyone being here today for the

8   hearing.

9       We are going to take up the motion for temporary

10  restraining order and preliminary injunction and the request for

11  an expedited hearing.  It's Docket No. 5 in the case.  I will

12  note for the record that a motion to dismiss was filed yesterday

13  on behalf of Senator Rapert in his individual capacity.  That

14  motion is not ripe yet.  It is Docket No. 11, but I did want to

15  make everybody aware of that filing yesterday.  I believe it was

16  yesterday.  Is that right?

17      All right.  Mr. Kaplan, are you ready to proceed?

18           MR. KAPLAN:  I am, Your Honor.

19           THE COURT:  And I'm happy if folks want to make

20  argument or if you want to launch into evidence.  I will let you

21  set the pace.  And you let me know how you wish to proceed.

22           MR. KAPLAN:  I think I would make a brief statement,

23  Your Honor.

24           THE COURT:  All right.  You are welcome to do so

25  either from the table or from the podium.  I'm happy either way.

1          MR. KAPLAN:  Your Honor, we appreciate the Court's

2     making this early date available to us.  And we recognize that,

3     obviously, the issues have not been joined yet.  But we have

4     been -- we have supplied the Attorney General's Office with the

5     names of our witnesses.  We have supplied the Attorney General's

6     Office with a number of documents, including a list of URLs that

7     support -- and we'll introduce that exhibit shortly -- URLs

8     which support the allegations in the complaint with regard to

9     the functionality of both Facebook and Twitter.  So for a large

10    portion of the complaint, we don't think that there is any

11    dispute, because it proceeds directly from those functionality

12    features online for both Facebook and Twitter.

13         We recognize that we have to show standing.  We have to

14    show that the damage is actual and imminent, that it's traceable

15    to the defendant's action and that it's likely to be redressed

16    by a favorable decision.  The Court, based on what we have

17    alleged in the complaint and cases that we have cited in the

18    complaint, the law has become clear now, it seems to me, that

19    Facebook pages and Twitter accounts now have been determined by

20    the courts to be part of the public fora and that actions taken

21    to impede contact with and comments upon either Facebook or

22    Twitter are in violation of the Constitution's right to freedom

23    of speech and access to political individuals.

24         Senator Rapert's accounts make it clear that these are

25    official positions of his in which he solicits comments from the

1    public.  We have three witnesses who have been blocked.  We saw

2    an affidavit from him this morning, only this morning, in which

3    he says that he has not blocked anybody.  But the three

4    witnesses who will testify shortly will testify that they have

5    been blocked from access either to Twitter or to Facebook.  And

6    this morning only one of them has a phone available.  And I will

7    just note that the only reason she has her phone here is that

8    they are part of her hearing aid devices.  So she was able to go

9    online this morning, and she is still blocked.

10        And we believe that even the affidavit which they seek to

11   introduce this morning substantiates virtually all of our claims

12   that he presents, both his Facebook and his Twitter accounts,

13   that they are under the color of state law, and they are clothed

14   with the authority of state law, and he has taken them in his

15   official status.  He has private Twitter accounts, five private

16   Facebook accounts.  But these are public.  These are pages.

17   These are not the kind of Facebook accounts that many people

18   have, not me, but that many people have in which they are purely

19   private, and you have to be a friend to access those accounts

20   and what appears on those accounts.  But these are clearly

21   Senator Jason Rapert accounts.

22        A little later, when we close, I will note that the issue

23   with regard to the motion to dismiss is addressed in every

24   particular in a portion of the Fourth Circuit case that we

25   brought to the Court's attention.  It deals exactly with the

1   same issue, where the defendant in that case asserted that,

2   well, this is just my individual private account, and therefore

3   I should be dismissed in my individual capacity, seeking to

4   overturn the trial court.  And the Court of Appeals for the

5   Fourth Circuit addressed that issue and sustained the trial

6   court with regard to the finding that that -- that the motion or

7   at least the request to reverse the trial court was not an

8   appropriate item.

9        At any rate, this is a public fora, it seems, also is

10  beyond dispute.  President Trump tried to make that assertion in

11  the *Knight v. Trump* case.  And although that case is on appeal,

12  there are many cases which make it clear that items or functions

13  such as Facebook and Twitter are in the public forum now beyond

14  dispute.  This is, obviously, something with so many millions,

15  hundreds of millions of people, who use Twitter and Facebook.

16  It's the new way for or at least a major new way for people to

17  address issues of public concern.

18       At any rate, we wish that he would have been here so that

19  the Court could have heard about what both his Facebook page and

20  his Twitter accounts are all about.  But we are ready to proceed

21  with three witnesses who themselves have been blocked.

22            THE COURT:  All right.  Counsel for Senator Rapert.

23            MR. JACOBS:  Thank you, Your Honor.  As my friend on

24  the other side mentioned, we think this case on the merits comes

25  down to the easy assertion that this is Jason Rapert's private

1    social media accounts that he operates in his capacity as a

2    private citizen.  We think the plaintiffs cannot marshal any

3    sort of evidence today that's going to bring them anywhere near

4    the evidentiary record that was before the courts in the couple

5    of other cases that they cited.  I think we'll have more to say

6    on that after we hear what the evidence is, of course.

7         As far as the factors for preliminary injunction, upfront I

8    would like to mention, as the Court is aware, this case was

9    originally filed back in October, a similar version of this

10   case.  Plaintiffs had 90 days to serve their complaint on the

11   defendant.  They didn't do that.  The defendant filed a motion

12   to dismiss for failure to serve.  And in response, plaintiffs

13   voluntarily nonsuited their case.  And then they refiled, this

14   time asking for extraordinary relief that, one, they didn't ask

15   for the first time around or alleging irreparable harm that, as

16   we think the evidence will show today, if the harm occurred,

17   it's occurred a long time in the past.

18        I think in the complaint many of the plaintiffs allege that

19   they were blocked from Senator Rapert's social media profiles

20   years ago and have only elected to bring suit recently and have

21   only elected to ask for injunctive relief as late as last week.

22   So we think that belies any notion that they have suffered

23   irreparable harm and that the balance of equities in this case

24   weighs strongly in favor -- weighs strongly against granting any

25   injunctive relief on that basis alone.  The Eighth Circuit has

1   made this clear at least as recently in the *McGehee* case, where

2   delay in asking for injunctive relief is enough in itself to

3   deny that injunctive relief.  We think that rings true today.

4        Unless the Court has any questions on the merits, we'll

5   save our argument for after the evidence.

6        THE COURT:  All right.  Thank you, Mr. Jacobs.

7        Mr. Byrd.

8        MR. BYRD:  Thank you, Your Honor.  My position is

9   pretty simple, and it's kind of laid out in my brief.  I'm here

10  in his individual capacity.  I certainly believe if he is

11  supposed to be here individually, then it's his individual page.

12  It can't be -- both arguments can't be true.

13       I think the Fourth Circuit case, you are going to over time

14  see that there are some distinctions, very important factual

15  distinctions.  We laid it out in Mr. Rapert's affidavit, some of

16  the differences.  As I understand it, the person in the Fourth

17  Circuit case used staff people to work the page and what have

18  you, and that's not the case here.  It's totally his own page.

19       I think it's kind of interesting that some of the TRO asks

20  for some very dramatic things about curtailing Mr. Rapert's

21  speech.  I think our Honorable Wendell Griffen has shown us that

22  even judges have a right to freedom of speech.  So some of it is

23  overreaching for sure.  But I basically am here to stand on my

24  motion.  Thank you.

25       THE COURT:  All right.  Thank you, Mr. Byrd.

1    Mr. Kaplan, are we ready to proceed with the evidence?

2          MR. KAPLAN:  Yes.  I'm sorry, Your Honor.

3          THE COURT:  That's all right.

4          MR. KAPLAN:  Karen Dempsey.

5          THE COURT:  Ms. Dempsey, the witness stand is here

6    next to me.

7          **KAREN DEMPSEY, PLAINTIFFS' WITNESS, DULY SWORN**

8                     DIRECT EXAMINATION

9    BY MR. KAPLAN:

10   Q.   Tell me your name and your address, please.

11   A.   Karen Dempsey, 1306 North Flamingo Road, Rogers, Arkansas,

12   72756.

13   Q.   You are not a constituent of Jason Rapert.  Is that

14   correct?

15   A.   I am not in his constituency.

16   Q.   You live in northwest Arkansas?

17   A.   Yes, I do.

18   Q.   How long have you lived in Arkansas?

19   A.   Over four years.

20   Q.   Okay.  And have you followed Mr. Rapert or Senator Rapert

21   in the past on his Facebook page?

22   A.   Yes, I have.

23   Q.   Tell me a bit about your education, please.

24   A.   I graduated from high school.  I went to college several

25   times, but I didn't complete it.  That's it.

1   Q.   And your employment, are you employed now?

2   A.   I retired last year.

3   Q.   And what did you retire from?

4   A.   I owned my own company in New Jersey for 21 years called

5   Precision Inspection Services, Inc.

6   Q.   Okay.  Are you a supporter of the American Atheists

7   organization?

8   A.   Yes, I am.

9   Q.   And do you use social media?

10  A.   Yes, I do.

11  Q.   How long have you had a Facebook account?

12  A.   Several years.

13  Q.   And you've told us that you followed Senator Rapert.  Why

14  did you follow him or any other politician?

15  A.   Well, I followed Asa Hutchinson because he was governor,

16  but I followed Senator Rapert when I got involved with the bill

17  that was passed requiring that the United States motto, "In God

18  We Trust," be put on posters and placed in classrooms all over

19  Arkansas.  The posters that were originally donated to Arkansas

20  schools were organized and donated through Senator Rapert, and

21  they did not meet the requirements of the bill, so American

22  Atheists had posters printed that met the requirements of the

23  bill.  And I got involved in donating or trying to donate those

24  posters, specifically to the Bentonville School District first,

25  and in hopes of getting them all sent out to the other schools.

1   So that's how I first heard about them.

2   Q.   Ms. Dempsey, shortly, on your screen you are going to see

3   an exhibit which I've marked for purposes of identification as

4   Karen Dempsey Exhibit No. 1.  I'll provide a hard copy.

5   A.   I'm sorry.  I touched the screen.  I didn't know it would

6   make a mark.

7   Q.   Can you see this on your screen?

8   A.   Yes, I can.

9   Q.   Can you identify it?

10  A.   This is a direct message to Senator Rapert from me that I

11  sent to him on his Facebook page.  When you are following the

12  page for somebody, Senator Rapert had set up the opportunity to

13  interact with him directly by sending him a private message.

14  And that's what I did.

15  Q.   All right.  Now, what did he post to which you reacted?

16  A.   He posted -- you can't see the link here, but you can see

17  the back of whatever it is, some kind of -- one piece of our

18  American currency, where it says, "In God We Trust."

19  Apparently, there was a lawsuit that -- I don't know because the

20  link is missing.  But he posted that it was a wonderful decision

21  because they couldn't remove "In God We Trust."  So I wrote to

22  him directly.

23  Q.   And he mentions that he had been advised my opponent is a

24  public member of an atheist group, Conway Freethinkers, and

25  American Society of Freethinkers.  Are you aware of those

1    groups?

2    A.    The American Society of Freethinkers, yes.  The Conway

3    Society of Freethinkers, yeah.

4    Q.    All right.  And are those both groups affiliated with the

5    American Atheist organization?

6    A.    I don't know.  I'm not a member of those groups.

7    Q.    Okay.  And --

8    A.    I might be like following the first one.

9    Q.    And what did you post in response?  Is that also on

10   Exhibit 1?

11   A.    No.  All that's on Exhibit 1 is the question that I asked

12   him.  I asked him:  "Do you want to keep the government secular,

13   or do you want America to become a Christian nation?"

14   Q.    All right.

15   A.    And you can't see his response or my response on this

16   slide.

17   Q.    All right.  But you did make a comment asking him

18   questions.  Is that correct?

19   A.    He responded to my question, and then I responded to his

20   response.

21   Q.    All right.  Are they on Exhibit 1, or are they on some

22   other documents which we're going to introduce?

23   A.    They are on other documents, because you can't see the

24   whole thread.  It's called a thread, where you keep going.

25   Q.    All right.  I'm going to show you some additional ones.

1          MR. KAPLAN:  Your Honor, we would offer Exhibit 1.

2          THE COURT:  Any objection from defense?

3          MR. BIRD:  No objection, Your Honor.

4          THE COURT:  All right.  Exhibit 1 will be admitted.

5      (Plaintiffs' Exhibit 1 received in evidence.)

6  BY MR. KAPLAN:

7  Q.    2.  You will shortly see in front of you a document which

8  I've marked for purposes of identification as Exhibit No. 2.

9  Can you identify that document?

10  A.    This is a post -- not a private post.  This is a post on

11  his -- on Senator Rapert's page that I made in response to the

12  "In God We Trust" motto on currency deemed constitutional by a

13  court after atheists complained.  So he posted about the win,

14  and I posted about his post about the win.

15          MR. KAPLAN:  Okay.  Your Honor, we would offer No. 2.

16          THE COURT:  Any objection?

17          MR. BIRD:  No objection, Your Honor.

18          MR. KAPLAN:  Let me show you a document which I've

19  marked for purposes of identification as No. 3.

20          THE COURT:  Mr. Byrd -- hold on just one minute.  You

21  are right.  Flip that around, and you should be able to see the

22  exhibits.  If you have trouble at any point seeing them on the

23  monitor, please let me know.

24          MR. KAPLAN:  I'm sorry, Your Honor.

25          THE COURT:  You are all right.  He had his monitor

1   flipped the other way, flipped to opposing counsel's table, so

2   he was not seeing these.

3       And I don't know that I ruled on Exhibit 2.  Was there any

4   objection?

5               THE WITNESS:  Do I need to read this?  Do I need to

6   read this?

7               MR. KAPLAN:  Yes.  Go ahead.

8               THE COURT:  Was there any objection to Exhibit 2?

9               MR. BIRD:  There was none, Your Honor.

10              THE COURT:  I'll admit Exhibit 2.  You may proceed.

11      (Plaintiffs' Exhibit 2 received in evidence.)

12              THE WITNESS:  What I wrote to Senator Rapert -- thank

13  you -- "As an atheist, please understand, I am not opposed to

14  people who believe in gods.  I understand that their faith is

15  important to them, and I defend their right to practice their

16  religion.  I have issue with people like you denigrating people

17  with a different philosophy on life.  We are not evil.  We are

18  moral, ethical citizens of our country.  We don't like being

19  told we are less than, second-class citizens.  The government

20  was set up as secular so that all people would be equal.  Please

21  don't diminish others in order to make yourself look good.

22  Every class, race and belief of people contains a bad element,

23  such is human nature.  Why do you feel the need to be mean

24  spirited to others?  Why are you so prejudiced?

25              MR. KAPLAN:  All right.  Your Honor, we've already

1    offered No. 2.

2              THE WITNESS:  I can't hear you.

3    BY MR. KAPLAN:

4    Q.   I show you a document which I've marked for purposes of

5    identification as No. 3 and ask you if you can identify that

6    document.

7    A.   Speak up for me.

8              THE COURT:  I think she's having a little trouble

9    hearing you, Mr. Kaplan.  If you would, you might pull that

10   microphone closer to you.  That's one of the problems with the

11   evidence cart.  We're limited by the number of microphones on

12   it.

13   BY MR. KAPLAN:

14   Q.   Can you identify No. 3?

15   A.   I don't have Slide No. 3 in front of me.

16   Q.   Yes.  It looks the same, except on the right-hand side

17   there's something in blue.  Do you see that?

18   A.   Oh, yes.  That is the personal correspondence through his

19   Facebook page.  He has a link where you can write to him

20   directly, so I wrote to him directly.  And that is the beginning

21   of a personal conversation that was between him and I.

22   Q.   Okay.  Let me show you a document which I've marked for

23   purposes --

24             MR. KAPLAN:  Your Honor, we would offer No. 3.

25             THE COURT:  Any objection to No. 3?

1          MR. BIRD:  No. 3 is the same document but just pointed

2   to a different portion.  Is that correct?

3          MR. KAPLAN:  It just has the part in blue on the

4   right.

5          THE COURT:  I think it is different.  It is a

6   different document.  It looks a lot like Exhibit 1, but the

7   message, where Ms. Dempsey just read, appears on Exhibit 3.

8          MR. BIRD:  Okay.  No objection.

9          THE COURT:  Mr. Byrd, any objection?

10          MR. BYRD:  No objection.

11          THE COURT:  3 will be admitted.

12       (Plaintiffs' Exhibit 3 received in evidence.)

13   BY MR. KAPLAN:

14   Q.   Let me hand you a document.  I want No. 5, which I've

15   marked for -- I'm skipping No. 4.

16          THE COURT:  All right.

17   BY MR. KAPLAN:

18   Q.   I'm marking No. 5, and I ask you if you can identify that

19   document.  Can you identify that document?

20          THE COURT:  Can you identify the document?

21          THE WITNESS:  I have the same document in front of me,

22   but it's scrolled further down.

23          THE COURT:  And because of the limitation of our

24   pages, that's a different document.  I understand when you see

25   it on the screen, it may be a thread.  But this is a different

1    exhibit.

2            THE WITNESS:  Okay.  This is a continuation of the

3    public post that I just read.  And other people that follow him

4    commented on it.

5    BY MR. KAPLAN:

6    Q.   All right.  Why are you interested in seeing the entire

7    thread of people who comment on your comments as well as his

8    original posts?

9    A.   I couldn't understand the question.  Could you speak into

10   the microphone?

11   Q.   Are you interested in seeing these comment threads?

12   A.   Yes, I am.

13   Q.   And why?

14   A.   People have different opinions.  I think it's important to

15   hear other people's opinions.  I think the more exposure we have

16   to other people's opinions provides a basis for tolerance and

17   acceptance.  If you don't know what the other people are

18   thinking, you are at a great loss in any conversation.  So it's

19   important to me to be part of the dialogue even if it doesn't

20   agree with me.  I also like the opportunity to present how I

21   think about things to people who don't think like me so that

22   they have the opportunity to see that I exist.

23           MR. KAPLAN:  Okay.  Your Honor, we would offer No. 5.

24           THE WITNESS:  I can't hear you.

25           MR. KAPLAN:  We would offer No. 5.

1        THE COURT:  Any objection?

2        MR. BIRD:  No objection, Your Honor.

3        THE COURT:  Mr. Byrd, any objection?

4        MR. BYRD:  No objection, Your Honor.

5        THE COURT:  Exhibit 5 will be admitted.

6      (Plaintiffs' Exhibit 5 received in evidence.)

7        MR. KAPLAN:  6.

8        THE WITNESS:  I'm turning this up.  Maybe that will

9  help.

10        THE COURT:  All right.  If you can't hear, please just

11  let us know.  We'll try to make what accommodations we can.

12  BY MR. KAPLAN:

13  Q.   Ms. Dempsey, I now have put in front of you a document

14  which I've marked for purposes of identification as No. 6.  Can

15  you identify this document?

16  A.   This is a continuation on the post we were just discussing

17  with more entries on the thread.

18  Q.   I'm going to skip for just a second.  I'm going to show you

19  some more.  But can you -- do you now have access to make

20  comments on Senator Rapert's page?

21  A.   No.

22  Q.   What happened?

23  A.   There's a term.  It's called "blocked."  So the owner of

24  the page can decide not to let you participate on the page, and

25  they block you.  So you can see the page, but you can't comment.

1   Q.   And can you see the thread also?

2   A.   Yes.  You can see the thread of things you have not

3   participated in.  So if Senator Rapert makes a comment and other

4   people comment on that, I can follow what the other people are

5   saying, but I can't participate.

6   Q.   Did you try this morning to get on to make a comment?

7   A.   Yes, I did.

8   Q.   And were you able to?

9   A.   No.  I was still blocked.

10  Q.   And how do you know that you were still blocked?

11  A.   The ability to make a comment isn't there.  There is a

12  specific little box that shows up where you can type in your

13  comment, and that box isn't there.

14          MR. KAPLAN:  Okay.  No. 7, please.  Let me hand you a

15  document -- Your Honor, we would offer No. 6.

16          THE COURT:  Any objections to 6?

17          MR. BIRD:  None.

18          THE COURT:  Mr. Byrd?

19          MR. BYRD:  No objection.

20          THE COURT:  6 will be admitted.

21      (Plaintiffs' Exhibit 6 received in evidence.)

22  BY MR. KAPLAN:

23  Q.   Can you identify for us the document in front of you, No.

24  7?

25  A.   Yes.

1    Q.    What is this?

2    A.    This is a screenshot of a partial interaction where I

3    responded to something Senator Rapert had posted.

4    Q.    Okay.  And where is your comment?  Is it at the bottom?

5    A.    About halfway down, it starts.

6    Q.    Okay.

7    A.    And it starts with my name in blue, so it becomes pretty

8    obvious.

9    Q.    And what did you post this time?

10   A.    "You get into office, and you work with the party of your

11   choice.  But once in office, you should represent all the

12   people, not just the ones that agree with you."

13        Then my next post says:  "The particular statute you

14   reference removes the freedom to protest against Israel via

15   boycott.  Why does the country" --

16   Q.    Let me stop you right there.  Would you look at his post at

17   the very top so that we have context?

18   A.    I see.  Okay.

19   Q.    And what does he say?

20   A.    He says:  "Today at the Arkansas Code Revision Commission

21   meeting, I had to endure an ACLU attorney and liberal activist

22   attorney attacking an Arkansas statute passed to protect and

23   honor Israel.  Oh, by the way, they are very active Democrats,"

24   all in capital letters, "Democrats.  Don't vote for Democrats."

25   Q.    All right.  And this post that you were reading to us is in

1  direct response to -- this comment that you were reading to us

2  is in direct response to his post at the top of the page.  Is

3  that correct?

4  A.    That is correct.

5         MR. KAPLAN:  Okay.  Your Honor, we would offer No. 7.

6         THE COURT:  Any objection?

7         MR. BIRD:  No objection.

8         MR. BYRD:  No objection, Your Honor.

9         THE COURT:  All right.  Exhibit 7 will be admitted.

10     (Plaintiffs' Exhibit 7 received in evidence.)

11  BY MR. KAPLAN:

12  Q.    Let me hand you a document which I've marked for purposes

13  of identification as No. 8, which will be on the screen -- now

14  is on the screen.  And can you identify that document?

15  A.    Yes.

16  Q.    Would you identify it for us, please.

17  A.    This is a blowup of the private message that I sent to

18  Senator Rapert and his response to that query that I made of

19  him.

20  Q.    Was this on the Facebook page that we've seen before, the

21  Senator Rapert page?

22  A.    It wasn't part of the public part of the page.  It was

23  on -- it was through his page that he has the opportunity to

24  dialogue with him personally, so this is like a private chat

25  session between the senator and I that doesn't get posted

1    publicly.

2    Q.    But it's through the same page.  Is that correct?

3    A.    That is correct.

4    Q.    All right.  And what's the discussion about?  You don't

5    have to read everything to us.  Just tell us what the discussion

6    is about on Exhibit No. 8.

7    A.    I had asked him if he wanted America to remain a secular

8    government or did he want it to become a Christian nation, and

9    he responded to that.  And I responded to his response.

10              MR. KAPLAN:  Your Honor, we would offer No. 8.

11              THE COURT:  Any objection?

12              MR. BIRD:  No objection.

13              MR. BYRD:  No objection, Your Honor.

14              THE COURT:  Exhibit 8 will be admitted.

15         (Plaintiffs' Exhibit 8 received in evidence.)

16    BY MR. KAPLAN:

17    Q.    Let me show you No. 9.  Can you identify No. 9, please.

18    A.    Yes.  This is -- the blue part is my response to Senator

19    Rapert regarding the question I had sent him.  This is part of

20    the personal chat that is through his web page.  There are

21    actually three boxes in my response.  This shows the first box

22    and part of the second box.

23    Q.    In blue, is that your response?

24    A.    Yes.

25              MR. KAPLAN:  Your Honor, we would offer No. 9.

1          THE COURT:  Any objection?

2          MR. BIRD:  No objection.

3          MR. BYRD:  No objection.

4          THE COURT:  Exhibit 9 will be admitted.

5      (Plaintiffs' Exhibit 9 received in evidence.)

6  BY MR. KAPLAN:

7  Q.    Now let me show you No. 10.  And can you identify No. 10?

8  A.    Yes.

9  Q.    Please identify for the Court No. 10.

10 A.    This is a screenshot showing the response in the private

11 chat thread that I made to Senator Rapert, including the partial

12 box number one in blue and the balance of my response, box

13 number two in blue, and box number three in blue.  So all of

14 those blue boxes are part of my response.

15 Q.    After this response, did you get any further comments from

16 him or posts from him?

17 A.    No.

18 Q.    What happened after you made these comments?

19 A.    I was blocked.

20 Q.    And how did you learn you were blocked?

21 A.    I went on his page to participate, and I couldn't.

22 Q.    And have you tried since then to engage him on his page?

23 A.    Several times.  I have gone back to see if I've been

24 unblocked as a function of him knowing about this action that's

25 being taken.

1   Q.   And at any point since then, including this morning, have

2   you been able to engage him by commenting on his posts?

3   A.   No.   And this is not that old.   This was last September,

4   last August and September.   So it's not old.   And I've been

5   trying to participate.

6            MR. KAPLAN:   Your Honor, we would offer No. 10.

7            THE COURT:   Any objections?

8            MR. BIRD:   No objection.

9            MR. BYRD:   No objection.

10           THE COURT:   Exhibit 10 will be admitted.

11      (Plaintiffs' Exhibit 10 received in evidence.)

12           MR. KAPLAN:   That's all I have, Your Honor, of this

13   witness.

14           THE COURT:   All right.

15                         CROSS-EXAMINATION

16   BY MR. BIRD:

17   Q.   Good morning, Ms. Dempsey.

18   A.   Good morning.

19   Q.   You testified a minute ago that Senator Rapert does not

20   represent you in terms of you living in his district.   Correct?

21   A.   I don't live in his district.   He represents me as a state

22   senator, so therefore he makes decisions that affect the entire

23   state, and therefore it affects me.

24   Q.   I understand.   You don't live in District 35.

25   A.   Nope.

Dempsey - Cross                                              27

1   Q.    You are -- I think you testified you are involved with the

2   American Atheists in Arkansas.  Correct?

3   A.    Correct.

4   Q.    In the complaint, there's an allegation that that group

5   sent a letter to Jason Rapert in July of last year.  Are you

6   aware of that letter?

7   A.    No.  You need to understand, I'm a member of the American

8   Atheists, and I volunteer as one of the assistant state

9   directors for American Atheists in Arkansas.  But as a

10  volunteer, I'm not privileged to everything they do.  So

11  sometimes they send me things.  I may have received it.  In all

12  honesty, I don't remember.

13  Q.    And my question was simply were you involved in the

14  preparation of that letter that went out last year?

15  A.    I would not -- I would remember if I prepared something.

16  No.  I think I would.

17  Q.    Is it true from your testimony and from the allegations in

18  the complaint that you first interacted with Mr. Rapert in

19  August of last year?

20  A.    Thereabouts, I would say.  It could be a little earlier.

21  It could be right about August of last year.

22  Q.    The exhibits that Mr. Kaplan walked you through all related

23  to some interactions that occurred on the Facebook page.  And I

24  think if we -- can you bring up Exhibit 1, please?

25        If we look at the post that is at the top of that page,

1    August 29, do you see that?

2    A.    Yeah.

3    Q.    Okay.  That would be August of 2018.  Is that a fair

4    representation of that?

5    A.    Correct.

6    Q.    Okay.  There's an allegation in the complaint, paragraph

7    64, that staff are involved in maintaining Mr. Rapert's social

8    media accounts.  You don't have any personal knowledge of that

9    fact, do you?

10   A.    No, sir.

11   Q.    If we look at Exhibit 1, up on the very top of that page,

12   do you see what -- I guess what I would describe, it looks kind

13   of like a campaign sticker up at the top?

14   A.    Correct.

15   Q.    And that says "Re-elect Senator Jason Rapert."  Correct?

16   A.    Correct.

17   Q.    If we scroll to -- look at Exhibit 2, please.  If we look

18   down the right side of this page, in the "about" box, what is

19   the website that is linked in the "about" section?

20   A.    I'm sorry.  I couldn't make out your question.

21   Q.    If you look on Exhibit 2, which is pulled up on the screen,

22   on the right side of the page, there is an "about" section.

23   Read what the website is that's linked on this page.

24   A.    All right.  On the right side of the page, there is

25   something.  And you want me to read it.  What is it?

1    Q.    The website.

2    A.    www.jasonrapertforsenate.com.

3    Q.    Ms. Dempsey, do you have -- I think the allegations in the

4    complaint with regard to you are limited to Facebook

5    interactions.  Is that fair?

6    A.    That is correct.

7    Q.    Okay.  Do you have a Twitter account?

8    A.    I do, but I set it up years ago.  Then I realized I don't

9    have any interest in Twitter.

10   Q.    So it's not something you actively use?

11   A.    No.

12         MR. BIRD:  Pass the witness, Your Honor.

13         MR. KAPLAN:  No further questions.  May this witness

14   be excused?

15         MR. BYRD:  Just one question.

16                      CROSS-EXAMINATION

17   BY MR. BYRD:

18   Q.    Hello.

19   A.    Hi.

20   Q.    I'm Paul Byrd.  We haven't met.  You have used your Twitter

21   account to reach Jason Rapert before, though.  Correct?

22   A.    I used the Facebook account to reach out to Senator Rapert.

23   I don't know if you said Twitter or Facebook.

24   Q.    Twitter.

25   A.    No.  I've never used Twitter.

1   Q.    You've never once used Twitter to reach --

2   A.    No, not regarding Senator Rapert, and I've probably made

3   one tweet in my whole life.  I don't know.  It was a zillion

4   years ago.  And I have no interest in Twitter.  I'm not part of

5   that.

6   Q.    Do you keep up with the Freedom From Religion Foundation on

7   Twitter?

8   A.    No.  I don't keep up with anyone on Twitter.

9   Q.    That's all I have.  Thank you.

10  A.    I only use Facebook.

11  Q.    Thank you.

12  A.    All right.

13  Q.    So it's clear, you've not tried to reach Jason Rapert on

14  Twitter.

15  A.    Correct.

16          MR. BYRD:  Thank you.

17          MR. KAPLAN:  Nothing further, Your Honor.

18          THE COURT:  All right.  May this witness step down?

19  Mr. Byrd?

20          MR. BIRD:  Yes.

21          THE COURT:  Mr. Byrd, may she step down?

22          MR. BYRD:  Yes.

23          THE COURT:  You may step down.

24          MR. KAPLAN:  Cathey Shoshone, please.

25     **CATHERINE SHOSHONE, PLAINTIFFS' WITNESS, DULY SWORN**

1                     DIRECT EXAMINATION

2   BY MR. KAPLAN:

3   Q.    Tell me your name and address, please.

4   A.    My name is Catherine Shoshone.  My address is 10 Oak Forest

5   Drive, Maumelle, Arkansas, 72113.

6   Q.    And you are not a constituent.  You do not reside in

7   Senator Rapert's district.  Is that correct?

8   A.    Correct.

9   Q.    Tell me a bit about your education, please.

10  A.    Uh-huh.  I have my medical technology training through the

11  Air Force from 1996, and then I have a bachelor's degree in

12  psychology from UCA in about 2002.

13  Q.    Are you employed, Ms. Shoshone?

14  A.    I am.

15  Q.    And how are you employed, and where are you employed?

16  A.    I'm a medical technologist, and I work at Arkansas Heart

17  Hospital.

18  Q.    How long have you been there?

19  A.    About seven years.

20  Q.    Do you use social media?

21  A.    I do.

22  Q.    And what form of social media do you use?

23  A.    I have Facebook and Twitter.  Also, I have a Reddit

24  account.

25  Q.    How long have you had the Facebook account?

1    A.    About 10, 11 years.

2    Q.    And how about Twitter?

3    A.    About four or five years.

4    Q.    Do you correspond with or follow Senator Jason Rapert

5    either on Facebook or on Twitter?

6    A.    Yes, sir.

7    Q.    Which or both?

8    A.    Facebook and Twitter.

9    Q.    And are you now able to follow him on either of those?

10   A.    I have not on Facebook.  I have not.  On Twitter, I have

11   two accounts.  And one of those has been blocked, and the other

12   one has not.

13   Q.    Okay.  We're going to get to the blocked account in just a

14   minute.  Do you follow other Arkansas politicians?

15   A.    I do.

16   Q.    And why do you follow these politicians?

17   A.    To keep up with the bills that they are filing and laws

18   that they are passing.

19   Q.    And who do you follow?

20   A.    I follow a lot.  I follow my own state representative, Mark

21   Lowery.  And I follow Asa Hutchinson and a lot of other state

22   representatives and, of course, our senators and representatives

23   to federal Congress as well.

24   Q.    Okay.  Let me show you a document which I'm going to mark

25   as Exhibit 11 and ask you if you can identify this document.

1  A.   Yes, sir.  This is on Twitter.  And I went to the ALC,

2  which is Arkansas Legislative Committee or something.  And he

3  gave a big speech about same-sex marriage because it was a big

4  deal at the time.  And he threw out a lot of statistics that I

5  believed were false, and I asked that he would share his sources

6  on any of those statistics.

7  Q.   Did he respond to your question --

8  A.   No.

9  Q.   -- asking --

10  A.   No.

11  Q.   At the top of No. 11, could you tell us -- read us his

12  comment to his post.

13  A.   At the top of this screen?

14  Q.   Yes.

15  A.   Okay.  "2 Chronicles 36:16."  I'm sure I said that wrong.

16  "But they mocked the messengers of God and despised his words

17  and misused his prophets until" -- and then he gave a link to a

18  website.

19  Q.   And was this on a private Twitter account of his or a

20  public?

21  A.   I don't think so, no.  I don't think I've ever followed any

22  of his private accounts.

23           MR. KAPLAN:  Okay.  Your Honor, we would offer No. 11.

24           THE COURT:  Any objection?

25           MR. BIRD:  No objection.

1          MR. BYRD:  No objection.

2    BY MR. KAPLAN:

3    Q.    Let me show you a document which I'm marking for purposes

4    of identification as No. 12.

5          THE COURT:  Exhibit 11 is admitted.

6          (Plaintiffs' Exhibit 11 received in evidence.)

7    BY MR. KAPLAN:

8    Q.    And can you identify that document?

9    A.    Yes, sir.  This is another Twitter post he had posted.

10   Another representative, "David Meeks verified details.  My

11   Democrat opponent, Tyler Pearson, took a thousand dollars in

12   blood money from baby killers.  Wow."

13         I said that was interesting because he had accepted over

14   $3,000 from the tobacco industry.  And I felt that was

15   hypocritical because the tobacco industry directly kills people.

16   Q.    Did he respond to you there?

17   A.    Not that I recall.

18         MR. KAPLAN:  Your Honor, we would offer No. 12.

19         THE COURT:  Any objection?

20         MR. BIRD:  No objection.

21         MR. BYRD:  No objection, Your Honor.

22         THE COURT:  Exhibit 12 is admitted.

23         (Plaintiffs' Exhibit 12 received in evidence.)

24   BY MR. KAPLAN:

25   Q.    Let me hand you a document which I've marked as No. 13 and

1  ask you if you can identify that document.

2  A.   Yes, sir.  He says:  "My opponent, Tyler Pearson, takes

3  money from abortion doctors who kill little babies just like

4  this."

5       Then I commented that he could support easy access to birth

6  control to slow down abortion.  And this was actually a

7  continuation of a conversation that we had in public where we

8  had discussed the fact that if they allowed mandated sex

9  education in schools and easy access to birth control, that

10 would lower abortion rates.

11 Q.   Did he respond to you there?

12 A.   I don't think so.

13          MR. KAPLAN:  Your Honor, we would offer No. 13.

14          THE COURT:  Any objection?

15          MR. BIRD:  No objection.

16          MR. BYRD:  No objection, Your Honor.

17          THE COURT:  Exhibit 13 is admitted.

18      (Plaintiffs' Exhibit 13 received in evidence.)

19 BY MR. KAPLAN:

20 Q.   Let me show you a document which I'm marking for purposes

21 of identification as No. 14 and ask you if you can identify this

22 document.

23 A.   Yes, sir.  They are discussing religious persecution upon

24 Christians.  And I asked him for an example, one example of

25 religious persecution on Christians.

1    Q.    Did you get a response?

2    A.    I don't think I did.

3              MR. KAPLAN:  Your Honor, we would offer No. 14.

4              THE COURT:  Any objection?

5              MR. BIRD:  No objection.

6              MR. BYRD:  No objection, Your Honor.

7              THE COURT:  Exhibit 14 is admitted.

8         (Plaintiffs' Exhibit 14 received in evidence.)

9    BY MR. KAPLAN:

10   Q.    Let me show you a document which I've marked for purposes

11   of identification as No. 15 and ask you if you can identify this

12   document.

13   A.    Yes, sir.  He was making fun of President Obama, who he was

14   often critical of, taking a selfie.  And I reposted a picture of

15   his that he had posted earlier where he is, obviously, taking a

16   selfie.  But, of course, I did the writing on the page and not

17   him.

18   Q.    Did you receive a response to this?

19   A.    Not that I recall.

20   Q.    What happened after you sent this comment?

21   A.    He blocked me on Twitter.

22   Q.    And how did you learn that you were blocked?

23   A.    Because if you go to Twitter and go to his page, then it

24   says that I am blocked and can't see any of his posts.

25   Q.    And have you tried to access his Twitter since then?

1   A.   Yes.

2   Q.   And do you recall the last time that you attempted to --

3   A.   I believe yesterday.

4   Q.   I'm sorry?

5   A.   Yesterday.

6   Q.   Yesterday?

7   A.   Uh-huh.  I'm still blocked.

8   Q.   And what happened yesterday when you tried to access his

9   Twitter?

10  A.   I was still blocked.

11  Q.   Okay.  Do you want to be able to continue to have this

12  dialogue with Senator Rapert?

13  A.   Yes, sir.

14  Q.   Why?

15  A.   Because he makes laws that affect me and people I care

16  about.

17  Q.   And do you have -- with some of the other politicians,

18  public officials that you follow, do you have the same kind of

19  back and forth with any of them?

20  A.   Some of them, yes.

21  Q.   Have you been blocked by anybody else?

22  A.   No, sir.

23  Q.   And are your posts with other public officials of the same

24  nature as the posts or the comments that you make to Senator

25  Rapert?

```
1   A.    Yes, sir.
2              MR. KAPLAN:  I can't remember if I offered No. 15.
3              THE COURT:  You did not.
4              MR. KAPLAN:  I offer No. 15.
5              THE COURT:  Any objection to No. 15?
6              MR. BIRD:  No objection.
7              MR. BYRD:  No objection, Your Honor.
8              THE COURT:  Exhibit 15 is admitted.
9         (Plaintiffs' Exhibit 15 received in evidence.)
10             MR. KAPLAN:  That's all I have of this witness, Your
11  Honor.
12             THE COURT:  All right.  Cross-examination?
13                         CROSS-EXAMINATION
14  BY MR. BIRD:
15  Q.    Good morning, Ms. Shoshone.  Your testimony was that with
16  regard to Facebook, you were blocked in May of 2014.  Is that
17  correct?
18  A.    I believe so, yes.
19  Q.    You agree with me that was more than four years ago?
20  A.    Yes, sir.
21  Q.    In terms of when you filed the complaint, more than four
22  years before you filed the complaint?
23  A.    Yes, sir.
24  Q.    Okay.  Your allegation also with regard to Twitter is that
25  you were blocked in February of 2015.  Is that correct?
```

1  A.    Yes, sir.

2  Q.    And you agree with me that's more than three years from the

3  time that you filed your complaint in this matter.  Correct?

4  A.    Yes, sir.

5  Q.    I want to go to Exhibit 15.  Exhibit 15 is on the screen.

6  And I think your testimony was is that it was after this post

7  that you were blocked.  Is that correct?

8  A.    Yes, sir.

9  Q.    Do you recall whether or not you made any other posts after

10  this?

11  A.    I do not recall.  I do not recall.  I know it was about ten

12  days later that I was blocked.

13  Q.    About ten days later?

14  A.    Uh-huh.

15  Q.    So there's a gap of at least ten days, or your testimony is

16  there was a gap of ten days between the time you posted this and

17  the time you were blocked.  You don't have any way of knowing in

18  terms of Senator Rapert's mindset in terms of why he blocked

19  you, do you?

20  A.    I do not.

21  Q.    Okay.  Because there was a gap in time, you admit, between

22  the time that you posted this and the time he blocked you.

23  Correct?

24  A.    Yes, sir.

25  Q.    If we go to Exhibit 12, Exhibit 12, this is on the Senator

1    Jason Rapert, the Jason Rapert Twitter account.  Correct?

2    A.    Yes, sir.

3    Q.    This was an exchange you had with him in 2014?

4    A.    Yes, sir.

5    Q.    The issues that are being discussed in his post that led to

6    your reply has to do with his opponent in a campaign.  Correct?

7    A.    Yes, sir.

8    Q.    So these matters that we're talking about in Exhibit 12,

9    these are campaign issues, issues with his opponent.  That's

10   what drew your reaction, and that's what that exchange was

11   about.  Correct?

12   A.    Yes, sir.

13   Q.    Okay.  If we look at Exhibit 13, again, the initial tweet

14   is about his opponent and funding for his campaign, those types

15   of issues.  Again, you agree with me this is about campaign

16   issues.  Correct?

17   A.    Yes, sir.

18   Q.    You have two Twitter accounts.  I think that's correct?

19   A.    Yes, sir.

20   Q.    One of those has been blocked.  The other has not.  Is that

21   right?

22   A.    Correct.

23   Q.    Have you had any interactions with Jason Rapert --

24   A.    I commented a few times, but I have tried not to.

25   Q.    Let me finish my question, not because I care, but just for

```
 1   the court reporter so she can make sure she gets it.  Have you,

 2   to your knowledge, had any interactions with Jason Rapert via

 3   your other Twitter account?

 4   A.   I have.

 5   Q.   Okay.  And how recently did you have interactions with him?

 6   A.   I don't remember.  Within the last six months.

 7   Q.   Okay.  And is it correct that that Twitter handle is

 8   @reesesqueen?

 9   A.   Yes.

10   Q.   Are you familiar with a Facebook page, Arkansans Against

11   Jason Rapert?

12   A.   I am.

13   Q.   Are you an administrator of that page?

14   A.   Yes.

15   Q.   Do you recall getting a join request from Jason Rapert to

16   that page?

17   A.   Yes.

18   Q.   Did you accept that join request?

19   A.   No, I did not.

20   Q.   Okay.

21           MR. BIRD:  Pass the witness, Your Honor.

22           MR. BYRD:  He asked everything I would, Your Honor.

23           THE COURT:  All right.  Any redirect?

24           MR. KAPLAN:  No redirect, Your Honor.  May this

25   witness be excused?
```

1      THE COURT:  May she be excused, Mr. Bird?

2      MR. KAPLAN:  May I ask just one other question?  I'm

3  sorry.

4      THE COURT:  You may.

5                     REDIRECT EXAMINATION

6  BY MR. KAPLAN:

7  Q.    Ms. Shoshone, why did you create this second account?

8  A.    To follow Jason Rapert.

9  Q.    I'm sorry?

10 A.    To follow Jason Rapert, to follow Senator Rapert on

11 Twitter.

12 Q.    And do you use it any differently than you do that original

13 account?

14 A.    No.

15 Q.    That's all.

16      THE COURT:  Anything further, Mr. Bird?

17      MR. BIRD:  Nothing further.

18      THE COURT:  Mr. Byrd?

19      MR. BYRD:  No, Your Honor.

20      THE COURT:  May this witness step down and be excused?

21      MR. BIRD:  Yes.

22      THE COURT:  You may.  Thank you.

23      MR. KAPLAN:  I have one additional witness, Your

24 Honor, Robert Barringer.

25      THE COURT:  Why don't we go ahead and just take a

1    short break.  I'm sorry, Mr. Barringer, to do that to you.  But

2    I think it will be better to break now to give our court

3    reporter a break.

4         We'll be in recess for ten minutes.  We'll come back in

5    here at 10:15.

6         (Recess at 10:05 a.m.)

7                        REPORTER'S CERTIFICATE

8       I certify that the foregoing is a correct transcript from
     the record of proceedings in the above-entitled matter.

9

10   /s/Elaine Hinson, RMR, CRR, CCR      Date:  January 20, 2019.
     United States Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      (Proceedings continuing in open court at 10:19 a.m.)

2          THE COURT:  Mr. Kaplan, you may call your next

3   witness.

4          MR. KAPLAN:  Thank you, Your Honor.  Robert

5   Barringer.

6          THE COURT:  Mr. Barringer, if you'd please raise

7   your right hand, Ms. Washington will administer the oath.

8          **ROBERT BARRINGER, PLAINTIFF, DULY SWORN**

9                    DIRECT EXAMINATION

10  BY MR. KAPLAN:

11  Q     Good morning, Mr. Barringer.  Tell me your name and your

12  address, please.

13  A     My name is Robert Barringer.  I live at 3700 Gina Drive

14  in Conway, Arkansas.

15  Q     Are you a constituent of Senator Rapert?

16  A     Yes, I am.

17  Q     And obviously you are -- are you a resident also of

18  Faulkner County?

19  A     Yes.

20  Q     And how long have you lived there?

21  A     At this particular address, about three years.

22  Q     How about your education?

23  A     Went to UCA for a year, went to -- the Army taught me

24  Russian and how to be a signals intelligence analyst, went to

25  UAF a couple semesters, and when I came back to Arkansas, I got

1   an associate's degree in surveying.

2   Q    Are you employed now?

3   A    Yeah.

4   Q    What do you do now?

5   A    I'm an Uber driver.

6   Q    Are you a supporter of the American Atheists

7   organization?

8   A    Yeah.  They generally do good things.

9   Q    Do you use social media?

10  A    Oh, yeah.

11  Q    What forms of social media do you use?

12  A    Facebook.  Just pretty much exclusively Facebook.

13  Q    And do you interact with Senator Rapert on Facebook?

14  A    I used to.

15  Q    And when you say used to, why don't you now?

16  A    I can't comment or like anything on his page anymore or

17  react in any way.

18  Q    When you were able to comment on his page in response to

19  his posts, did the fact that you were a constituent lead to any

20  particular designation on when you did?

21  A    Right, I made sure to set it up so that whenever I'm on

22  his page or any other, like Tom Cotton or French Hill, when I

23  comment on their pages, it's got a logo showing that I'm a

24  constituent.

25  Q    Can you describe for the Court what happened that you are

Barringer - Direct

1    no longer -- well, first, let me ask you, you've already said

2    Senator Cotton, that you comment on his page.  Any others?

3    A      French Hill, Tom Cotton.  But I don't comment on theirs a

4    whole lot.  They're not nearly as active as Senator Rapert is,

5    so I used to comment on his stuff a lot, but not so much on

6    their pages, just occasionally.

7    Q      And can you describe for the Court what happened that you

8    are now unable to access his Facebook page?

9    A      He was talking about enacting a new bill for the state of

10   Arkansas to restrict abortions more.  And he said something

11   about, you know, all good Christians need to vote for this and

12   call your senator and get this bill passed.  So I commented on

13   there that, you know, don't believe people that tell you that

14   God is against abortion or the Bible is against abortion.  Here

15   are God's instructions on how to conduct an abortion, and then

16   I linked, "The Test For An Unfaithful Wife."

17   Q      What happened -- when was this?

18   A      Two years ago or more, maybe three.

19   Q      And what happened after you commented in that fashion?

20   A      Usually when somebody comments under you, you kind of get

21   a notification or people react to your comment, you got

22   notifications, and I noticed shortly after that, I wasn't

23   getting any kind of notifications on it so I eventually went

24   back to his page and noticed that I was now blocked.

25   Q      Okay.  And have you since then attempted to access

1  Senator Rapert's page?

2  A      Yeah, I tried yesterday.  I still can't comment on

3  anything he posts.

4  Q      Why do you want to have continuing access to his Facebook

5  page?

6  A      Well, couple reasons.  I guess the first reason is I

7  really like seeing and trying to understand what other people's

8  positions are, why do they want to enact these policies or laws

9  and what is their motivation behind that, what is their

10 reasoning.  And if I can engage somebody in a discussion about

11 why do you want this this way and then I can begin to

12 understand what -- you know, maybe there is a good reason that

13 they're trying to push this policy.

14        And then another thing is I can also try to educate the

15 people about -- that don't have good reasons to support a

16 policy about -- like when Senator Rapert was posting about

17 getting God put back into schools, I felt that was extremely

18 disingenuous and he was misinforming his constituency and other

19 people, as a government representative, about what their rights

20 are, so I was trying to educate the people that followed him

21 and looked at his thread, what their rights were and that if

22 their child is being told that they cannot pray in school, then

23 they need to -- there are plenty of people that would be more

24 than happy to represent them and sue the heck out of that

25 school, or at least get them a letter so that their child could

1   now pray in school.

2   Q      When was this?

3   A      That was right after I first moved to Conway, I think.  I

4   think that was like three or four years ago.

5   Q      Can you now see his Facebook page?

6   A      I can see it.  I can see what he posts and I can see what

7   other people comment, but I can't react, like, angry face or

8   anything like that on any of his posts and I can't comment.

9   Q      When you went on yesterday, does Senator Rapert's page

10  still invite comments from the public to his page?

11  A      Oh yeah.  The rest of the public, but not me, and plenty

12  of other people that he's blocked.

13                MR. KAPLAN:  That's all I have, Your Honor.

14                THE COURT:  All right.  Cross-examination.

15                          CROSS-EXAMINATION

16  BY MR. BIRD:

17  Q      Good morning, Mr. Barringer.

18  A      Morning.

19  Q      The complaint says that you viewed Senator Rapert, the

20  Senator Jason Rapert Facebook page in roughly 2015.  I think

21  your testimony a minute ago that it was two, maybe three years

22  ago is --

23  A      That would be 2015 if it was three years ago.

24  Q      I'm representing to you that's what the complaint says

25  and I understand that plaintiffs don't always draft the

1    complaints, that's what lawyers do, so is it accurate do you

2    believe that it was sometime in 2015 when you first started

3    viewing his page?

4    A     It could have been earlier than that.  I know at some

5    point, like I moved to Conway and then I moved back to

6    Plumerville, and then I moved back to Conway.  I know it was

7    either the first time I moved to Conway or the second time I

8    moved to Conway that I first became a follower of his page and

9    Senator Tom Cotton and French Hill.  That's when I started, I

10   guess, realizing I need to pay attention to the politics.

11   Q     As you sit here today, you're not sure exactly when you

12   began viewing that page?

13   A     Correct, yeah.

14   Q     As you sit here today, you're not exactly sure when the

15   exchange took place that you describe in the complaint,

16   correct?

17   A     Correct.  I know I was following his page for about three

18   months before I got blocked.

19   Q     As you sit here today, you're not exactly sure when you

20   were blocked from that page, are you?

21   A     Correct.  I couldn't tell you the day.

22   Q     There's an allegation in the complaint, paragraph 64,

23   that alleges that Jason Rapert uses staff to maintain his

24   social media accounts.  You don't have any personal knowledge

25   of whether that's true or not, do you?

1    A    Not that I could swear to, no.

2    Q    Are you aware that Jason Rapert doesn't have any staff as

3    a Arkansas state senator?

4    A    So -- no, I was not.  So you're saying the senator has no

5    secretary or any other staff at all?

6    Q    I'm just asking if you're aware of the staffing situation

7    with the Arkansas state senate.

8    A    No.

9    Q    Or Senator Rapert.

10        No further questions, Your Honor.

11   BY MR. BYRD:

12   Q    Hi, Mr. Barringer.  I'm Paul Byrd.  How are you?

13   A    Good.  Nice to meet you.

14   Q    Are you saying you haven't had any Facebook interchange

15   with Jason Rapert since last October?

16   A    I may have seen him post on news articles like under

17   THV-11 or some other thing, and then I might be able to respond

18   to him there, but I cannot post in his official -- I don't get

19   to show off my constituency label under THV-11.

20   Q    Did you have an interchange with him where he asked you,

21   "Robert Barringer, sir, are you the same Robert Barringer that

22   is named in the lawsuit as a plaintiff against me"?

23   A    Yes.

24   Q    Did you respond to that?

25   A    I may have, yes.

1   Q      You said, "Yes, I sure am"?

2   A      Yes.

3   Q      And that's been since the last lawsuit was filed in

4   October?

5   A      Right.  But, again, that was not on his page, and I don't

6   even remember if that was his senator profile or if that was

7   his personal profile.  And he tends to -- he has, like, four

8   profiles.  He obviously wants to keep his government separate

9   from his personal life separate from his ministry and separate

10  from his other organization, Keeping Judeo-Christian Values in

11  Government.

12  Q      Thank you for that.  So in that quote, you said when

13  people quote you, your tweets -- or your tweets, they aren't

14  lying when people quote the Bible that disagrees with you, they

15  aren't lying.  Do you remember that whole discussion you had

16  with him?

17  A      Talking about the one that got me blocked?

18  Q      I don't know.  This is you talking to him about the worst

19  part is you make announcements --

20  A      Oh, oh, that's right, because he had said that the

21  American Atheists are trying to silence him.  He was speaking

22  on behalf of me as my representative and he was saying that I

23  was lying or that I wanted to silence him, which is not true in

24  any way, shape or form.  I don't want to silence him, so that's

25  a lie.  He's misrepresenting what I want.

1    Q      So he has just as much rights as you do?

2    A      Yes.

3    Q      But you have been able to talk to him on Facebook?

4    A      Not on his page, no, but yes, I have responded to him in

5    other pages.

6    Q      Okay.  Thank you very much.

7            MR. KAPLAN:  No redirect, Your Honor.

8            THE COURT:  May this witness step down and be

9    excused?

10           MR. BIRD:  Yes, Your Honor.

11           THE COURT:  Mr. Byrd?

12           MR. BYRD:  Yes, Your Honor.

13           THE COURT:  You may step down and you're excused.

14    Thank you, Mr. Barringer.

15           MR. KAPLAN:  That concludes the testimony, Your

16    Honor.  I have marked as Exhibit 16 a document which I have

17    provided to counsel and I'll show the Court.

18           THE COURT:  All right.

19           MR. KAPLAN:  Your Honor, Exhibit 16 is a listing on

20    the left side of paragraphs in the complaint and they are

21    identified as either relating to Facebook or relating to

22    Twitter, and then the column immediately to the right of that

23    identification demonstrates what that paragraph talks about.

24    For example, paragraph 20, verification; 21, status updates;

25    23, friending.  And then on the right-hand side where it says

1   link are the URLs to each of those paragraphs and items such as

2   verification or blocking or friending.  And if one were to go

3   to those URLs, they would support the allegation in the

4   complaint and would allow whoever is looking at that URL to see

5   the derivication (sic) -- derivation of the allegation in the

6   complaint.  And we would offer No. 16.

7            THE COURT:  Any objection?

8            MR. BIRD:  Your Honor, with regard to Exhibit 16, we

9   are going to object to 16 on the basis that we had not seen

10  this list prior to this morning.  We have not reviewed these

11  links.  We don't know if these links are consistent with the

12  allegations in the complaint as they present these.  To the

13  extent that the plaintiffs are seeking to offer into evidence

14  the substance that's behind these links, different from just

15  this page of links, we would object on that basis.

16           THE COURT:  Do you have a response, Mr. Kaplan?

17           MR. KAPLAN:  Your Honor, I believe that these are

18  totally noncontroversial items.  It is early in the proceeding,

19  and when and if there are further discovery or hearings in this

20  matter, I think it would be easy to provide a book with each of

21  the links themselves, that is, the hard copy of the link, and

22  this is merely an attempt to assist the Court if the Court had

23  some question with regard to, for example, users and nonusers,

24  or in paragraph 55, blocking; 56, blocking; 57, blocking, the

25  Court can go to the URLs for 56, 57, and 58 and satisfy itself

1    with regard to what Twitter says with regard to blocking.  This

2    is an attempt to assist the Court at this very early stage of

3    the proceeding.  And I don't think it prejudices the other

4    side.  They have knowledge now of each of these URL links.

5              THE COURT:  All right.  I'm going to receive 16 at

6    this stage.  And I've said it many times in writing, so it's

7    not a surprise.  I believe I can consider lots of things at

8    this stage of the preliminary stage.  I will always ask for and

9    weigh objections in regard to it.  I will accept it and review

10   it for what I understand it to be offered as, which is a

11   reference or a resource to Twitter, Facebook, these URLs that

12   the paragraphs are derived from.  It may be correct; it may not

13   be correct.  I don't know.

14         And I'm sure that that's really the objection I think

15   that the defendant is making that they haven't had the

16   opportunity to verify it or to look at it or to understand what

17   these links are.  So I'm open to receiving any other additional

18   counter evidence in regard to it.  There's not been a response

19   yet to the motion for temporary restraining order or

20   preliminary injunction.  You're certainly welcome to address

21   this issue in that filing, but I'll receive it today.

22              (Plaintiffs' Exhibit 16 received in evidence.)

23              MR. BYRD:  Your Honor, just for purposes of the

24   record, I join with the other Mr. Bird's objection.

25              THE COURT:  All right.

1    MR. KAPLAN:  Your Honor, lastly, I would offer

2  No. 17 which I've also showed to the defendants, which is the

3  affidavit of Nicholas Fish who is the president of American

4  Atheists, Inc., and is offered to demonstrate the position of

5  American Atheists with regard to this proceeding.  It really

6  doesn't contain any -- at this early stage, it really just

7  deals with an attempt to bolster standing, and I offer this, I

8  wasn't going to offer it, but I understand that defendants are

9  going to offer the affidavit of Senator Rapert.  If his

10  affidavit is admissible, then my position is that the affidavit

11  of Nicholas R. Fish at this stage is also admissible.

12    THE COURT:  All right.

13    MR. BIRD:  No objection, Your Honor.

14    MR. BYRD:  None.

15    THE COURT:  I'll receive 17, which is the affidavit

16  of Nicholas Fish.

17    (Plaintiffs' Exhibit 17 received into evidence.)

18    MR. KAPLAN:  Your Honor, at this point, Plaintiffs

19  rest subject to whatever evidence the defendants might offer.

20    THE COURT:  All right.  Mr. Jacobs, do the

21  defendants wish to present any evidence today?

22    MR. JACOBS:  Your Honor, the only evidence we'd like

23  to present, as my friend mentioned, a declaration signed by

24  Senator Rapert.  Would the Court prefer it to be Defendant's

25  Exhibit 1 or to consecutively --

1          THE COURT:  Why don't you do Defendant's Exhibit 1.

2          MR. JACOBS:  We provided this to Mr. Kaplan.

3    Defendant will offer this.

4          THE COURT:  Any objection, Mr. Kaplan?

5          MR. KAPLAN:  No, subject to my ability to

6    cross-examine him at the appropriate time.

7          THE COURT:  All right.

8        (Defense Exhibit 1 received in evidence.)

9          MR. JACOBS:  So we also had a few -- we had planned

10   on asking initially Ms. Fernau, one of the plaintiffs, about

11   these if she were to testify.  Ms. Fernau did not testify

12   today, so we would offer -- we have three e-mail exchanges from

13   Ms. Betty Fernau to Senator Rapert that I believe my colleagues

14   are going to provide.  If we could offer these as Defense

15   Exhibits 2, 3, and 4.  The first one is -- the top date on this

16   e-mail exchange is February 10th, 2017, from ABFernau@gmail.com

17   to JasonRapert@senateAR.gov.  This would be Defense Exhibit 2.

18   Next one, the top date on the e-mail is October 13th, 2016,

19   also from ABFernau@gmail.com to Jason.Rapert@senateAR.gov.

20   That would be Defendant's Exhibit 3.

21        And the last one, top date is December 19th, 2016.  This

22   one is just one page and that will be Defendant's Exhibit 4.

23   So we would ask that these be admitted.

24          MR. KAPLAN:  Your Honor, my objection is that these

25   all seem to be to Senator Rapert's personal or Senate account

1    but not his either Facebook page or Twitter handle which are

2    the subjects of this proceeding.  I know that I could send an

3    e-mail to Senator Rapert or to any senator at Senate.AR.gov.

4    That's not a Facebook e-mail address nor is it a Twitter

5    handle.  So I would object on the grounds of relevancy because

6    it doesn't have anything to do with this proceeding.

7            MR. JACOBS:  Your Honor, the defendant wishes to

8    introduce those not for that purpose, but to show the reason

9    behind Senator Rapert blocking certain people.  In this case

10   it's harassing and potentially threatening e-mails from one of

11   the plaintiffs.  That's what that's offered for.

12           MR. KAPLAN:  Well, I note that at least on -- I'm

13   reading this for the very first time.  On page 2 of the exhibit

14   tendered Exhibit No. 3, there is a communication from somebody

15   named "Star Stuff".  It says ABFernau@gmail.  "I am requesting

16   that you unblock me from your Senator Jason Rapert page" --

17   which is a relevant item in connection with this proceeding

18   because it refers to his page, his Facebook page -- "that I may

19   participate in discussions where my opinion will be heard."

20       And if you look further up in the chain on October 13th,

21   this was -- what I just read to you was at 2:17, and this is at

22   3:13 on his Senate e-mail, he writes to Ms. Fernau, "If I can

23   help you with an issue, he said, my personal social media sites

24   are private platforms.  When anyone attempts to commandeer the

25   sites and spread information and attacks, but not only attacks,

1    but use vulgarities, my campaign and site administrators have

2    permission to" -- and he refers here to his campaign and site

3    administrators, which apparently in his affidavit, he denies he

4    has -- "have permission to delete comments or block someone who

5    repeatedly violates our standards."

6         I note that there is -- on the testimony that we heard

7    today, there's nothing -- none of those three had used any

8    profanity, vulgarity, used anything.  And then if you look on

9    page 3 in the morning, that same day, October 13, she wrote to

10   him.  It doesn't say where -- to what e-mail address.  And she

11   says, "Since you now have me blocked on your personal Facebook

12   profile and your senator page -- so obviously this is to some

13   other e-mail address -- along with Twitter, I suppose I'll have

14   to e-mail you if I need the help of the senator in my district.

15   For the record I have never messaged you anything irate.  I

16   commented with Bible verses on your senator page years ago.  I

17   will include screenshots below -- which she apparently does --

18   for you to block people you are supposed to represent is

19   extremely low."  So I don't see anything here that demonstrates

20   her vulgarity.  On Exhibit 4, I think it's the same thing, I

21   don't see anything that would establish what Mr. Jacobs has

22   said it's introduced for.

23        MR. JACOBS:  Your Honor, I didn't really catch an

24   evidentiary objection in all that, maybe relevance.  I'm sure

25   we can discuss that in a legal argument.  I think Mr. Kaplan

1   can see that this is at least irrelevant to the issues in the

2   case since the complaint I think mentions some of these

3   e-mails.

4              THE COURT:  Do you want to stand on the relevance

5   objection, Mr. Kaplan?

6              MR. KAPLAN:  Your Honor, I objected on the grounds

7   of relevance, but now that I read and have read the documents,

8   I think they support my position so I'm going to withdraw my

9   objection.

10             THE COURT:  All right.  Are there any other

11  objections to Defense proposed Exhibits 2, 3, and 4?

12             MR. KAPLAN:  I'm sorry, Your Honor?

13             THE COURT:  Any other objections to 2, 3, and 4 that

14  I need to address before I rule on whether I'll consider them

15  or receive them?

16             MR. KAPLAN:  No, Your Honor.

17             THE COURT:  I'll receive 2, 3, and 4 offered by

18  defendant.

19        (Defense Exhibits 2, 3, and 4 received in evidence.)

20             MR. BIRD:  So defendants would offer this as Exhibit

21  5.  So this is just a screenshot, a page of Senator Rapert's

22  personal Twitter account, just sort of an example of the types

23  of things that he posts.  So Exhibit 5, we ask the Court admit

24  that.

25             MR. KAPLAN:  Well, again, Mr. Jacobs has identified

1  this as his personal Twitter account and that's different than

2  his Senator Rapert Twitter account.  I have no way of knowing

3  whether this is on Senator Rapert Twitter account or the

4  personal Twitter account.  If it's on his personal Twitter

5  account, I would object on the grounds of relevancy.  If it's

6  on his Senator Rapert account, I don't have any objection.

7              MR. JACOBS:  Your Honor, our position is that all of

8  these are his personal accounts.  I'll note that the handle on

9  this is the @JasonRapert account, which it's the defendant's

10  position that this is Senator Rapert's personal account as

11  opposed to @RapertSenate, which he currently uses as a campaign

12  account.  I think plaintiffs state in their complaint that that

13  one is a campaign account.  But, again, this is a screenshot

14  from the Twitter that this lawsuit or that -- the Twitter that

15  this lawsuit is about, so I don't understand the objection.

16             MR. KAPLAN:  Well, this is not about his personal

17  Twitter account.  It's about his senatorial account, Twitter

18  account in which he invites his constituents and any others to

19  respond to him about matters of public concern.  So if it's on

20  his -- I know that they take the position that he has a

21  personal Twitter account and that they're all the same, but

22  they're not all the same, and that's what this lawsuit's about

23  so I would continue to reassert my objection.

24             THE COURT:  I'll recognize the relevance objection,

25  but I'll admit it.  I'll consider it at this stage.  Admitting

1   it at this stage simply means that I'm going to look at it and

2   make a decision on the temporary restraining order or

3   preliminary injunction question before me.  You're not waiving

4   any and all evidentiary objections you may ever have to these

5   documents, but I want to know and understand what your

6   positions are regarding these documents when I'm considering

7   the temporary restraining order or preliminary injunction

8   matters before me.

9           (Defense Exhibit 5 received in evidence.)

10          MR. BRONNI:  Your Honor, if I may, just to correct

11  one point.  This is the @JasonRapert account which is named in

12  their complaint that they are suing over.  I just wanted to

13  make that clear for the Court's convenience.

14          THE COURT:  Thank you, Mr. Bronni.

15          MR. JACOBS:  That's all the evidence from the

16  defendant, Your Honor.

17          THE COURT:  All right.

18          MR. KAPLAN:  Your Honor, all I have now is argument.

19          THE COURT:  All right.  We're going to take a short

20  recess before we get to argument so that both sides can prepare

21  and present it.  I want to raise with the parties questions

22  that I don't know that you've talked to one another about.

23  This request is posed as a temporary restraining order and

24  preliminary injunction.  Clearly different things flow from

25  those.  A temporary restraining order under the rules is 14

1    days unless I extend it for good cause or unless the other side

2    agrees.  The inquiries are not that different.  Typically in my

3    court, what I've done is considered a temporary restraining

4    order when the defendants haven't had the opportunity to fully

5    contest or respond to the issues.

6         That's somewhat the position we're in today.  We're sort

7    of in a mixed position, I would say.  I don't have briefing and

8    there are clearly legal issues that are involved in this case.

9    I do have some evidence and some exhibits.  We've had the

10   opportunity to talk and discuss those.  So I don't know if the

11   parties -- it's up to the plaintiffs really if you want me to

12   consider it as a temporary restraining order or preliminary

13   injunction combined.  Or I want to hear from both sides

14   basically of where you think we're at in the federal rules of

15   civil procedure today.  And keeping in mind, I know we

16   discussed having this hearing later in the month, having this

17   hearing next month, and talking about all of those dates.

18        So I don't know your calendars.  I know the 14 days is

19   what is triggered by a temporary restraining order.  A

20   preliminary injunction, the duration is different.  I haven't

21   made my mind up one way or the other, so by saying those

22   things, I'm not saying I'm going to enter one or deny one.  I

23   just want to, while we're all here today, to hear from Counsel

24   about where you think we are procedurally in this case.  With

25   that, we'll take a break.  We'll come back in at five after 11.

1   I'll hear argument, and then at the end of the argument we'll

2   take up these procedural issues.  We're in recess.

3          (Recess at 10:54 a.m. until 11:06 a.m.)

4          THE COURT:  Mr. Kaplan, you may proceed with

5   argument.

6          MR. KAPLAN:  May it please the Court.  We know that

7   we have to demonstrate irreparable harm.  The irreparable harm,

8   in connection with constitutional matters, is different.  Even

9   a short period of time constitutes irreparable harm.  In our

10  brief, we cite *Elrod v. Burns*, 427 U.S. 347.  It's a case

11  that's been around since 1976.  And this deprivation, even

12  though some of the blocking took place as long as three years

13  ago, it's clear, and each of the plaintiffs have testified that

14  they either today or yesterday went on either Twitter or

15  Facebook and they remain blocked from commenting and

16  participating in the thread.

17         And the legislature, the Arkansas legislature, began its

18  session yesterday and so this is a particularly auspicious and

19  appropriate time to deal with this that they are in session

20  now.  We recognize obviously that matters of public concern

21  continue even after the session, either 60 to 90 days is over,

22  committees meet on a regular basis.  And politicians, public

23  officials, senators, representatives in the Arkansas General

24  Assembly continue to deal with matters that engage the public

25  and that are crucial to the continued viability of this

1   society.  So with regard to irreparable harm, although the

2   plaintiff -- the defendants say, well, look, some of these

3   things happened years ago and they knew that they were being

4   blocked and they didn't take immediate action.  One doesn't

5   have to take immediate action.

6        Particularly with regard to the original lawsuit that was

7   filed here, unfortunately counsel did not act in an appropriate

8   and timely manner.  But as soon as we got involved, this firm

9   got involved, we immediately took action to remedy that

10  situation.  We filed the nonsuit to make certain that the issue

11  with former counsel did not linger on.  And we refiled together

12  with, almost immediately just within a day or two, the request

13  for the extraordinary relief.  So I think that it's clear that

14  under the constitutional issue with regard to irreparable harm,

15  that it has long been established that even a very brief

16  deprivation of a constitutional right constitutes irreparable

17  harm.

18       With regard to the likelihood of success on the merits,

19  it's clear that his posts provide information and give

20  opinions, invite discussions.  I think that the Court can take

21  judicial notice of his Twitter and Facebook, his Facebook page

22  and his official Twitter account both of which have an

23  invitation on them to members of the public and to his

24  constituents to post.  So it's clear that this is in his

25  official position as senator.  If there was any clearer

1    exposition of this issue raised by the motion to dismiss in the

2    individual capacity, what the Fourth Circuit says in *Davison*

3    *against Randall* decided on January 7, just a week ago -- and

4    it's Fourth Circuit Case No. 17-2002, they said -- and this is

5    at page 18 of the slip opinion.

6         "Although no one factor is determinative, this court has

7    held that a defendant's purportedly private actions bear a,

8    quote, sufficiently close nexus, closed quote, with the State

9    to satisfy Section 1983's color of law requirement when a

10   defendant's challenged, quote, actions are linked to events

11   which arose out of his official status, period, closed quote."

12   When a defendant's status as a public official enabled, in this

13   case, her, to execute a challenged action in a matter that a

14   private citizen never could have, then the action is also more

15   likely to be treated as attributable to the State.

16        Going on, at page 19, "This court has found that a

17   challenged action by a government official is fairly

18   attributable to the state when, quote, the sole intention,

19   closed quote, of the official in taking the action was, quote,

20   to suppress speech critical of his conduct of official duties

21   or fitness for public office."  So what we're talking about

22   is -- and then lastly at page 20, "A private citizen could not

23   have created and used the chair's -- she was a chair of a

24   county commission, a county board -- I'll start again.  This is

25   Randall in *Davison v. Randall*.  "A private citizen could not

1   have created and used the chair's Facebook page in such a

2   manner.  Put simply, Randall clothed the chair's Facebook page

3   in the power and prestige of her office and created and

4   administered the page to perform actual apparent duties of her

5   office."

6        And I think when you look at his Facebook page and

7   particularly you'll see that it began as a campaign item and

8   the history of the page will show right on it that it changed

9   to Senator Jason Rapert's page as soon as he got elected, that

10  this is an official page in which he invites people, he has

11  commented on legislation before the Arkansas General Assembly,

12  commented on his effort with regard to have the monument to the

13  ten commandments placed on the Capitol grounds.  So I think

14  that it is -- it's clear that this is an action, these are

15  actions taken under color of law.  And the Exhibits 7 and 11

16  introduced through the testimony of Karen Dempsey and Cathy

17  Shoshone make it clear that these are taken under color of

18  state law.

19       And the law is now clear, the case, Knight First

20  Amendment Institute at Columbia and others against President

21  Trump, Hope Hicks, Sarah Sanders, and Daniel Scavino, in a

22  memorandum decision of the United States District Court for the

23  Southern District of New York made it clear in an extensive

24  75-page well-reasoned decision that these accounts, Facebook

25  pages, and Twitter accounts, are public fora, and it would

1   be -- it's inconceivable to me that anybody could deny that

2   they are public fora.

3       With regard to the third factor, harm against an adverse

4   party, there's certainly no harm in requiring that Senator

5   Rapert make available his Facebook page and his Twitter account

6   to all comers.  There's no indication that these plaintiffs had

7   any -- did anything to violate his terms of use with regard to

8   those accounts.  They merely say that -- or presented points of

9   view which were clearly contrary, I guess about 180 degrees

10  contrary to those that he has taken.  He claims in his

11  affidavit that these folks aren't blocked.  Well, we had hoped

12  that he would be here.  He says in his affidavit also that he's

13  a part-time legislator.  Well, I know it's about 20 blocks from

14  the State Capitol to come down to hit Capitol and Broadway, but

15  there's certainly no reason why he could not have come and

16  defended himself, but clearly these people have been blocked.

17      They were blocked as of yesterday and as of this morning,

18  and the fact that he claims in one place that he doesn't have

19  any staff, and in another in response to Ms. Fernau, alludes to

20  his staff, indicates, I think, clearly to the Court that

21  there's something awry here, and that that would not be in

22  terms of the impact on people who want to communicate with him

23  as opposed to his having to listen to adverse points of view, I

24  guess even though he might not -- he doesn't have to read them,

25  I mean, they get there, but he doesn't have to read them, but

1    the important thing is that they're part of this chain of

2    discussion with the public that he invites.

3          And, that should he choose to ignore them, okay, he

4    chooses to ignore them.  There are lots of politicians who

5    ignore what either their constituents or other members of the

6    public have to say.  But it's a far different thing to say,

7    "I'm going to ignore them" than to say "You can't even approach

8    me, you can't even come with your comments to this public page

9    that I have created."  And that clearly implicates the fourth

10   point, the public interest requirement, the enforcement of the

11   First Amendment of free speech rights is always in the public

12   interest and in support of a robust public debate.

13         So with regard to each of the four foundations of a

14   request for extraordinary relief, I would urge the Court that

15   the plaintiffs have made out their case both with regard to or

16   each with regard to irreparable harm, the likelihood of

17   success, harm against an adverse party, or that is the

18   balancing of the equities test, and the public interest test.

19         If the Court wants to hear our position now on whether

20   this should be considered to be only on the TRO or the

21   preliminary injunction also, I can state our position there

22   too.

23              THE COURT:  Why don't we hold that, Mr. Kaplan.

24   We'll have that discussion after we talk about the merits.

25              MR. KAPLAN:  Sure.  Thank the Court for listening.

1          THE COURT:  Thank you.  Mr. Jacobs.

2          MR. JACOBS:  Thank you, Your Honor.  Jason Rapert is

3    a civic-minded private citizen, a small business owner, and an

4    ordained minister.  Like most Americans, he uses social media

5    as a platform to discuss things that are important to him

6    including politics and sharing his faith.  And like most

7    Americans with large social media followings, Defendant is

8    forced to exercise his control over the content that appears on

9    his profiles including blocking and banning users who violate

10   the rules that he has laid down.

11         This case concerns two social media accounts, in

12   particular:  A Facebook page and a Twitter account.  The

13   plaintiffs, the individuals at least, have been blocked or

14   banned from one of these social media profiles for abusing the

15   privilege of accessing them.  They claim that this violates

16   their First Amendment rights, but they have no First Amendment

17   right to access anyone's personal social media profiles

18   including Senator Rapert's.  We are only here because in

19   addition to being a small business owner and ordained minister,

20   Jason Rapert is a member of Arkansas's part-time legislature.

21         Plaintiffs claim that because Jason Rapert is a state

22   senator, he is robbed of his ability to manage his social media

23   accounts, but even more startling than that, Plaintiffs ask

24   this court to issue a prior restraint on his ability to discuss

25   his religion on these private pages.  That would clearly

1   violate his First Amendment rights to express his religious

2   beliefs, and such a request is totally improper.  That is

3   perhaps the reason I haven't heard Plaintiffs make any remarks

4   about that today.  But in order for Senator Rapert's social

5   media profiles to be subject to the First Amendment, two tests

6   must be met.  First, Senator Rapert has to be acting under

7   color of state law when he creates and manages his social media

8   accounts and curates the content and permissions for those

9   accounts; and, second, his social media profiles must be a

10  public forum.

11       On the record before this court now, Plaintiffs did not

12  come close to being able to prove either of these things.  This

13  is because his social media accounts are controlled by

14  Defendant in his capacity as a private citizen.  And if I could

15  direct the Court's attention to the affidavit that Defendant

16  filed today as Exhibit 1, he provides a description of these

17  accounts.  So one of these is a Facebook page which was

18  launched during his first senate campaign, and the original

19  caption of this page was "Jason Rapert For Arkansas Senate,"

20  and he testifies under oath in his affidavit that this is

21  solely managed by him, he's never had any government staff

22  managing this page, and the most obvious reason is that he does

23  not have government staff who work under him to manage the

24  page.  He testifies that during campaign seasons, he has on

25  occasion provided his campaign staff with access to his social

1    media accounts and allowed them to assist in managing, but

2    never any official government staff.

3        So a Facebook page -- Plaintiffs agree with some of these

4    in their complaint.  A Facebook page is different from a

5    Facebook profile or account in that it allows for greater reach

6    of an audience.  So a Facebook account, which most individuals

7    have, only allows 5,000 friends, you can post to these friends.

8    Anybody can create a Facebook page which allows an unlimited

9    number of followers that a person can post and share their

10   thoughts with.  And so turning to paragraph 7 of this exhibit,

11   the defendant has put a screenshot of the current impressing

12   some of the rules of the Senator Jason Rapert or @JasonRapert

13   Facebook page, and it reads that "Anyone who engages in

14   bullying, intimidation, personal attacks, uses profanity or

15   attempts to mislead others with false information will find

16   their privileges to post on this page revoked.  Thank you for

17   respecting others.  This is not paid for or administered by a

18   government entity."

19       On Twitter, similarly, the account at issue is a personal

20   account of Senator Rapert's.  It's the @JasonRapert Twitter

21   handle.  This is the only personal account on Twitter that

22   Senator Rapert has.  He doesn't have an official government

23   Twitter account.  He has the @JasonRapert handle and he also

24   has the @RapertSenate handle, which is his campaign account.

25   And I believe from their complaint, Plaintiffs agree that

1    @RapertSenate is a campaign account.  And the plaintiffs aren't

2    challenging anything that Senator Rapert has done on this

3    account.  The @JasonRapert Twitter account, like his Facebook

4    page, was created before he was elected to the Senate.  And

5    Senator Rapert has continued to use it in the same way as he

6    did before and after being elected to office.

7         The plaintiffs rely on two cases chiefly in asking for

8    injunctive relief.  If I could just give a few brief remarks

9    about the stark differences between the case as it sits before

10   Your Honor today.  And the case, in those cases, *Davison v.*

11   *Randall* which was decided by the Fourth Circuit this past week,

12   and the *Knight First Amendment v. Trump*, which is a Southern

13   District of New York decision from earlier this year.  Both

14   cases resulted in declaratory judgments finding that the social

15   media accounts or activities at issue violated the First

16   Amendment.

17        Both of those cases, I think the most important fact that

18   distinguishes them, involve government staff managing social

19   media accounts.  The undisputed testimony in the record today

20   is that is the case.  It's never been the case.  Senator Rapert

21   manages these accounts personally just like everyone else in

22   this courtroom who has a social media account would do.  Both

23   of those cases involved a voluminous record.  *Davison v.*

24   *Randall*, which is the Fourth Circuit case that was originally

25   in the Eastern District of Virginia, was a final judgment after

1    a one day bench trial.  The Court in that case had hundreds of

2    exhibits before it in analyzing the specific facts of the

3    social media accounts before it.  In the *Knight First Amendment*

4    *v. Trump* case, which was resolved on summary judgment, on

5    undisputed facts and stipulations.

6         Importantly, neither of those cases involved injunctive

7    relief and, in fact, both courts, the district court in the

8    Fourth Circuit case and the Southern District of New York, both

9    declined to grant injunctive relief to the plaintiffs in that

10   case despite finding for them on the First Amendment

11   declaratory relief.  So the plaintiffs here are asking for

12   relief that neither of those two cases stand for.

13        So if we turn to the legal issues, the first being the

14   state action requirement, in order to maintain a lawsuit under

15   1983 for a constitutional violation, the defendant must have

16   been acting under color of law.  And the Eighth Circuit has

17   explained this in the *Wickersham v. City of Columbia* case.

18   It's at 481 F.3d 591.  The relevant Supreme Court test for that

19   is *Lugar v. Edmondson Oil Company*, 457 U.S. 922.

20        And so to ascertain whether it's a state action in the

21   case, courts look to the record to examine whether the conduct

22   is fairly attributable to the state, and they've asked whether

23   the deprivation or the alleged deprivation resulted from the

24   exercise of a right or privilege of the defendant having its

25   source in state authority and whether the party engaging in

1    that deprivation may appropriately be characterized as a state

2    actor.  So the two cases that they rely on discuss this.  The

3    first is *Davison v. Randall*, the Fourth Circuit in the Eastern

4    District of Virginia case.

5         The defendant in that case was the chair of the Loudoun

6    County Board of Supervisors.  She created a Facebook page that

7    she described as a county page and invited, quote, any

8    constituent to post on the chair page on, quote, any county

9    issues.  The Eastern District of Virginia thought was the most

10   important fact in that case, and that isn't the case here.

11   With regard to the Facebook page in particular, only Senator

12   Rapert can post to that page.  Senator Rapert is the only one

13   who can make new posts on the page and to initiate discussion

14   on the topics that he wishes to talk about.  Others can only

15   comment and reply to comments on the page, which is a critical

16   distinction from the Eastern District of Virginia case.  And

17   that court noted eight particular facts that it found weighed

18   in favor of finding that the chair of the board of supervisors

19   acted under color of state law in managing that page and

20   banning the plaintiff from that page for what the Court later

21   determined was viewpoint information.  And the facts are quite

22   different here.

23        The only one that is actually the same is the title page

24   included the defendant's title, which is descriptive and not

25   something that the Court there gave much weight to.  The page

1    in that case was categorized as that of a government official,

2    so I think the Court can see from several of the first exhibits

3    the plaintiffs introduced about Jason Rapert's Facebook page,

4    that his page is categorized as a politician.  So this is the

5    same as President Obama and former Governor Mike Huckabee.

6    They were also listed as politicians.  This is different from

7    holding out this Facebook account as someone who is a

8    government official, which was the case in the Eastern District

9    of Virginia Fourth Circuit case.

10        The district court noted that the Facebook page at issue

11   there listed the contact information as the defendant's county

12   e-mail address, the telephone number of county office.  We

13   looked to the plaintiffs' exhibits that they introduced.  The

14   contact website is Senator Rapert's campaign e-mail or, sorry,

15   campaign website.  He doesn't have an official office like that

16   to have a phone number for on there, so again, very different.

17   The posts, the district court found in that case, were

18   expressly addressed to Loudoun or citizens of Loudoun.  You can

19   see from the exhibits that the plaintiffs introduce that

20   Senator Rapert doesn't begin his addresses that way.  He posts

21   and shared posts in his personal capacity as a citizen as

22   anyone else might.

23        The defendant in that case submitted posts on behalf of

24   the board of supervisors as a whole.  Senator Rapert does not

25   purport to post on behalf of the legislature as a whole.  The

1   defendant in that case specifically asked her constituents for

2   back and forth constituent conversations and held the page out

3   as being for that purpose.  That's not the case here.  As

4   Senator Rapert has put in his affidavit, the rules of the road,

5   the conversations that can be had on there are limited, and

6   followers can only post on the topics that Senator Rapert

7   chooses to post about in the first instance.

8        And the district court noted that it reviewed nearly 100

9   exhibits of posts in that case.  I believe we have a few, maybe

10  a dozen exhibits in here about the Facebook page, all about

11  really a single post, so the volume of the record here is

12  striking lack of evidence, and the district court noted in that

13  case that nearly all of the posts on that Facebook page related

14  directly or indirectly to Defendant's public office.  A quick

15  perusal of Senator Rapert's Facebook page or Twitter accounts

16  will show that's not the case.  He frequently posts about

17  politics in general, various local, state, and global issues,

18  he posts about his religion, about his ministry, about his

19  business.  It's clear that this is not held out as an official

20  account in the same way that the account in *Davison* would.

21       And the Court specifically held in that case, and this is

22  at page 7 of the Fourth Circuit's opinion, that a private

23  citizen could not have created and used the chair's Facebook

24  page in the manner that it did.  Put simply, the defendant

25  clothed that Facebook page in the power and prestige of her

1   government office and created and administered that page to

2   perform actual or apparent duties of her office.  So that's

3   wholly findings on a voluminous record by the district court

4   that the Court found supported that conclusion.  So the Fourth

5   Circuit in the district court in that case had before it a very

6   different record, and contrary to the bench trial that was in

7   that case, we have very scant evidence in terms of the content

8   of Senator Rapert's social media accounts.  We have a few posts

9   from his Facebook.

10          I believe the only evidence Plaintiffs introduced at all

11  about Senator Rapert's Twitter account are some replies such as

12  in Exhibit 15 where he's replying on someone else's page.  And

13  the defendant introduced, I believe it was Exhibit 5, which is

14  the only tweet from Senator Rapert in the record at this point,

15  I believe, where Senator Rapert tweets on November 10th, "Hope

16  all my deer hunting buddies bagged a nice buck this morning.

17  Be safe in the deer woods in Arkansas this weekend."  And then

18  further down, he says, quote, "Never be afraid -- never ever be

19  afraid to speak the truth and oppose those who are evil.

20  Silence in the face of evil is itself evil.  I will always

21  oppose evil locally, nationally, and globally.  I'm committed

22  to true justice and liberty."  And at the end of it, he

23  references Psalm 56:11.  These are the only two tweets that are

24  in the record before the Court at this moment.  That's in stark

25  contrast to the hundreds of pages of exhibits that the circuit

1  court reviewed in *Davison v. Randall*.

2        And, finally, even upholding that conclusion, Judge

3  Keenan, who fully joined the majority opinion in *Davison v.*

4  *Randall*, set out in a separate concurrence that she had doubts

5  about whether a public official serving in a legislative

6  capacity even qualifies as a unit of government or governmental

7  entity for purposes of a person's ability to open a public

8  forum in the first place, and noted that this is a substantial

9  open question.  So if Plaintiffs are claiming that *Davison v.*

10  *Randall* and the Fourth Circuit is what decides this case, the

11  judges in that case didn't even think that was the case and at

12  least one of them expressly disclaimed it.  So we can see from

13  just a quick perusal of Senator Rapert's social media accounts

14  that he doesn't purport to act as a government official in

15  tweeting or in posting on Facebook.

16        He posts about a variety of topics, the same topics that

17  he's posted about since before becoming an elected official,

18  and one would think the same topics that he posts after leaving

19  office.  There's no difference.  It's an entirely different

20  situation than a county page that was dedicated to county

21  business, which is what the district court in *Davison* found and

22  which the Fourth Circuit upheld on that record.  So there's

23  simply no evidence in the record from which the Court could

24  conclude that Senator Rapert's acting as a state actor when he

25  tweets, when he posts on Facebook, or when he curates the

1    messages on those accounts.

2         The second requirement is that for the First Amendment to

3    even apply to Senator Rapert's social media accounts, it would

4    have to be a public forum.  And as the Supreme Court explained

5    in *Cornelius v. NAACP Legal Defense Fund*, which is 473 U.S.

6    788, that case was relied on by *Davison v. Randall*, and the

7    Court in *Knight First Amendment v. Trump*, the Supreme Court

8    said in that case, "The government does not create a public

9    forum by inaction or by permitting limited discourse, but only

10   by intentionally opening a nontraditional forum for public

11   discourse."  So it's clear from the Supreme Court's case law

12   that a public forum isn't something that someone

13   unintentionally creates.

14        These accounts were created by Senator Rapert before he

15   ever was in office.  They were created for use in his personal

16   capacity sometimes in campaign pages, other times as simply as

17   an individual, and he -- in order for them to qualify as a

18   public forum, you'll have to intentionally open them as such,

19   and there's no evidence from which this court could conclude

20   that he did so.  So in the *Davison* case, for example, the key

21   fact was that the defendant invited -- she invited for any

22   constituent to come and talk about any issues they wished to

23   discuss with the chair, and they also make use of government

24   employees in managing the page.  It was the chief of staff in

25   that case.  In the *Knight v. Trump* case, the key facts the

1   district court found were that The Real Donald Trump Twitter

2   account was registered to Donald J. Trump, 45th President of

3   the United States of America.

4        The tweets from that account were official records that

5   had to be preserved under the Presidential Records Act, and

6   that the account had been used in the course of the appointment

7   of officers including cabinet secretaries, the removal of

8   officers, and the conduct of foreign policy, all of which the

9   district court held were squarely executive functions.  And the

10  district court held in that case that the president presents

11  The Real Donald Trump Twitter account as being a presidential

12  account as opposed to a personal account, and more importantly,

13  uses the account to take actions that can only be taken by the

14  president as president.  And that was the finding of the

15  district court in that case on a motion for summary judgment

16  after reviewing an evidentiary record.  So we don't have any of

17  that here.

18       So Jason Rapert created these accounts prior to being

19  elected to public office, he uses them as a public citizen, he

20  uses them just as any other public citizen does, and he curates

21  the content of those posts just the way that any other public

22  citizen might do.  No action that he's taken with regard to his

23  social media is something that he's able to do based on the

24  fact that he is a state legislator.  He has no more power than

25  any other private citizen, he doesn't exercise any power when

1    he curates the content of these accounts.

2         And, finally, I didn't hear much from the plaintiffs on

3    this point.  There is no evidence on the record before this

4    court that Senator Rapert engages in viewpoint discrimination.

5    So a cursory review of his social media profiles reveals

6    numerous comments and tweets by individuals who disagree with

7    him.  Some of his posts garner hundreds if not thousands of

8    comments, and dozens and maybe hundreds of these are people who

9    are criticizing Senator Rapert for various reasons.  Those

10   posts are still there, he hasn't banned them.  He doesn't ban

11   everyone who disagrees with him.  He bans people for violating

12   the rules that he set down.  People who are respectful and

13   avoid harassing and derogatory language, they're not blocked,

14   not banned, it doesn't matter what their views are.

15        And on their free exercise claims which I also didn't

16   hear a lot from the plaintiffs, there's no evidence that

17   Senator Rapert blocks people because they're atheists.  He

18   explains in his declaration at paragraph 13 that he uses his

19   social media accounts to share ideas on a multitude of topics

20   and as a tool of his ministry sharing his Christian faith.  He

21   says, quote, "As far as I am concerned, I am grateful for every

22   atheist or other nonbeliever who follows my social media posts

23   because they present an opportunity to share my faith.  I would

24   never ban or block someone from social media merely because

25   they do not share my faith, end quote."

1     So the undisputed testimony today is that Senator Rapert

2     has not engaged in viewpoint discrimination on the stand today.

3     The plaintiffs admitted they don't know of a reason, the state

4     of mind leading to the reason that they were blocked.  In

5     certain instances there were many days between the last post

6     that some of the plaintiffs made before the time that they were

7     blocked.  We don't have any evidence as to what happened in the

8     meantime, as far as at least Mr. Barringer is concerned, I

9     don't believe we actually have the content of the posts in the

10    record that he says resulted in him being blocked from

11    Facebook.

12         So to sum up the merits, this court simply doesn't have

13    the evidentiary record before it to say that even if it were

14    possible that Senator Rapert acted in a state capacity when he

15    manages the social media accounts, and there's no evidence from

16    which the Court can conclude that his social media accounts are

17    public forum, so for that reason, Plaintiffs don't have a First

18    Amendment right to access or post to his social media accounts

19    and they're unlikely to succeed on the merits of the case.

20         Plaintiffs' claim of irreparable harm is laughable in

21    light of their own conduct.  So to start, several of the

22    plaintiffs have been blocked from the defendant's social media

23    profiles for years before they decided to file this lawsuit.

24    When they originally brought this lawsuit, they could not be

25    bothered to serve their complaint within the 90 days allowed

1    under the federal rules.  They didn't ask for injunctive relief
2    with that first complaint.  They waited months and months and
3    only upon refiling their lawsuit did they ever ask for
4    injunctive relief.  And the Eighth Circuit's held that's reason
5    enough to deny injunctive relief altogether.
6         Finally, as to the scope of an injunction which
7    highlights the evidentiary concerns, we don't have any evidence
8    from one of the plaintiffs as to the posts that they claim led
9    to them being blocked.  We have allegations of a complaint.
10   And so no matter, I think, how the Court feels about the law in
11   this case or the evidence for the other plaintiffs at the very
12   least, there cannot be a likelihood of success for her.
13   Finally, we would ask that if the Court -- we could have the
14   discussion about the TRO or preliminary injunction in a few
15   moments, but if the Court were to enter a preliminary
16   injunction, we would request that the Court stay the order so
17   that we could immediately appeal that because of the First
18   Amendment issues that are involved.
19        The status quo supports that.  They're asking for
20   injunctive relief to overturn a status quo that has been in
21   place for months and for years and have only recently come into
22   court asking for injunctive relief when they could have done so
23   years and years and years and years ago.  The defendant would
24   ask that the motion be denied.  If this court has any
25   questions.

1          THE COURT:  I don't at this time, Mr. Jacobs.  I

2     appreciate it.  We'll talk about the procedural posture of the

3     case in a few minutes.  I'll let Mr. Byrd address the Court if

4     he wishes to do so.

5          MR. BYRD:  Thank you, Your Honor.  Of course, first

6     and foremost, my position is set out in my brief that an

7     individual can't commit state action to prevent anybody's

8     freedom of speech, but with that motion already there, and the

9     Court will deal with that in due time, I do want to argue in

10     the context of where we are today which is a preliminary

11     hearing, almost emergency hearing with no chance to respond to

12     the allegations really in full advance, so that's where we are

13     today.  And there's this tendency, and I kind of hear it in the

14     arguments that we start getting into like lawyers do, we're

15     arguing over some kind of full-fledged case where evidence has

16     been fleshed out.

17          I'm sitting here in a personal quandary.  I'm thinking my

18     brother ran for justice of the peace and got on the quorum

19     court, so I'm thinking from the context of what's happening

20     here today, what am I supposed to go tell him?  Oh, gosh, you

21     know, you may have just turned your Facebook page into some

22     kind of official something or another.  Don't post anything

23     that could look official.  And I'm already trying to tell him

24     what he can and can't do, and, like, warn him, and I don't know

25     how.

1    I mean, there's three or four people here that are saying
2    they can't talk to the senator.  They've already lived through
3    the session of 2015, the session of 2017, we're sitting here in
4    the session of 2019.  Where was the irreparable harm?  One
5    gentleman that's testified today got on Facebook and somehow
6    commented to Jason Rapert.  Again, I'm trying to figure out how
7    to tell my brother what he ought to do.  And what do I tell my
8    brother about when someone gets to the point of it's almost
9    pornographic?  What would we do if that kind of post comes
10   along?  Is that something that we have to come -- would I have
11   to have my brother come to a court and say, May we block this
12   person?  I mean, just seems like at this phase where we're at
13   today, there's just no way to set the ground rules for this.
14       They sued him individually.  If he's an individual, then
15   did they know he might be an individual?  I mean, is that where
16   we are?  It's this gray area of when a Facebook post is going
17   to turn and change, so I guess I'll live in the context of
18   today that we're here for a emergency hearing on a temporary
19   restraining order that someone can't go down and say their
20   piece, you know.  It's not far to the Capitol, they can walk
21   down there and go talk to him and write him a note at the door,
22   I guess.  That's what I do.  But in any event, my real concern
23   is just how to advise my brother when he's become some
24   different kind of animal and has to be careful when he
25   formulates his own opinions and put them out there on the page.

1  Thank you for your time, Your Honor.

2          THE COURT:  Thank you, Mr. Byrd.

3          MR. KAPLAN:  May I have a brief response, Your

4  Honor?

5          THE COURT:  You may.

6          MR. KAPLAN:  Your Honor, I'm somewhat baffled by the

7  contrast between what the cases say and how the attorney

8  general interprets those cases, as well as how the attorney

9  general and Senator Rapert construe his efforts.  His Facebook

10 page stated that it was, quote, for communication with

11 constituents and citizens as a courtesy.  His Facebook page is

12 quite different from another Facebook account, and the attorney

13 general recognizes that.  It can have thousands and thousands

14 of participants and likes as opposed to the 5,000 or the

15 smaller limitation on a regular Facebook account.  The Facebook

16 account -- Facebook page is different.

17     I don't know how one can continuously assert that he is

18 Senator Rapert and that he has -- and that he posts with regard

19 to legislation not only in the Arkansas General Assembly, but

20 in this nation as a whole and not consider it something other

21 than a personal account.  He can have and does have a personal

22 account and has a personal Twitter account, but not the Senator

23 Rapert account.  It's pretty clear that those accounts are

24 quite different in character from anything that I can create,

25 that the Court can create, that any other individual can

1    create.

2         And he can have a Jason Rapert minister account, he can

3    have a Jason Rapert financial consultant account or whatever

4    the name of his business is, and those accounts are different

5    in -- totally different in character from what he has and from

6    what is here.  The *Davison* court indeed did deny an injunctive

7    relief because the user's account was, or the user was

8    unblocked already, and if one looks at the pages that we have

9    printed in the complaint, you can see that individuals have

10   used obscenities in connection with responses as long as they

11   are in agreement with Senator Rapert.  There is -- these four

12   individuals did nothing to indicate that they -- not that I

13   agree that the terms of usage would be constitutional, but even

14   at that, they didn't use any obscenity, they didn't try to

15   create some kind of inappropriate behaviors in responses.  All

16   they did was to say that they -- respectfully, to say that they

17   disagreed.

18        So -- and there's nothing to indicate why any of these

19   four people were blocked.  And their own -- his own affidavit

20   contradicts what he said in Exhibit 4.  He does have an

21   administrator.  In his affidavit, he says no.  This is so

22   reminiscent of the issues with regard to summary judgment

23   motions where opposing parties later supply affidavits that are

24   contrary to either their deposition testimony or testimony in

25   some prior e-mail where they try to offset and say no, no, no,

no, that's not what really happened, ignore my testimony, take

my testimony in my affidavit.

Well, this court obviously has had that happen, most

courts have.  And it's pretty clear that you can't change the

world by a subsequent affidavit to modify previous accounts and

previous testimony as he has tried to do today.  I'm looking

now at page 21 of the *Davison* opinion.  The Court says, well,

under long-established First Amendment laws, government

entities are strictly limited in their ability to regulate

private speech in public fora.  And that's in conjunction with

Randall's argument that the district court heard in ruling in

his favor on his individual capacity First Amendment claim, and

the Fourth Circuit makes very short shrift of that as does the

Southern District of New York with regard to whether this is a

public forum and whether the president's tweets are personal as

opposed to some kind of private, nonpublic forum.

The evidence, it seems to me, is abundantly clear in this

case that we have made out our case under each of the four

requisites for extraordinary relief.

THE COURT:  All right.  Thank you, Mr. Kaplan.

Let's take up the housekeeping matter that I raised

earlier in regard to where we are at procedurally in this case.

I will hear from Plaintiffs' counsel first.  I'll give everyone

an opportunity to address me, and I may have some specific

questions for folks as we move through it.  Mr. Kaplan.

1    MR. KAPLAN:  Your Honor, we are cognizant of the

2 rule that requires, under TRO, 14 days, and be extended to 14

3 days, and if the other side agrees, can we extend it even

4 beyond that.  My own personal situation is that I'm unavailable

5 in the month of February, but obviously we have a firm and can

6 remedy that situation if it came to that.  We think that the

7 Court can and ought to consider this as a matter for

8 preliminary relief in addition to relief under the

9 extraordinary terms of a temporary restraining order.

10    We think that we have made out that case, and that the

11 Court ought to consider this as both a combined hearing -- we

12 know that it is early in these proceedings, but there's very

13 little additional testimony that would be required with regard

14 to those issues.

15    THE COURT:  All right.

16    MR. BRONNI:  Your Honor, if I heard Mr. Kaplan

17 correctly, they're okay converting this to a PI.  And that

18 would be our preference rather than to just treat these

19 separately.  Part of the reason for that, frankly, although I

20 think the Court is going to rule for us on this record, I would

21 say this is an issue that they're actually, I think, for a

22 prior restraint against the minister.  Given that context in

23 what they're actually asking for, a preliminary injunction at

24 least gives us the ability to ask the Eighth Circuit for

25 sanctions should we feel this court's decision is in error.  So

our preference would be to simply skip over the TRO portion of
it and go ahead and move to the preliminary injunction phase.
That having been said, one qualification, Your Honor.

     The rules allow us to file a written response obviously
to a preliminary injunction request.  Our plan is to file that
within the period provided by the rules.  I know that they, at
least, have requested that the Court shorten that response
period.  I don't believe there's been any filings back and
forth on that point or that the Court's decided otherwise.  So
we would like that full amount of time, but if Your Honor would
prefer to shorten that time to give the Court adequate ability
to consider that, we're open to those -- shortening it, but we
would certainly like enough time to actually draft that.

     THE COURT:  All right.  Have there been any
discussions among counsel about that?  I know there were a lot
of discussions about calendars before we met today, so I didn't
know.  And if you haven't, you haven't, that's fine, about
shortening time.

     MR. BRONNI:  I haven't been involved in that and
Mr. Jacobs is telling me no.

     MR. KAPLAN:  I'm sorry, Your Honor.  I didn't
understand the Court's inquiry.

     THE COURT:  I think what Mr. Bronni suggested is
that the plaintiffs asked for me to shorten the response time
for the request for preliminary injunction, Mr. Rapert's

1  ability to respond in writing to the request for preliminary
2  injunction.
3            MR. KAPLAN:  We have not formally filed anything
4  with regard to request for shortening of time.
5            THE COURT:  All right.
6            MR. BRONNI:  With that understanding, Your Honor,
7  will Plaintiff file within 14 days unless Your Honor advises
8  them --
9            THE COURT:  It's fine to take the 14 days, in my
10 view.  What I may do in this case, and I don't know --
11 Mr. Bronni, you don't have to tell me today because your
12 strategy clearly may change as you move through it, if there
13 are evidentiary exhibits attached to the response, I may set a
14 schedule by which the plaintiffs would then need to apprise me
15 of whether you object to any of those exhibits, I give a
16 response time.  So that we're clear on what the record is
17 before me that I can consider.
18           MR. BRONNI:  Right now, Your Honor, I would advise
19 the Court we're not planning to introduce any evidence.  We
20 like this record as it stands.
21           THE COURT:  All right.  If that changes, I'm not
22 holding you to it today, right?  If there are exhibits, we'll
23 deal with them at that point, but I appreciate that.  All
24 right.  Thank you.  Mr. Bird.
25           MR. BIRD:  I would just take the same position of

1  Mr. Bronni.

2            THE COURT:  All right.

3            MR. BYRD:  Your Honor, I'm used to taking

4  depositions and fleshing things out.  This is fast and furious

5  for me.

6            THE COURT:  I understand.  All right.  Where I

7  understand us to be, I understand, Mr. Kaplan, your position is

8  that I can consider both a preliminary injunction and a

9  temporary restraining order as one at this point?

10           MR. KAPLAN:  Yes, Your Honor.

11           THE COURT:  The State has not yet responded in

12  writing to the request, the motion for preliminary injunction

13  and temporary restraining order.  They intend to do so within

14  the time provided under the rules.  What I intend today is take

15  these matters under advisement.  I plan to wait until the State

16  has had the opportunity to file -- the State, Senator Rapert,

17  has had an opportunity to respond in writing, both in his

18  official and individual capacity.  I'll assume that that's

19  going to be done by the time set forth under the rules.  If

20  there are discussions among counsel that change that, let me

21  know.  If I need to look for something later period, that's

22  what I'm most interested in, but otherwise I'll wait until the

23  written response comes in from Senator Rapert in his official

24  and individual capacity and then we'll go from there, I'll take

25  up the issues at that point.  If the plaintiffs would like to

1    file a reply brief to that, you may certainly request leave to

2    do it.  Typically what I've advised folks of, there's really no

3    provision under the rules until you get to summary judgment for

4    reply briefs.  If you want to file one, the most expeditious

5    way usually is to prepare it and ask me for leave to file

6    something that's attached.  So that way, things get expedited,

7    I know exactly what that looks like, the other side has an

8    opportunity then to object to the request for leave to file a

9    reply.  If there's evidence that comes in with Senator Rapert's

10   response, we'll deal with that as well.  I'll ask either side

11   if there are objections or things that I should consider if the

12   record expands either through a response or reply.

13        Are there any questions?  All right.  If there's no

14   question, I appreciate everyone's time and attention today.

15   Everyone did a good job presenting the issues.  They're

16   complicated and weighty issues, but they're interesting issues,

17   as are nearly everything in this court, I will be honest.  So I

18   appreciate everyone's work to present it as quickly as you

19   have.  Thank you.  We're adjourned.

20        (Proceedings adjourned at 12:03 p.m.)

21                    REPORTER'S CERTIFICATE

22     I certify that the foregoing is a correct transcript of

23   proceedings in the above-entitled matter.

24   /s/ Karen Baker, RMR, CRR, CCR
     -------------------------------        Date: January 22, 2019
25   United States Court Reporter