**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**

**AMERICAN ATHEISTS, INC.;**
**BETTY JO FERNAU;**
**CATHERINE SHOSHONE;**
**ROBERT BARRINGER; and**
**KAREN DEMPSEY,**                                                        **PLAINTIFFS**

   **v.**     **Case No. 4:19-cv-00017-KGB**

**STANLEY JASON RAPERT, in his individual**
**and official capacity,**                                                **DEFENDANT**

## RESPONSE IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

   Jason Rapert is a civic-minded private citizen, a small business owner, and an ordained minister.  Like most Americans, he uses social media as a platform to discuss things that are important to him, including politics and his faith.  And like most Americans with large social media followings, he is forced to exercise control over the content that appears on his social media accounts, including blocking and banning users who violate the rules he has laid down.

   Plaintiffs are four atheists, and a group purporting to represent them, who erroneously claim that they were blocked or banned from Defendant's personal social media accounts because of their views.  In reality, they were blocked or banned from those accounts for abusing the privilege of accessing them.  They claim that this violates their First Amendment rights, but they have no First Amendment right to access anyone's personal social media accounts, including Defendant's.

   It makes no difference that, in addition to being a small business owner and ordained minister, Defendant is a part-time Arkansas legislator.  Plaintiffs claim that because Defendant is a state senator, he has forfeited the ability to manage his personal social media accounts and prevent disruptive commenters from having a heckler's veto.  But even more startling than that,

Plaintiffs ask this Court to issue a prior restraint on Defendant's ability to discuss his religion on his private accounts.  That would clearly violate his First Amendment right to express his religious beliefs.  Such a request is totally improper.

Plaintiffs have failed entirely to marshal the evidence necessary to show that they are entitled to their requested preliminary injunction.  Relying chiefly on two other cases involving government officials blocking individuals from their official social media accounts, Plaintiffs seek to bootstrap the fact-specific holdings of those cases into this case, which lacks any evidentiary basis to justify the same outcome.  Defendant's management of his personal social media accounts is not unconstitutional, and Plaintiff's motion should be denied.

### Background

In addition to owning his own business, speaking around the country as an ordained minister, and being the president and founder of a non-profit organization, Defendant is a member of the Arkansas Senate.  Rapert Decl. ¶ 3.  He was first elected in 2010 and was most recently reelected in November 2018.  *Id*. at ¶ 2.  Defendant created the two social media accounts at the center of this lawsuit before he was first elected: Defendant's Facebook "page" and his Twitter account, @jasonrapert.  *Id.* at ¶¶ 5, 10.  He uses these accounts in his personal capacity; they are not, and have never been, official government accounts.  Defendant uses them for personal use—for his campaigns, his business, and his ministry.  *Id.* at ¶ 4.

Having attained a large social media following, Defendant is forced to curate the contents of his personal social media accounts, lest "harassing and disruptive comments" render them "totally unusable."  *Id*. at 15.  From time to time, Defendant is forced to ban or block from these personal individuals who engage in harassing, vulgar, or disruptive behavior.  *Id*. at ¶ 14.  This

case concerns four such individuals who have been blocked from either Defendant's Facebook page or Twitter account.  *Id*. at ¶ 12.

Plaintiffs first filed this lawsuit in October 2018, just before the November 2018 general election.  *See* Case No. 4:18-cv-00729-KGB (E.D. Ark.).  As here, Plaintiffs complained about being banned or blocked from Defendant's personal social media accounts—generally years in the past—claiming violations of a myriad of constitutional rights.  *See e.g.*, Compl. at ¶¶ 96, 112. Underscoring that not even Plaintiffs took their allegations seriously, they failed to even obtain a summons for two months, and despite Defendant's counsel agreeing to accept service of Plaintiffs' complaint and summons, Plaintiffs failed to serve Defendant within the 90 days allowed under the rules.  *See* Case No. 4:18-cv-00729-KGB, ECF No. 6 (moving to dismiss for failure to serve complaint).  Blaming their failure on their first counsel, Plaintiffs then voluntarily dismissed their lawsuit.  Case No. 4:18-cv-00729-KGB, ECF No. 10.

Having refiled their lawsuit, Plaintiffs now ask the Court to grant them the extraordinary relief (that they did not request the first time) of a preliminary injunction.  They seek a preliminary injunction to force Defendant to allow (on his personal social media accounts) the kind of harassing conduct for which Plaintiffs were blocked or banned in the first place.  But even more problematically, they seek an injunction that would impose a prior restraint on Defendant's religious speech on his personal social media accounts.  On January 15, 2019, this Court held a preliminary injunction hearing.  During that hearing, Plaintiffs failed to offer even a scintilla of evidence supporting their request for a preliminary injunction.  Plaintiffs' motion should be denied.

**Argument**

A preliminary injunction is an extraordinary and drastic remedy that should not be granted unless Plaintiffs have clearly carried their burden of persuasion. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997); *see Sanborn Mfg. Co., Inc. v. Campbell/Hausfield Scott Fetzer Co.*, 997 F.2d 484, 495–96 (8th Cir. 1983) (noting the burden on the movant "is a heavy one") (citing *Dakota Indus., Inc. v. Ever Best Ltd.*, 944 F.2d 438, 440 (8th Cir. 1991)). Considering the four factors set forth in *Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.3d 109 (8th Cir. 1981)— (1) likelihood of success on the merits, (2) irreparable injury to the movant, (3) the balance between any irreparable injury to the movant and the injury that granting the injunction will inflict on other parties, and (4) the public interest—Plaintiffs simply cannot justify the extraordinary relief they seek.

Beyond the fact that Plaintiffs have failed to meet their heavy burden, their delay in seeking an injunction gives the Court another reasons to deny their motion. "A delay in seeking a preliminary injunction is a factor to be considered in weighing the propriety of relief." *Lydo Enters., Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984); *see also Jones v. Markiewicz-Qualkinbush*, 842 F.3d 1053, 1057 (7th Cir. 2016) (affirming denial of preliminary injunction where "the [district] court emphasized the significance of the plaintiffs' delay, more than two months after receiving notice, as a deciding factor in the case"); *Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel*, 872 F.2d 75, 80 (4th Cir. 1989) (affirming denial of preliminary injunction for six-month delay). With one exception, Plaintiffs filed this lawsuit years after being blocked or banned from Defendant's personal social media accounts. Even after filing their first lawsuit, they did not request a preliminary injunction. Instead, they waited *three months*, nonsuited their first case, and then filed a new lawsuit asking for injunctive relief. They

had every opportunity to press these claims earlier, yet chose not to do so.  This alone warrants denial of their motion, all the more so given that they are requesting a change to the *status quo* that has been in place for years.

## I.     Plaintiffs are not likely to succeed on the merits of their claims.

Plaintiffs bring a number of unfocused challenges to Defendant's decision to block or ban them from his personal social media accounts.  All of these scattershot claims fail at the outset because Defendant does not act under color of state law when managing his personal social media accounts—a requirement for a constitutional violation.  But in addition to that, all of Plaintiffs' constitutional and state-law claims fail on the merits.  Their motion should be denied.

### A.     Defendant acts in his capacity as a private citizen, and not under color of state law, in creating and managing his social media accounts.

Section 1983 provides a federal cause of action for the deprivation, under color of law, of a citizen's "rights, privileges, or immunities secured by the Constitution and laws" of the United States.  In order to have a viable claim under Section 1983, a plaintiff must show that the defendant acted under color of state law and that the defendant violated a right secured by the Constitution.  *West v. Atkins*, 487 U.S. 42, 48 (1988); *Dunham v. Wadley*, 195 F.3d 1007, 1009 (8th Cir.1999).  The First Amendment in particular protects individuals against abridgments of their speech by the government, not against restrictions attributable to private action.  *See, e.g.*, *Harris v. Quinn*, 134 S. Ct. 2618, 2628 n.4 (2014) ("[T]he First Amendment does not restrict private conduct."); *Wickersham v. City of Columbia*, 481 F.3d 591, 597 (8th Cir. 2007) ("The First Amendment guarantee of free speech guards against abridgment through state action alone. It does not inhibit private restrictions on speech.").

That Defendant is a member of the Arkansas Senate does not control the state-actor analysis.  "[A] defendant's government employment does not make the defendant a

governmental actor for all purposes." *Federer v. Gephardt*, 363 F.3d 754, 759 (8th Cir. 2004). Rather, "the particular actions complained of must be fairly attributable to the respective government." *Id.* "To ascertain whether there is state action in a case, [courts] examine the record to determine 'whether the conduct at issue is fairly attributable to the state." *Wickersham*, 481 F.3d at 591 (quoting *Montano v. Hedgepeth*, 120 F.3d 844, 848–849 (8th Cir. 1997)). Courts are further "guided in this inquiry by two additional queries: whether the claimed deprivation 'resulted from the exercise of a right or privilege having its source in state authority' and whether the party engaging in the deprivation 'may be appropriately characterized as a state actor.'" *Id.* (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939 (1982)) (alterations omitted).

The "ultimate conclusion must turn on the particular facts of the case, since 'only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance.'" *Id.* (quoting *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 722 (1961)) (alterations omitted). "The one unyielding requirement is that there be a 'close nexus' not merely between the state and the private party, but between the state and the alleged deprivation itself." *Id.* (quoting *Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n*, 531 U.S. 288, 295 (2001)). Because Defendant did not act under color of state law in creating or managing his personal social media accounts, but rather acted in his capacity as a private citizen, all of Plaintiffs' constitutional claims fail.

In arguing that Defendant acted under color of state law when he blocked or banned the individual Plaintiffs from his social media accounts, Plaintiffs rely upon a single case, *Davison v. Randall*, — F.3d —, 2019 WL 114012 (4th Cir. Jan. 7, 2019). There, the Fourth Circuit affirmed the district court's conclusion that, on the record before it, the Chair of the Loudoun

County Board of Supervisors acted under color of state law in creating an official governmental

Facebook page and blocking the plaintiff from that page when he posted a comment containing

allegations of corruption on the part of local school board members.  *Id*. at *3.  The district court

made this determination after holding a bench trial and reviewing hundreds of exhibits

concerning the defendant's use of the "Chair" Facebook page.  *Davison v. Loudoun Cty. Bd. of*

*Supervisors*, 267 F. Supp. 3d 702, 714 n.3 (E.D. Va. 2017).

The court concluded that the defendant created the Chair page "to further her duties as a

municipal official" and used it "as a tool of governance."  *Davison*, 2019 WL 114012, at *7.  The

district court noted the following facts as particularly persuasive:

> (1) the title of the page includes 'Defendant's title; (2) the page is categorized as
> that of a government official; (3) the page lists as contact information Defendant's
> official County email address and the telephone number of Defendant's County
> office; (4) the page includes the web address of Defendant's official County
> website; (5) many—perhaps most—of the posts are expressly addressed to
> "Loudoun," Defendant's constituents; (6) Defendant has submitted posts on
> behalf of the Loudoun County Board of Supervisors as a whole; (7) Defendant
> has asked her constituents to use the page as a channel for "back and forth
> constituent conversations"; and (8) the content posted has a strong tendency
> toward matters related to Defendant's office.

*Davison*, 267 F. Supp. 3d at 714.  The Chair page was also managed by government staff.  *See*

*Davison*, 2019 WL 114012, at *1.  The Fourth Circuit held that a "private citizen could not have

created and used the Chair's Facebook Page in such a manner."  *Id.* at *7.  The *Davison*

defendant "clothed the Chair's Facebook Page in 'the power and prestige of her state office,'" *id.*

(quoting *Harris v. Harvey*, 605 F.2d 330, 337 (7th Cir. 1979) (alterations omitted)), "and created

and administered the page to 'perform actual or apparent duties of her office,'" *id.* (quoting

*Martinez v. Colon*, 54 F.3d 980, 986 (1st Cir. 1995) (alterations omitted)).

By contrast, the record in this case establishes that Defendant uses his Facebook page and

Twitter account in his personal capacity; at the very least, Plaintiffs have failed to carry the

burden of clearly showing that Defendant acted under color of law.  Comparing the facts here to

those in *Davison*, only one of the eight facts noted above is present here—namely, that

Defendant includes "Sen." in the title of his personal profiles.  *See* Pls.' Ex. 1 (Facebook); Pls.'

Ex. 15 (Twitter).[1]  Unlike in *Davison*, Defendant's Facebook page is categorized as a

"Politician" page.  *See* Pls.' Ex. 2.  The Fourth Circuit noted that the *Davison* defendant's

separate campaign Facebook page was designated as a "Politician" page.  *Davison*, 2019 WL

114012 at *1.  Defendant does not list "official" contact information on his social media profiles.

The only evidence in the record as to a website being included on Defendant's social media

pages is the link to "www.jasonrapertforsenate.com"—Defendant's campaign website—on

Defendant's Facebook page.  *See* Pls.' Ex. 2.  None of the evidence introduced shows Defendant

addressing any of his posts expressly to his constituents, which makes perfect sense given that

Defendant also uses his social media accounts in furtherance of his business and ministry.

Defendant has no submitted—and cannot submit—posts on behalf of the Arkansas Senate as a

whole.  Defendant has not asked his constituents to use his Facebook page for "back and forth

constituent conversations," instead choosing to limit the topics of discussions to things he posts,

*see* Rapert Decl. at ¶ 6, and the nature of what may be posted in comments, *id*. at ¶ 7.  Finally,

there is no evidence indicating that the content posted by Defendant has a "strong tendency

toward matters" related to his office.  *See, e.g.*, Pls.' Ex. 1 (post during campaign discussing

election challenger's views on a court case upholding the National Motto as constitutional);

Def.'s Ex. 5 (discussing deer season and posting a picture reflecting his endorsement by the

National Rifle Association); Pls.' Ex. 13 (post during campaign season commenting on abortion

and criticizing his opponent for taking money from abortion doctors).  In contrast, the district

---

[1] Exhibit numbers refer to exhibits admitted by the Court at the hearing.

court in *Davison* noted that of the over 100 exhibits depicting the defendant's Facebook posts, "nearly all" of them related directly or indirectly to her public office, and there was "comparably little evidence of posts of a more personal nature." *Davison*, 267 F. Supp. 3d. at 714 n.3.

The Fourth Circuit also noted that "the specific actions giving rise to [the plaintiff's] claim"—the banning of the plaintiff from the Chair page—"are linked to events which arose out of [the defendant's] official status." *Davison*, 2019 WL 114012, at *7 (*citing Rossignol v. Voorhaar*, 316 F.3d 516, 524 (4th Cir. 2003)); *accord Wickersham*, 481 F.3d at 597 (noting the "unyielding requirement" that there be a close nexus "between the state and the alleged deprivation itself"). This was so because the district court found that the motivation behind the defendant banning the plaintiff from the Chair page was a comment by the plaintiff regarding allegations of corruption in the local school board. That comment was made in response to a post by the defendant informing "the public about what happened at the Loudoun Board and Loudoun County School Board's joint meeting." *Davison*, 2019 WL 114012, at *7. In other words, there was a direct connection between the defendant's official actions and the reason she blocked the plaintiff from the Chair page. Here, in contrast, there is no evidence in the record to establish why any of the Plaintiffs were blocked. *See, e.g.*, Hearing Tr. at 39:17–20 (Plaintiff Shoshone admitting she does not know why she was blocked).

Contrary to Plaintiffs' arguments, the mere fact that Defendant is a member of Arkansas's part-time legislature does not subject his social media accounts to First Amendment scrutiny. *Davison* did not purport to establish such a rule. Rather, even assuming that case was deciding correctly, it was decided on the basis of a voluminous record after a trial. The record in this case contains comparatively little information about Defendant's use of his personal social media accounts. It does not come close to establishing that Plaintiffs are likely to succeed in

9

showing that Defendant acts under color of state law in managing those personal accounts.  That alone justifies denying Plaintiffs' motion.

**B.      Defendant's management of his personal social media accounts does not violate the First Amendment.**

As explained above, Defendant's decision to block or ban Plaintiffs from his personal social media accounts was not taken under color of state law because he made that decision in his personal capacity, not as a government official.  That alone disposes of Plaintiffs' First Amendment claims.  But even setting this aside, Defendant's personal social media accounts are not public fora subject to First Amendment restrictions, and even if they were limited public fora, Defendant has not engaged in impermissible viewpoint discrimination.  Plaintiffs are unlikely to succeed on their First Amendment claims.  Plaintiffs' motion should be denied.

**1.      Defendant's social media accounts are his personal accounts, not public fora.**

To qualify as a public forum subject to First Amendment scrutiny, the space at issue must be owned or controlled by the government.  *See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 801 (1985) ("[A] speaker must seek access to public property or to private property dedicated to public use to evoke First Amendment concerns.").  Further, the application of forum doctrine must be consistent with the purpose, structure, and intended use of the space. *See Pleasant Grove City v. Summum*, 555 U.S. 460, 480 (2009) ("[W]here the application of forum analysis would lead almost inexorably to closing of the forum, it is obvious that forum analysis is out of place.").  Finally, the "government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." *Cornelius,* 473 U.S. at 802.

a.      **Defendant's personal social media accounts are not government controlled.**

Plaintiffs cite to *Davison*, *supra*, and *Knight First Amendment Institute v. Trump*, 302 F. Supp. 3d 541 (S.D.N.Y. 2018), to argue that Defendant's personal social media accounts are designated public fora for purposes of the First Amendment.  ECF No. 6 at 39.  Plaintiffs are mistaken, however; Defendant's personal social media accounts are owned by Twitter and Facebook—private corporations—and Defendant exercises at most limited control over those accounts in his capacity as a private citizen.  Defendant's personal social media accounts are neither owned nor controlled by the government.  Both *Davison* and *Knight* support this conclusion.

In *Davison*, the Fourth Circuit held that the defendant had opened the Chair page as a public forum.  Chiefly relying on its prior conclusion that the defendant acted under color of state law in creating and managing the page, the court held that the defendant exercised governmental control over the page.  *See Davison*, 2019 WL 114012 at *10.  Because Davison's under-color-of-state-law analysis does not apply in this case, as explained above, neither does its governmental-control analysis.

In *Knight*, the court held that President Trump's @realDonaldTrump Twitter handle constituted a public forum.  In determining that the control President Trump and the White House Social Media Director had over the @realDonaldTrump account was governmental, the court found several facts persuasive.  First, the account was "presented as being registered to Donald J. Trump, 45th President of the United States of America, Washington, D.C."  302 F. Supp. 3d at 567 (internal quotation marks omitted).  Second, President Trump's tweets from that account "are official records that must be preserved under the Presidential Records Act."  *Id.* Third, the President used the account "in the course of the appointment of officers (including

cabinet secretaries), the removal of officers, and the conduct of foreign policy, . . . all of which are squarely executive functions[.]"   *Id*. (internal citations omitted).   In other words, the court held that "the President presents the @realDonaldTrump account as being a presidential account as opposed to a personal account and, more importantly, uses the account to take actions that can be taken only by the President as President."   *Id*.

The record in this case falls far short of establishing that Defendant's social media accounts are government-controlled.   For one, this case is easily distinguishable from *Davison* and *Knight* because, unlike there, no government staff has ever managed Defendant's social media accounts.   *See* Rapert Decl. ¶¶ 5, 7.[2]   Defendant's accounts are managed by him alone, other than occasional access being given to *campaign* staff.   *Id*. at ¶ 5.   Thus, on this record, Plaintiffs have failed to offer any evidence that Defendant's personal social media accounts are government-controlled and they cannot show that they are likely to succeed on the merits. Unlike in *Knight*, Defendant has not used his social media accounts as "official accounts" in the way the *Knight* court held that the President did.   On the contrary, Defendant uses his social media accounts for his personal use, his campaigns, and his ministry.   Rapert Decl. ¶ 4. Defendant has not taken any sort of "official" actions using his personal social media accounts, nor is it clear what those kinds of actions would even be in the case of a legislator.

---

[2] At the hearing, Plaintiffs noted an email communication wherein Defendant references his "campaign and site administrator" having authority to manage his social media accounts.   *See* Hearing Tr. at 87:18–21 (referencing Def.'s Ex. 4).   This is entirely consistent with Defendant's testimony that he has "on occasion provided campaign staff with access to [his] Facebook page and allowed them to assist with managing it."   Rapert Decl. at ¶ 5.   It certainly does not contradict his uncontroverted testimony that he has never had government staff manage his personal social media accounts.   *See id.*

b.      **Defendant did not intentionally create a public forum.**

Contrary to Plaintiffs' argument, the mere fact that Defendant is a part-time state legislator does not make his personal social media accounts public fora.  As Judge Keenan explained in her concurrence in *Davison*, "it appears to be an open question whether an individual public official serving in a legislative capacity qualifies as a unit of government or a government entity for purposes of her ability to open a public forum."  *Davison*, 2019 WL 114012, at *16 (Keenan, J., concurring).  But even assuming that legislators can open public fora, Plaintiffs have not come close to showing Defendant's personal social media accounts qualify as public fora, as illustrated by the vast differences between this case and *Davison* and *Knight*.

Because the *Davison* and *Knight* courts held that the defendant in each case engaged in viewpoint discrimination, they did not determine what type of public forum the social media accounts at issue qualified as.  But in determining whether the defendant did, in fact, open a public forum, the facts in the record were key.  And the record here lacks any similar evidence.

The *Davison* court noted that the most important facts in its analysis in concluding that the defendant opened a public forum were that the defendant "invit[ed] 'ANY Loudoun citizen' to make posts to the comments section of the Chair's Facebook Page—the interactive component of the page—'on ANY issues, request, criticism, complement [sic] or just [their] thoughts[.]'"  *Id.* at *8.  The defendant "placed no restrictions on the public's access to the page or use of the interactive component of the Chair's Facebook Page."  *Id.*  The opposite is true here.  Defendant has not invited any citizen to post on his personal social media profiles on whatever topics they wish.  Indeed, Defendant specifically limits the topics of discussion on his Facebook page by restricting anyone but himself from creating new posts.  Rapert Decl. at ¶ 6.  And Defendant has placed restrictions on the content of what may be posted on his page.  The "Impressum" of his

13

Facebook page reads:  "Anyone who engages in bullying, intimidation, personal attacks, uses profanity or attempts to mislead others with false information, will find their privilege to post on this page revoked.  Thank you for respecting others.  This page is not paid for or administered by a government entity."  *Id*. at ¶ 7.[3]  Clearly, Defendant has placed far more restrictions on his personal social media profiles than was the case in *Davison*.

The court in *Knight* made similar observations regarding the facts in that case.  It noted that the "@realDonaldTrump account is generally accessible to the public at large without regard to political affiliation or any other limiting criteria," meaning anyone who is not blocked may follow the account and reply to or retweet the account's tweets.  *Knight*, 302 F. Supp. 3d at 574.  That fact, said the *Knight* court, weighed in favor of the account being a designated public forum.  *Id.*  Further, the account was held out by White House staff "as a means through which the President 'communicates directly with you, the American people!'"  *Id.*  Finally, the court noted that the account was compatible with expressive activity.  *Id.*

Here, Defendant's personal social media accounts are not generally accessible to the public with no limiting criteria.  Instead, Defendant takes steps to curate the content displayed on those accounts.  *See* Rapert Decl. ¶¶ 7, 14.  Defendant also does not hold out his social media accounts as direct communication between constituents and himself in his capacity as a state legislator.  And while social media accounts are generally compatible with expressive activity, placing too much weight on this factor would prove too much, as the Supreme Court has said as much about the Internet writ-large.  *See Packingham v. North Carolina*, — U.S. —, 137 S. Ct. 1730, 1735, (2017) (identifying "cyberspace" as "the most important place[] . . . for the exchange

---

[3] The version of the "Impressum" in Plaintiffs complaint is outdated and was no longer accurate at the time they filed this lawsuit.   *See* Compl. at ¶ 34; Rapert Decl. at ¶ 7.

of views" today).  To the contrary, the record here demonstrates that individuals—including the

Plaintiffs here—can and do contact Defendant via his official email.  *See* Def.' Exs. 2–4.

The evidence in the record at this stage of the case does not come close to establishing

that Defendant intended for his personal social media accounts to be public fora.  Plaintiffs have

not met their burden of showing they are likely to succeed, and their motion should be denied for

that reason.

> **2.    Even if Defendant's social media accounts could be considered limited public fora, Plaintiffs have failed to show that Defendant engaged in viewpoint discrimination.**

If Defendant's social media accounts could be considered public fora at all, they would

be of a limited nature.  A limited public forum is "a forum that is limited to use by certain groups

or dedicated solely to the discussion of certain subjects."  *Summum*, 555 U.S. at 470.  "When the

State establishes a limited public forum, the State is not required to and does not allow persons to

engage in every type of speech."  *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106

(2001).  Instead, the government can reserve its forum "for certain groups or for the discussion of

certain topics."  *Id.* (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829

(1995)).  As just explained, Defendant has not opened—and as an individual legislator, likely

*could not* open—his personal social media accounts as a public forum, limited or otherwise.  But

even if those accounts were limited public fora, this does not end the analysis.

Restrictions within a limited public forum "must not discriminate on the basis of

viewpoint, and [they] must be reasonable in light of the purpose served by the forum."  *Good

News Club*, 533 U.S. at 106–07 (quotations and citations omitted).  Plaintiffs do not claim that

Defendant's social media policy is unreasonable, but instead argue that Defendant engaged in

viewpoint discrimination when he banned or blocked them from his social media accounts.  But

they have failed to introduce any evidence that this is the case.  Rather, Defendant has adopted a viewpoint-neutral policy designed to cull "harassing and disruptive comments and replies" that would otherwise "render [his] social media profiles totally unusable."  Rapert Decl. at ¶ 15.  Defendant's *uncontroverted* testimony is that he enforces this policy "without regard to whether" a social media follower "support[s] [his] beliefs" and that he "do[es] not block people simply because they disagree with [him]."  *Id*. at ¶ 14.  In other words, the undisputed evidence is that Defendant engages in no viewpoint discrimination.  This is the opposite of *Davison* and *Knight*, where the courts found that the record established that the defendants blocked or banned the plaintiffs for the views they expressed.

In a similar case as to this one, the same district court that decided *Davison* considered the constitutionality of Loudoun County's social media policy, which banned "off topic" comments.  *Davison v. Plowman*, 247 F. Supp. 3d 767, 776–77 (E.D. Va. 2017).  The court had little trouble concluding that the policy was "self-evidently viewpoint neutral."  *Id*. at 777.  It also noted that prohibiting off-topic comments is "a common restriction among limited public forums."  *Id.* (citing *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 71 n.7 (1983)).  And the court further found that the "clearly off topic" restriction "was reasonably related—indeed, integral—to the forum's purpose."  *Id*.  Defendant's practice of culling vulgar and harassing comments from his personal social media accounts is likewise viewpoint-neutral and integral to the accounts' purposes.  Otherwise, as Defendant has testified, the accounts would become "totally unusable."  Rapert Decl. at ¶ 15.

Plaintiffs have failed to meet their burden to show that Defendant engaged in viewpoint discrimination.  The evidence in the record at this stage of the case is totally silent about Defendant's motivation in blocking or banning the Plaintiffs, save for Defendant's testimony.

16

The courts in *Davison* and *Knight* reached their decisions after being presented with a voluminous record.  Plaintiffs have failed to make a similar showing and have shown no likelihood that they will be able to.  Their motion must therefore be denied.

C.    **Defendant has not violated Plaintiffs' right to petition the government by blocking or banning them from his private social media accounts.**

Plaintiffs' claim that Defendant violated their right to petition under the First Amendment is likewise meritless.  First and foremost, Defendant's social media accounts are, again, his private, personal accounts.  There can be no right on the part of anyone to view or make use of these accounts in contacting Defendant.  Plaintiffs' claims fail for that reason alone.

Even if Defendant's social media accounts were subject to First Amendment scrutiny, Plaintiffs' claims would still fail.  There is "no constitutional right as members of the public to a government audience for their policy views."  *Minn. State Bd. for Cmty. Colls. v. Knight*, 465 U.S. 271, 286 (1984).  Defendant is under no obligation to listen to Plaintiffs, and Plaintiffs have no constitutional right to be heard via his personal social media profiles.  "Nothing in the First Amendment or in this Court's case law interpreting it suggests that the rights to speak, associate, and petition require government policymakers to listen or respond to individuals' communications on public issues."  *Id.* at 285.

Defendant has effectively chosen to "ignore" those who post vulgar or harassing messages in response to his posts.  *Smith v. Ark. State Highway Emp., Local 1315*, 441 U.S. 463, 466 (1979) (holding, in part, that "the First Amendment does not impose any affirmative obligation on the government to listen [or] to respond").  Plaintiffs remain free to contact Defendant through a variety of other means, including email, telephone, in person, or even by creating new social media accounts.  *See* Hearing Tr. at 40:18–22 (Plaintiff Shoshone admitting she has an unblocked Twitter account); *id.* at 50:16–23 (Facebook communication with Plaintiff

17

Barringer); Def.'s Ex. 4 (email communications with Plaintiff Fernau).  Plaintiffs point to no case holding that elected officials must allow anyone to contact them through social media or any other particular medium.  *See Lee v. Driscoll*, 871 F.3d 581, 585–86 (8th Cir. 2017) (holding that "there is no First Amendment right to participate in a non-public government meeting as a member of the public").

**D.      Defendant's religious speech does not violate Plaintiffs' right to free exercise of religion.**

Plaintiffs astonishingly claim that Defendant—an ordained minister—should be subject to a prior restraint silencing his religious speech.  That claim amounts to a request for a presumptively unconstitutional order by this Court.  *See New York Times Co. v. United States*, 403 U.S. 713, 714 (1971) ("Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity.") (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963)).  That unconstitutional demand hardly warrants a response and should be rejected with the remainder of Plaintiffs' baseless Free Exercise claims.

Plaintiffs' first claim is that Defendant engages in viewpoint discrimination by blocking or banning atheists from his personal social media accounts.  As explained above, *supra* at pp. 15–16, there is no evidence on this record that Defendant's decision to block or ban individuals for harassing and vulgar comments is viewpoint discriminatory.  Moreover, Defendant's uncontroverted testimony is that he has never banned or blocked anyone from his social media accounts because he or she is an atheist, and would not do so.  *See* Rapert Decl. at ¶ 13.  Because his personal social media accounts are a "tool of [his] ministry," Defendant is "grateful for every atheist or other non-believer who follows" him on social media.  *Id.*  Plaintiffs have failed to meet their burden to show that Defendant has engaged in viewpoint discrimination, whether on

the basis of speech or religious beliefs.  They are therefore unlikely to succeed on either their federal or state claims.

Plaintiffs' second claim is that Defendant uses his social media accounts to "single out atheists for opprobrium and derision."  ECF No. 6 at 44.  They do not explain what they mean by this, and they fail to provide even a single example of the alleged behavior they complain about. Yet they have asked this Court to enjoin Defendant from "disparag[ing] any particular beliefs about religion, and/or single users out for opprobrium and derision on the basis of their religious beliefs[.]"  *Id.* at 47.  This vague and overbroad request amounts to a prior restraint on Defendant's ability to speak about his religious beliefs—both as an individual and as a minister. They ask this Court to violate Defendant's right to freely express his religious beliefs, in the name of being free from being "disparaged"—whatever it is that they mean by that term.  This astonishing request must be rejected.

### E. Plaintiffs' equal-protection challenge cannot succeed.

For their final claim, Plaintiffs purport to bring an equal protection claim, arguing that they have been singled out for disparate treatment without justification.  "The Supreme Court recognizes such a 'class of one' equal protection claim—meaning 'the plaintiff did not allege membership in a class or group'—'where the plaintiff alleges that [it] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'"  *Robbins v. Becker*, 794 F.3d 988, 995 (8th Cir. 2015) (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).  This claim is doomed from the start because, as explained above, Defendant acts in his capacity as a private citizen when he manages his personal social media accounts.  Regardless, Plaintiffs have not even attempted to explain how they satisfy either prong of this test.  *See* ECF No. 6 at 44–45.

Plaintiffs cannot simply claim to have been singled out—they must prove it, and their burden of proof is a high one. "'The threshold inquiry in the class-of-one equal protection claim [Plaintiffs] assert is whether [Plaintiffs] are similarly situated to others who allegedly received preferential treatment.'" *Robbins*, 794 F.3d at 996 (quoting *Domina v. Van Pelt*, 235 F.3d 1091, 1099 (8th Cir. 2000)) (brackets omitted). "'Absent such a threshold showing, [Plaintiffs] do not have a viable equal protection claim.'" *Id.* (quoting *Klinger v. Dep't of Corr.*, 31 F.3d 727, 731 (8th Cir. 1994)) (brackets and ellipses omitted). "'To be similarly situated for purposes of a class-of-one equal-protection claim, the persons alleged to have been treated more favorably must be identical or directly comparable to the plaintiff in all material respects.'" *Id.* (quoting *Reget v. City of La Crosse*, 595 F.3d 691, 695 (7th Cir. 2010)).

"'Identifying the disparity in treatment is especially important in class-of-one cases.'" *Id.* (quoting *Barstad v. Murray Cty.*, 420 F.3d 880 884 (8th Cir. 2005)). *Id.* "'A class-of-one plaintiff must therefore provide a specific and detailed account of the nature of the preferred treatment of the favored class, especially when the state actors exercise broad discretion to balance a number of legitimate considerations.'" *Id.* (quoting *Nolan v. Thompson*, 521 F.3d 983, 990 (8th Cir. 2008)) (internal quotation marks omitted). The Eighth Circuit has described the requirement of a "specific and detailed account" of the alleged disparate treatment as a "demanding standard." *Id.* In sum, Plaintiffs cannot simply claim that they have been treated differently than others. In order to establish that they have been singled out, they must identify similarly situated comparators and give a specific and detailed account of the disparate treatment. They have not even attempted to identify others who are similarly situated and received more favorable treatment.

What is more, even if Plaintiffs establish that they have been singled out for disparate treatment, they must show that there was no rational basis for this treatment. Such treatment "is accorded a strong presumption of validity" and "must be upheld against [an] equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Heller v. Doe*, 509 U.S. 312, 319–20 (1993) (internal citation omitted). Rational-basis review, "a paradigm of judicial restraint," does not provide "a license for courts to judge the wisdom, fairness, or logic of [government] choices." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313–14 (1993) (citation omitted). The question is simply whether the challenged government action is rationally related to a legitimate state interest, and establishing otherwise is an extremely heavy burden that is rarely satisfied. Plaintiffs have not attempted to do that here, and they are therefore unlikely to succeed on this claim.

## II.     The remaining factors strongly weigh against granting a preliminary injunction.

Plaintiffs' failure to show a likelihood of success on the merits dictates denying their motion. The remaining factors do as well.

First, Plaintiffs have failed to show "great" irreparable harm will occur absent an injunction. "To succeed in demonstrating a threat of irreparable harm, 'a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief.'" *Roudachevski v. All-Am. Care Ctrs., Inc.*, 648 F.3d 701, 706 (8th Cir. 2011) (quoting *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 425 (8th Cir. 1996)). Certainly, "speculative harm does not support a preliminary injunction." *S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 779 (8th Cir. 2012) (citing *Minn. Ass'n of Health Care Facilities, Inc. v. Minn. Dep't of Pub. Welfare*, 602 F.2d 150, 154 (8th Cir. 1979)). But even harm that is certain and imminent does not constitute irreparable harm unless it is also great. *See Roudachevski*, 648

F.3d at 706; *see also Munson v. Gilliam*, 543 F.2d 48, 52 (8th Cir. 1976) (finding no irreparable

harm where injury was not "great").   Here, any harm suffered by Plaintiffs is at most not being

able to view or post to Defendant's personal social media profiles on their usual accounts.

Plaintiffs are free to register an additional account in order to view and post on Defendant's

accounts.  Indeed, at least one Plaintiff testified that she has done exactly that.  *See* Hearing Tr. at

42:7–12.

Second, granting a preliminary injunction would certainly harm Defendant.  It cannot be

the case that part-time elected officials must check their own First Amendment rights at the door

of the Capitol when they take office.  Defendant has every right to curate the content of his

personal social media accounts just as any other citizen.  Plaintiffs' requested injunction would

prevent Defendant from removing any content from his personal social media accounts, even if it

were illegal content, such as threats of violence.  Moreover, the ludicrous request of a prior

restraint on Defendant's ability to discuss his religious beliefs speaks to the intrusiveness of the

injunctive relief Plaintiffs request.

Finally, the public interest would not be served by granting an injunction.  Faced with the

threat of having hecklers commandeer their social media accounts, elected officials such as

Defendant may be forced to simply close their accounts, depriving their followers of content they

are interested, as well as the public at large.  And if it is the case that elected officials lose their

First Amendment freedoms upon taking office, as Plaintiffs insist they do, many qualified

individuals will simply decline to seek public office in the first place.  That would certainly not

serve the public interest.

**Conclusion**

For the foregoing reasons, Plaintiffs' motion should be denied.


Respectfully submitted,

LESLIE RUTLEDGE
Arkansas Attorney General

*/s/ Nicholas J. Bronni*
Nicholas J. Bronni (Ark. Bar No. 2016097)
  Arkansas Solicitor General
Dylan L. Jacobs (Ark. Bar No. 2016167)
  Assistant Solicitor General
Arkansas Attorney General's Office
323 Center Street, Suite 200
Little Rock, AR 72201
Telephone: (501) 682-3661
Fax: (501) 682-2591
Dylan.Jacobs@arkansasag.gov

*Attorneys for Defendant, in his official capacity*


## CERTIFICATE OF SERVICE

I, Dylan L. Jacobs, hereby certify that on January 24, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which shall send notification of the filing to any participants.


*/s/ Dylan L. Jacobs*
Dylan L. Jacobs