## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## WESTERN DIVISION

**AMERICAN ATHEISTS, INC.;**
**BETTY JO FERNAU;**
**CATHERINE SHOSHONE;**
**ROBERT BARRINGER; and**
**KAREN DEMPSEY**                                                          **PLAINTIFFS**

**v.**                          **Case No. 4:19-cv-00017-KGB**

**STANLEY JASON RAPERT, in his**
**individual and official capacity**                                      **DEFENDANT**

### ORDER

Before the Court is a motion for temporary restraining order and preliminary injunction
and request for expedited hearing filed by plaintiffs American Atheists, Inc., Betty Jo Fernau,
Catherine Shoshone, Robert Barringer, and Karen Dempsey (Dkt. No. 5). Plaintiffs bring this
action against defendant Stanley Jason Rapert, Arkansas state senator, in his individual and official
capacity, seeking declaratory relief, injunctive relief, and monetary damages. Plaintiffs assert
claims under 42 U.S.C. §§ 1983 and 1988 alleging violations of the First and Fourteenth
Amendments to the United States Constitution and under Arkansas Code Annotated § 16-123-
105(a) alleging violations of rights secured by Article 2, § 6 of the Arkansas Constitution, and the
Arkansas Religious Freedom Restoration Act ("ARFRA"), Ark. Code Ann. 16-123-404 (Dkt. No.
1, ¶ 6). Plaintiffs challenge State Senator Rapert's alleged action to block plaintiffs on social
media.

On January 15, 2019, the Court held a hearing on plaintiffs' motion, granting plaintiffs'
request for a hearing. State Senator Rapert, in his individual and official capacity, responded to

plaintiffs' motion (Dkt. Nos. 18, 19).[1]  Also before the Court is a motion to dismiss as to State Senator Rapert individually (Dkt. No. 11).  Plaintiffs responded to the motion to dismiss (Dkt. No. 20).  Plaintiffs also filed a request for leave to file a reply (Dkt. No. 22).  State Senator Rapert, in his official capacity, responded in opposition to plaintiffs' request for leave to file a reply and, alternatively, requested the Court to allow him to introduce additional evidence into the preliminary injunction record (Dkt. No. 25).  State Senator Rapert in his individual capacity incorporated and adopted that filing (Dkt. No. 26).  State Senator Rapert, in his individual capacity, filed a request for leave to file a reply (Dkt. No. 24).  Plaintiffs have not filed a response to State Senator Rapert's request in his individual capacity for leave to file a reply, and the time to do so has passed.

For the following reasons, the Court denies plaintiffs' motion for temporary restraining order and preliminary injunction (Dkt. No. 5).  The Court denies in part State Senator Rapert's motion to dismiss as to certain claims against him in his individual capacity, takes the remaining issues in the motion under advisement, and directs State Senator Rapert to supplement his motion to the extent he seeks the Court's consideration on certain issues (Dkt. No. 11).  The Court grants the parties' motions for leave to file replies, directs the parties to file their replies within 14 days from the entry of this Order, and has considered the replies in ruling on the pending motions (Dkt. Nos. 22, 24).

## I.  Procedural Background

Plaintiffs originally filed this lawsuit October 2, 2018, and filed a notice of voluntary dismissal on January 3, 2019.  *American Atheists, Inc. v. Rapert*, 4:18-cv-00729-KGB, (Dkt. Nos.

---

[1]  State Senator Rapert is represented by separate counsel for the claims against him in his individual and official capacity.

1, 10) (E.D. Ark. Oct. 2, 2018).  The Court dismissed without prejudice that case on January 4, 2019.  *Id.*, (Dkt. No. 11).  Plaintiffs filed the current action on January 8, 2019 (Dkt. No. 1).

The Court held an evidentiary hearing on plaintiffs' motion on January 15, 2019.  At the hearing on plaintiffs' motion, the parties discussed the status of the request for both a temporary restraining order and preliminary injunction.  The parties agreed that the Court should consider plaintiffs' motion as a combined request for a temporary restraining order and preliminary injunction.  For this reason, the Court will consolidate plaintiffs' request for a temporary restraining order and preliminary injunction.

Following the hearing, all parties made further filings.  The Court will address the motions for leave to file a reply filed by both plaintiffs and State Senator Rapert (Dkt. Nos. 22, 24).  For good cause shown, the Court grants plaintiffs' motion for leave to file a reply (Dkt. No. 22).  Further, for good cause shown, the Court will allow State Senator Rapert to file his proposed reply in order to respond to the arguments and evidence included in plaintiffs' reply (Dkt. No. 25).  As plaintiffs have filed no opposition to the motion, the Court also grants State Senator Rapert's motion filed in his individual capacity for leave to file a reply (Dkt. No. 24).

Plaintiffs and State Senator Rapert will have 14 days from the date of this Order to file their proposed reply briefs.  The Court has considered the parties' proposed reply briefs in ruling on the pending motion for temporary restraining order and preliminary injunction.

## II.    Motion For Temporary Restraining Order And Preliminary Injunction

Plaintiffs seek a temporary restraining order and preliminary injunction against State Senator Rapert.  For the following reasons, under the unique circumstances of this case, the Court denies plaintiffs' motion for temporary restraining order and preliminary injunction (Dkt. No. 5).

### A.    Findings Of Fact

The following facts are taken from the affidavits and exhibits in the record and the testimony presented to the Court at the hearing on the motion for temporary restraining order and preliminary injunction.

### 1.    Social Media Accounts At Issue

State Senator Rapert is an Arkansas state senator who represents portions of Faulkner County and Perry County, Arkansas.  State Senator Rapert submitted a declaration during the preliminary injunction hearing (Def. Ex. 1).[2]  According to his declaration, in addition to his duties as a state senator, State Senator Rapert is the owner and president of Rapert Financial & Associates, Inc., in Conway, Arkansas (*Id.*, ¶ 3).  He is also president and founder of Holy Ghost Ministries, Inc., of Arkansas, a faith-based humanitarian mission organization with projects in Ghana West Africa and the Philippines (*Id.*).  He is an ordained minister and speaks around the country on faith, Judeo-Christian values, and religious liberty (*Id.*).  State Senator Rapert is the founder and president of American History and Heritage Foundation, Inc., an Arkansas non-profit organization that is not faith-based and educates the public on American history and heritage (*Id.*).  According to his declaration, State Senator Rapert maintains multiple social media accounts on Facebook and Twitter that he uses for personal reasons, his campaigns, and his ministry (*Id.*, ¶ 4).  He states that he does not have an official government social media account or page (*Id.*).  At issue in this case are only two of those accounts:  @JasonRapert Twitter account and "Sen. Jason Rapert" Facebook page (Dkt. No. 6, at 13).

---

[2]  The exhibits entered into the record at the preliminary injunction hearing are cited in this Order as "Pls. Ex." and "Def. Ex."

Twitter is a social media platform that allows its users to send electronic messages of limited length to the public.  After creating a Twitter account, users can "tweet," post messages on the platform; "reply," respond to messages posted by others; "retweet," post a message originally posted by a different user; or "like" another user's message, showing approval or acknowledgement of another user's message.  A Twitter user can choose to "follow" another Twitter user's account, allowing them to view all of the user's tweets.  A user's "feed" is a continuously updated display of tweets and content mostly from accounts the user has chosen to follow.  Users are able to interact directly with each other on Twitter by replying and commenting on a single tweet, which allows multiple users to discuss topics from a single tweet.  When a user "blocks" another user, the blocked user can no longer view the tweets, reply, comment, or react to the tweets of the user who blocked him or her.

Facebook is a different social media platform that also allows its users to comment and interact with other users by sending electronic messages.  After creating a Facebook account, users can "follow" other users allowing them to view the other users "posts," electronic messages, on a similarly continuously updated feed.  Users are able to comment on and "share," post a message originally posted by a different user, on other user's posts.  Facebook users are also able to post live videos that can be viewed by their followers.  The users who are watching the live video can comment on the video allowing the user who posted the video to respond in real time to other users.  Facebook users can also send private electronic messages to other users that function similarly to text messages.  Similar to Twitter, a user may "block" another user, which does not allow the user who has been blocked to view or interact with the other user's posts.

State Senator Rapert maintains several Twitter accounts:  @RapertSenate, @ChristLawmakers, @HGM_Evangelism, and @JasonRapert (Dkt. No. 22-1, at 17-20).

5

His @JasonRapert Twitter account is at issue in this case.  State Senator Rapert registered the account as "Sen. Jason Rapert."  (Dkt. No. 22-1, at 20).  In his declaration, State Senator Rapert states that he created the Twitter account in 2010, before he was elected to the Arkansas Senate (Def. Ex. 1, ¶ 10).  In the description section of the account, State Senator Rapert describes himself as "AR State Senator," "Past President of ncoil.org," and "Founder of National Association of Christian Lawmakers," which appears to include a link to the corresponding Facebook account for the National Association of Christian Lawmakers (Dkt. No. 22-1, at 20).  His Twitter account also includes a link to the Arkansas State Legislature website, which is maintained by the Arkansas Bureau of Legislative Research, Information Systems Dept., and is the official website of the Arkansas General Assembly.[3]  (*Id.*).  The account also includes pictures of State Senator Rapert and a wooden gavel with what appear to be the words "Arkansas Senate" written on the side of the gavel (*Id.*).

State Senator Rapert also maintains several Facebook pages:  "Holy Ghost Ministries," "National Association of Christian Lawmakers," "American History & Heritage Foundation, Inc.," and "Sen. Jason Rapert."  (*Id.*, at 22-25).  In addition to the public Facebook pages, he maintains a private "Jason Rapert" Facebook profile (Def. Ex. 1, ¶ 9).  The "Sen. Jason Rapert" page is at issue in this litigation.  According to his declaration, State Senator Rapert created the "Sen. Jason Rapert" page in 2010 for his campaign and originally titled the page "Jason Rapert for Arkansas Senate." (*Id.*, ¶ 5).  State Senator Rapert has a link to the website www.jasonrapertforsenate.com under the "About" section of the Facebook page (Pls. Ex. 2).  Plaintiffs introduced a picture of

---

[3] The copy of the State Senator Rapert's Twitter page provided by plaintiffs does not include the full webpage link, but the Court determines that it is a link to the Arkansas General Assembly's official website for the 2019 session.  *See* http://www.arkleg.state.ar.us/assembly/2019/2019R/Pages/Home.aspx

State Senator Rapert's Facebook page that was taken on August 31, 2018, and includes a picture of a campaign logo at the top of the page that reads: "Re-elect Senator Jason Rapert." (Pls. Ex. 1). Plaintiffs included a different picture of the "Sen. Jason Rapert" Facebook page that includes a picture of the United States Capitol, not the campaign logo, but it is not clear when plaintiffs took this picture of State Senator Rapert's Facebook page (Dkt. No. 22-1, at 25).

According to his declaration, State Senator Rapert has the following social media policy posted on his Facebook page but not on his Twitter page:

> Anyone who engages in bullying, intimidation, personal attacks, uses profanity or attempts to mislead others with false information, will find their privilege to post on this page revoked. Thank you for respecting others. This page is not paid for or administered by a government entity.

(Def. Ex. 1, ¶ 7). State Senator Rapert states, "I post on various topics in my personal capacity, including politics and religion. I post about various state and local issues and share newsworthy items with my supporters. I also use this page as a tool of my ministry." (*Id.*, ¶ 8). During the preliminary injunction hearing, State Senator Rapert introduced pictures of tweets that he posted on the @jasonrapert account, including a statement about deer hunting season and a picture showing that he is endorsed by the National Rifle Association and another tweet where he writes, in part, "Never ever be afraid to speak the truth and oppose those who are evil. Silence in the face of evil is itself evil." (Def. Ex. 5). According to his declaration, State Senator Rapert created a Facebook page so that he could have an unlimited number of followers, compared to a Facebook account which limits the account to 5,000 followers and friends (*Id.*, ¶ 9). State Senator Rapert's Facebook page currently has over 25,000 followers, and he states that he is able to reach a wider audience through the Facebook page (*Id.*). State Senator Rapert also states in his declaration that government staff have never managed either of his social media pages and that he does not have government staff who work under him (*Id.*, ¶ 5). State Senator Rapert does state that, during

campaign season, campaign stuff will access his Facebook page and that he has allowed them to assist in managing the page (*Id.*).

### 2.    Individual Plaintiffs

At the preliminary injunction hearing, individual plaintiffs Karen Dempsey, Catherine Shoshone, and Robert Barringer testified at the preliminary injunction hearing.  Regarding individual plaintiff Betty Fernau, plaintiffs discuss Ms. Fernau in their brief in support of the motion for preliminary injunction and include pictures of several social media posts and emails that Ms. Fernau sent to State Senator Rapert (Dkt. No. 6, at 18-23).  During the hearing, State Senator Rapert presented email exchanges between Ms. Fernau and State Senator Rapert from 2016 and 2017 (Def. Exs. 2-4).

### a.    Betty Fernau

According to plaintiffs' complaint and brief in support of the motion for preliminary injunction, Ms. Fernau is an atheist and serves as Treasurer of Arkansans for Equality, a community group advocating that all individuals regardless of race, religion, sexual orientation, or gender identity should be treated equally under the law (Dkt. Nos. 1, ¶¶ 83-84; 6, at 18).  Plaintiffs also allege that Ms. Fernau has an account on both Twitter and Facebook (Dkt. Nos. 1, ¶ 83; 6, at 18).

Plaintiffs allege that Ms. Fernau first interacted with State Senator Rapert on Facebook in May 2014 when State Senator Rapert posted on his page regarding Pulaski County, Arkansas, Circuit Judge Chris Piazza's declaring Arkansas' same-sex marriage ban unconstitutional (Dkt. Nos. 1, ¶¶ 86-87; 6, at 18).  According to the picture of the post attached by plaintiffs, State Senator Rapert's original Facebook posts says, "Thanks to all of you who have sent personal messages of encouragement the past few days . . . I was a Christian and ordained minister before entering

politics and I will not bow to the intimidation of those who want to silence Christianity in America." (Dkt. Nos. 1, ¶ 87; 6, at 19). Plaintiffs also include a picture of Ms. Fernau's response to State Senator Rapert's post where she states, "The Bible bans a lot of things. Just ask right-wingers when they use it to defend their incessant attempts to discriminate against the LGBT community." (Dkt. Nos. 1, ¶ 88; 6, at 20). In the post, plaintiffs allege that Ms. Fernau also lists "conduct that the Bible prohibits but which [State Senator] Rapert and others do not oppose." (Dkt. Nos. 1, ¶ 88; 6, at 19). Plaintiffs allege that Ms. Fernau made a different Facebook post a few minutes later stating that "there is separation of church and state. Therefore, stating that laws that affect the whole public should be based on one religion in [sic] inherently unconstitutional." (Dkt. Nos. 1, ¶ 89; 6, at 21). Plaintiffs allege that within 24 hours of Ms. Fernau posting the two Facebook comments, State Senator Rapert deleted Ms. Fernau's comments and blocked her from the Facebook page (Dkt. Nos. 1, ¶ 91; 6, at 21).

Plaintiffs also include a picture of a tweet sent by Ms. Fernau on May 19, 2014, stating that State Senator Rapert's decision to block her "is NOT how a politician should act when someone disagrees." (Dkt. Nos. 1, ¶ 94; 6, at 22). Plaintiffs allege that State Senator Rapert blocked Ms. Fernau on Twitter on May 20, 2014 (Dkt. Nos. 1, ¶ 96; 6, at 22).

Plaintiffs include pictures of several emails exchanged between Ms. Fernau and State Senator Rapert on October 13, 2016 (Dkt. Nos. 1, ¶¶ 98-101; 6, at 22-23). Ms. Fernau sent the first email, where she states, in part, "Since you now have me blocked on your personal Facebook profile AND your senator page, along with Twitter, I suppose I will have to email you if I need the help of the senator in MY district." (Dkt. Nos. 1, ¶ 98; 6, at 22). State Senator Rapert sent an automated response email that same day that asked, "What issue can I assist you with?" (Dkt. Nos. 1, ¶ 99; 6, at 23). In response, Ms. Fernau says, "I am requesting that you unblock me from your

Sen Jason Rapert page so that I may participate in discussions where my opinion will be heard."

(Dkt. Nos. 1, ¶ 100; 6, at 23).  State Senator Rapert sent Ms. Fernau another response stating:

> If I can help you with an issue please contact my office again.
>
> My personal social media sites are private platforms.  When anyone attempts to commandeer the sites and spread misinformation, attacks others with ad hominem attacks or uses vulgarities, my campaign and site administrators have permission to delete comments or block someone who repeatedly violates our standards.
>
> Thanks for contacting my office.

(Dkt. Nos. 1, ¶ 101; 6, at 23).  According to the email presented by State Senator Rapert at the preliminary injunction hearing, Ms. Fernau responded to his email and said, "Hopefully I will run into you at Lowes sometime.  Not your obedient servant." (Def. Ex. 3).

During the preliminary injunction hearing, State Senator Rapert introduced additional emails written to him by Ms. Feranu (Def. Exs. 2-4).  On December 19, 2016, Ms. Fernau emailed State Senator Rapert regarding the "national popular vote bill" and encouraged him to support the law (Def. Ex. 4).  The exhibit introduced by State Senator Rapert at trial does not indicate that he responded to Ms. Fernau's email (*Id.*).  On February 10, 2017, Ms. Fernau sent State Senator Rapert an email suggesting that State Senator Rapert change the "Ten Commandment Monument . . . to be a monument of The Golden Rule." (Def. Ex. 2., at 2-3).  In that email, Ms. Fernau further stated that "[t]his would be an all inclusive monument, rather than singling out Christianity.  Even atheists live by the Golden Rule.  I believe this would prevent further court battles over whether the monument violates separation of church and state." (*Id.*).  In response, State Senator Rapert thanks Ms. Fernau for her email and discusses similar monuments that have been placed on state capitol grounds in other states (*Id.*, at 1-2).  In response to State Senator Rapert's email, Ms. Fernau discusses her opposition to the monument and states that she would support "an artist rendering of

[a] monument" that includes "other prominent ancient lawgivers; including Confucius, Solomon, and Augustus." (*Id.*, at 1).

### b.      Karen Dempsey

Ms. Dempsey lives in Northwest Arkansas and is not a constituent of State Senator Rapert's.  Ms. Dempsey testified at the preliminary injunction hearing that she followed State Senator Rapert in the past on Facebook.  She testified that she is a supporter of and involved with the American Atheists in Arkansas organization.  Ms. Dempsey sent State Senator Rapert a direct message on Facebook and also commented on State Senator Rapert's posts.  Ms. Dempsey was able to interact with State Senator Rapert directly by sending a private message.  Ms. Dempsey testified that it is important to her to be a part of the dialogue about different issues and to present her thoughts and opinions to other people.

Ms. Dempsey testified that State Senator Rapert "blocked" her on Facebook in August 2018.  According to Ms. Dempsey, this means that she can see State Senator Rapert's Facebook page and the comments made by State Senator Rapert and other people, but Ms. Dempsey can no longer comment or participate in the conversation on State Senator Rapert's page.  According to Ms. Dempsey, she posted on State Senator Rapert's Facebook page regarding a variety of topics, including the relationship between government and religion.

According to Ms. Dempsey's testimony, on August 28, 2018, State Senator Rapert posted on his Facebook page regarding a meeting he attended where he heard from representatives of the American Civil Liberties Union ("ACLU") (Pls. Ex. 7).  In the post, State Senator Rapert stated that he "endure[d] an ACLU Attorney and liberal activist attorney attacking an Arkansas statue passed to protect and honor Israel . . . they are very active DEMOCRATS – don't vote for Democrats." (*Id.*).  In response to his post, Ms. Dempsey wrote in a comment that "once in office

you should represent ALL the people.  Not just the ones that agree with you." (*Id.*).  Several hours later, she also posted a longer comment on the same post by State Senator Rapert and criticized State Senator Rapert's position on the state statute (*Id.*).

On August 29, 2018, State Senator Rapert posted an article on his Facebook page that was titled "'In God We Trust' Motto on Currency Deemed Constitutional By Court After Atheists Complain." (Pls. Ex. 3).  In his post about the article, State Senator Rapert supported the article and stated, "Atheists lose this battle in their war on the National Motto." (*Id.*).  In response to his post, Ms. Dempsey testified that she wrote a comment where she identified herself as an atheist and criticized State Senator Rapert's position about the article (*Id.*).

At some point after Ms. Dempsey commented on State Senator Rapert's August 29, 2018, post, Ms. Dempsey testified that she sent State Senator Rapert a private message that stated, "Do you want to keep the government secular or do you want America to become a Christian nation?" (Pls. Ex. 8).  She testified that she messaged State Senator Rapert to comment on the stance that he took regarding the court case.  After Ms. Dempsey sent the private message, State Senator Rapert responded with a message where he stated that "[o]ur nation is already based upon Judeo-Christian principles and ideals." (Pls. Ex. 8).  In his message to Ms. Dempsey, State Senator Rapert also stated, "I have seen your posts and know you are an atheist.  That is your right.  You must also respect the rights and values of the vast majority of people who believe in God in our nation." (*Id.*).  Ms. Dempsey further responded to State Senator Rapert with three more private messages where she criticized his statements (Pls. Ex. 10).  In her message to State Senator Rapert, she stated, "You were elected in your district, but you now sit in the senate and represent us all.  Be more gentle, more kind, more open to allowing all people to live good, happy, free productive

12

lives.  We are not the enemy." (*Id.*).  She also stated in another message, "Please refrain from dictating your personal religious beliefs into our secular government." (*Id.*).

Ms. Dempsey testified that, after sending State Senator Rapert these three messages, she realized that he blocked her on Facebook.  Ms. Dempsey has been blocked by State Senator Rapert since that time and has been unable to comment or interact with State Senator Rapert or others on his Facebook page.

c.      **Catherine Shoshone**

Ms. Shoshone lives in Maumelle, Arkansas, and is not a constituent of State Senator Rapert's.  Ms. Shoshone has a Facebook account as well as two Twitter accounts.  She testified that State Senator Rapert has blocked one of her Twitter accounts.  On direct examination, Ms. Shoshone testified that she follows State Senator Rapert and other elected officials from Arkansas in order to keep up with the bills they file and how they vote on issues.

Ms. Shoshone testified that she attended a speech that State Senator Rapert delivered at the Arkansas Legislative Committee ("ALC") concerning same-sex marriage.  On June 26, 2014, after she watched State Senator Rapert's speech, Ms. Shoshone replied to one of State Senator Rapert's tweets from his @jasonrapert twitter account and asked "will you please share your sources that you referred to in your speech last week at the ALC?" (Pls. Ex. 11).

Ms. Shoshone testified that, on July 4, 2014, she again replied to one of State Senator Rapert's tweets from his @jasonrapert twitter account regarding campaign contributions taken by one of State Senator Rapert's political opponents (Pls. Ex. 12).  State Senator Rapert's tweet stated: "My democrat opponent . . . took $1,000 blood money from baby killers-wow . . . ." (*Id.*).  In response to State Senator Rapert's tweet, Ms. Shoshone stated, "interesting, since you accepted

13

[more than] $3000 from the tobacco industry.  Hypocritical?" (*Id.*).  Ms. Shoshone testified that State Senator Rapert never responded to her message on Twitter.

Ms. Shoshone further testified that, on July 5, 2014, she replied to one of State Senator Rapert's tweets from his @jasonrapert twitter account again regarding campaign contributions taken by one of State Senator Rapert's political opponents (Pls. Ex. 13).  State Senator Rapert tweeted that his opponent "takes money from abortion doctors who kill little babies just like this . . .", and he included a link to an article on the subject (*Id.*).  In her reply to State Senator Rapert's tweet, Ms. Shoshone stated that State Senator Rapert should "support easy access to [birth control].  That's how you [slow] down abortion.  How do you not see that?" (*Id.*).  Mr. Shoshone testified that State Senator Rapert did not respond to that tweet either.

Ms. Shoshone also testified that, on August 22, 2014, she replied to one of State Senator Rapert's tweets from his @jasonrapert twitter account where State Senator Rapert tweeted "I see it everyday," in response to another user's tweet regarding "the assault on the Christian faith . . . in the public square." (Pls. Ex. 14).  In response to State Senator Rapert's tweet, Ms. Shoshone asked State Senator Rapert for "[o]ne example.  Please, just one." (*Id.*).  Ms. Shoshone testified that State Senator Rapert never responded to her tweet.

Ms. Shoshone testified that, on February 18, 2015, she replied to one of State Senator Rapert's tweets from his @jasonrapert twitter account where State Senator Rapert tweeted, "I guess you will wait on a golf cart with Obama taking selfies until the Islamic terrorists roll into the USA." (Pls. Ex. 15).  In response to State Senator Rapert's tweet, Ms. Shoshone tweeted a picture of State Senator Rapert with the caption "Jason Rapert Selfie." (*Id.*).  Ms. Shoshone testified that State Senator Rapert never responded to her picture.

Ms. Shoshone testified that, after she replied to State Senator Rapert's tweet on February 18, 2015, she learned that State Senator Rapert blocked her on Twitter. Ms. Shoshone further testified that she learned that she was blocked when she attempted to view State Senator Rapert's @jasonrapert twitter account profile, and it said that she was blocked. According to Ms. Shoshone, State Senator Rapert has kept her blocked on Twitter since that time.

Ms. Shoshone testified that she is unable to have a dialogue with State Senator Rapert on Twitter because she has been blocked. Ms. Shoshone is interested in being able to continue to talk with State Senator Rapert because "he makes laws that affect [her] and people [she] care[s] about." Ms. Shoshone further testified that she follows other politicians and public officials on Twitter and replies to their tweets in the same manner as the posts and comments that she made to State Senator Rapert. Ms. Shoshone stated that she has not been blocked by any other elected official on Twitter.

On cross examination, Ms. Shoshone testified that she was blocked by State Senator Rapert on Twitter in February 2015, more than three years before she filed the complaint in this case. Ms. Shoshone testified that State Senator Rapert blocked her on Twitter about ten days after she posted the picture of him in response to one of his tweets. On cross examination, Ms. Shoshone stated that she has two twitter accounts: "@cshoshone" and "Reese's Queen." Ms. Shoshone testified that State Senator Rapert blocked her Twitter account @cshoshone but did not block her "Reese's Queen" account. Ms. Shoshone stated that she has interacted with State Senator Rapert on Twitter by using her "Reese's Queen" account within the last six months leading up to the preliminary injunction hearing on this matter.

On re-direct examination, Ms. Shoshone testified that she created the "Reese's Queen" Twitter account in order to follow State Senator Rapert after she was blocked and that she did not use it differently than how she used the @cshoshone Twitter account.

15

### d.      Robert Barringer

Mr. Barringer lives in Conway, Arkansas, and is a constituent of State Senator Rapert's. Mr. Barringer has a Facebook account and has interacted with State Senator Rapert on Facebook. Mr. Barringer testified that he has a logo on his Facebook account that indicates he is a constituent of State Senator Rapert.   Mr. Barringer testified that he also follows other Arkansas elected officials on Facebook, but he does not comment on their posts often because they are not active on social media compared to State Senator Rapert.

Mr. Barringer further testified that, at some point during 2015 or 2016, State Senator Rapert posted on Facebook encouraging his Facebook followers to call their local elected officials and tell them to support a bill in the Arkansas legislature "to restrict abortions more."  Mr. Barringer commented on State Senator Rapert's Facebook post, criticizing State Senator Rapert's stance on the issue of abortion, and discussing Bible verses that Mr. Barringer argued were relevant to the issue of abortion.   Mr. Barringer testified that, after making that comment, he found that State Senator Rapert blocked him on Facebook.

Mr. Barringer testified that he wants to have continued access to State Senator Rapert's Facebook page because he wants to see other people's opinions on political issues and engage in the dialogue on State Senator Rapert's Facebook page.  Mr. Barringer stated that he can see State Senator Rapert's Facebook page and posts, but he cannot comment or react to State Senator Rapert's posts.

On cross examination, Mr. Barringer testified that he followed State Senator Rapert on Facebook for about three months before he was blocked.  Mr. Barringer further testified that he has interacted with State Senator Rapert on Facebook since this lawsuit has been filed when they have both commented on a post made by a Facebook profile that has not blocked Mr. Barringer.

Mr. Barringer is unable to comment or react to posts made by State Senator Rapert because Mr. Barringer has been blocked.

### 3.    American Atheists, Inc.

In addition to the individual plaintiffs, plaintiff American Atheists, Inc. ("American Atheists), also brings claims against State Senator Rapert.  At the preliminary injunction hearing, plaintiffs submitted the affidavit of Nicholas R. Fish, President of American Atheists (Pls. Ex. 17).[4]  According to Mr. Fish's affidavit, American Atheists is a 501(c)(3) nonprofit corporation that is dedicated to the separation of religion and government and elevating atheists and atheism in our nation's public and political discourse (*Id.*, ¶ 1).  Mr. Fish states in his affidavit that Ms. Dempsey is American Atheists' assistant state director for Bentonville, Arkansas, which is a voluntary position (*Id.*, ¶ 3).  As assistant state director, Ms. Dempsey's duties include amplifying American Atheists' positions, events, and programs through social media, such as communicating with government officials about matters that pertain to the separation between religion and government (*Id.*, ¶ 4).  American Atheists has conducted activism in Arkansas in cooperation with numerous residents who are not included in their database and is affiliated with the Arkansas Society of Freethinkers; the Hot Springs, Arkansas, Freethinkers; and the Atheist Community of Conway (*Id.*, ¶¶ 13-14).  For an organization to qualify as an affiliate of American Atheists, an organization must support the complete and absolute separation of religion and government and promote activism on the part of its members advancing secular government (*Id.*, ¶ 16).  According to Mr. Fish's affidavit, affiliate groups can receive assistance from American Atheists on civil

---

[4]  Mr. Fish's affidavit indicated that it is a total of three pages, but the Court's copy only had the first and last page of the affidavit (Pls. Ex. 17, at 1-2).  Plaintiffs later supplemented by informal communication with the Court and all counsel Mr. Fish's affidavit to include the three total pages.

rights issues and on organizational issues (*Id.*, ¶ 17).   American Atheists frequently refers individual constituents to affiliate groups in their vicinity (*Id.*, ¶ 18).

### 4.    Additional Social Media Posts

Plaintiffs, in their brief in support of the motion for temporary restraining order and preliminary injunction and reply, and State Senator Rapert, in his reply, attached pictures of many social media posts made by State Senator Rapert and other social media users who posted on State Senator Rapert's social media pages (Dkt. Nos. 6, at 6, 11, 14-17, 19-23, 25-27, 30-31; 22-1, at 20-75; 25-3, at 2-51).   The Court has reviewed all of the social media presented by the parties. The following is the Court's summary of those social media posts.

Plaintiffs include in the record pictures of several Facebook posts made by State Senator Rapert regarding public safety, including a level 3 sex offender moving to Faulkner County, Arkansas; a warning from the Faulkner County Sheriff's Office regarding calls about scams; and a "Public health alert" regarding an outbreak of Hepatitis A in Northeast Arkansas (Dkt. No. 6, at 6).

Plaintiffs also attached a Facebook post made by State Senator Rapert that informs constituents of government job openings for part time dispatchers and detention center officers in the Perry County, Arkansas, Sheriff's Office (*Id.*).   Plaintiffs also include a post by State Senator Rapert including a tweet calling for major reforms to the Environmental Protection Agency ("EPA").   (Dkt. No. 22-1, at 26).

Plaintiffs also include several tweets from State Senator Rapert that discuss various local current events and political issues, including:   creating a public poll on Twitter asking his followers if they would support a bill removing the names of Bill and Hillary Clinton from the airport in Little Rock, Arkansas; tweeting about a merger of a state insurance exchange; tweeting about

various subjects relating to abortion policy including his support for a rally held at the Arkansas State Capitol for the Arkansas March for Life and advocating for various laws related to abortion; posting weekly reviews of the laws and discussions at the Arkansas State Capitol on Facebook; tweeting about awards given out to a family farm in his district; and asking questions on Facebook to constituents regarding policies they would like him to pursue at the Arkansas State Legislature (*Id.*, at 27, 32-42).

Plaintiffs include tweets from State Senator Rapert discussing why he posts public polls on Twitter, including him stating that because "[c]onstituents asked me & I asked constituents"; explaining that he posted the public poll on Twitter because "responding to constituents is part of the job description";  stating that he posted the public poll on Twitter because "gathering public input on issues raised to my attention is part of the job description";  and thanking his "constituents for your support & feedback during the 91st General Assembly."  (*Id.*, at 28-31).

Plaintiffs have submitted pictures taken of live videos posted by State Senator Rapert on Facebook (*Id.*, at 44-72).  The pictures also show that other Facebook users can comment on the video while State Senator Rapert is speaking, allowing other users to engage directly with State Senator Rapert while he is live on video (*Id.*).  According to the screen shots, State Senator Rapert and the other Facebook users are discussing various issues that relate to politics and current events in Arkansas and across the country (*Id.*).  In many of these posts, State Senator Rapert can be seen sitting at what appears to be an official government desk with the American flag or Arkansas State flag in the background (*Id.*, at 50, 54, 57, 59).

Plaintiffs also submitted tweets from State Senator Rapert about why he blocks users on social media, including a tweet where State Senator Rapert explains to another user that he is "forced to block very few people.  You just happen to be one of the liberal extremists that made

the list."; a tweet where State Senator Rapert states to another user that "[w]e block those who engage in ad hominem attacks, defamation or threatening communications"; a tweet where State Senator Rapert says to another user, "if you keep lying I might block you too. You've been on the watch list for blocking of course."; a tweet where State Senator Rapert explains to another user that "I actually suppose I should have blocked you for spreading false information in the first place." (Dkt. No. 6, at 14-15).

In his response in opposition to the motion for leave, State Senator Rapert includes pictures of many messages and posts made by State Senator Rapert and other users on social media (Dkt. No. 25-3, at 1-51). He includes pictures of posts relating to a Facebook event that was to occur at a restaurant in Little Rock, Arkansas, where a different user posted a picture of State Senator Rapert with a baby photoshopped into his mouth (*Id.*, at 4-10). State Senator Rapert also includes pictures of other users who posted on State Senator Rapert's Facebook page in response to the Facebook event discussing the event and the photoshopped picture (*Id.*).

State Senator Rapert also includes pictures of posts that he made on Twitter and Facebook regarding religion and local events relating to religion, including Bible verses and articles related to religious issues (*Id.*, at 12-28, 33-34, 48). State Senator Rapert also submits posts on Twitter regarding his church ministry and the projects he undertakes as a part of that ministry (*Id.*, at 41-42, 49). He includes pictures of tweets regarding Rapert Financial & Associates, Inc. (*Id.*, at 35-36). State Senator Rapert also submits tweets by other users who used profanity when tweeting at and commenting on posts made by State Senator Rapert (*Id.*, at 29-30, 43-47, 51). State Senator Rapert further includes tweets that he made regarding his campaign, including thanking volunteers and contributors for their support and requesting campaign donations (*Id.*, at 31-32, 37-40).

20

B.      **Legal Standard**

The parties agree that plaintiffs' motion for temporary restraining order and preliminary injunction should be combined into a request for preliminary injunction.  Plaintiffs seek a preliminary injunction under 42 U.S.C. §§ 1983 and 1988 and the Arkansas Civil Rights Act ("ACRA"), codified at Ark. Code Ann. § 16-123-105(a), against State Senator Rapert for his alleged unconstitutional restriction of the participation of plaintiffs, who were critical of his statements and policy positions on Twitter and Facebook.  Specifically, plaintiffs seek a preliminary injunction from the Court enjoining State Senator Rapert from:  "(1) restricting plaintiffs' and other users' ability to interact with [State] Senator Rapert's @jasonrapert Twitter account and 'Sen. Jason Rapert' Facebook page based on their political and/or religious viewpoints and (2) using the @jasonrapert Twitter account and 'Sen. Jason Rapert' Facebook page to disparage any particular beliefs about religion, discriminate against users on the basis of their beliefs about religion, and single users out for opprobrium and derision on the basis of their beliefs about religion."  (Dkt. No. 5, ¶ 2).

When determining whether to grant a motion for a preliminary injunction, this Court considers the same factors as the Court considers when evaluating a request for a temporary restraining order:  (1) the movant's likelihood of success on the merits; (2) the threat of irreparable harm to the movant; (3) the balance between the harm to the movant and the injury that granting an injunction will cause other interested parties; and (4) the public interest.  *Kroupa v. Nielsen*, 731 F.3d 813, 818 (8th Cir. 2013) (quoting *Dataphase Sys., Inc. v. CL Sys., Inc.,* 640 F.2d 109, 113 (8th Cir. 1981)).  Preliminary injunctive relief is an extraordinary remedy, and the party seeking such relief bears the burden of establishing the four *Dataphase* factors.  *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).  The focus is on "whether the balance of the equities so

favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase*, 640 F.2d at 113. In deciding whether to grant preliminary injunctive relief, likelihood of success on the merits is most significant. *S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 776 (8th Cir. 2012). The "ordinary preliminary injunction test" applies here, and it "asks only whether a movant has demonstrated a 'fair chance of prevailing' in the ultimate litigation . . . ." *1-800-411-Pain Referral Serv., LLC v. Otto*, 744 F.3d 1045, 1054 (8th Cir. 2014) (quoting *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 730-31 (8th Cir. 2008) (en banc)).

For the reasons discussed below, although it is a close call, under the unique circumstances of this case, the Court denies plaintiffs' request for a preliminary injunction (Dkt. No. 5).

### C.    Likelihood Of Success On The Merits

Plaintiffs specifically allege that State Senator Rapert's action to block them on social media violates their First Amendment rights to free speech, petition the government, and free exercise of religion, right to free exercise under the Arkansas Religious Freedom Restoration Act, and equal protection under the Fourteenth Amendment. To show a likelihood of success on the merits of their claims under § 1983, plaintiffs must show that the conduct of a defendant acting under color of state law deprived them of a right, privilege, or immunity secured by the United States Constitution or the laws. 42 U.S.C. § 1983.

### 1.    Free Speech Under The First Amendment

The Court will first address plaintiffs' §1983 claim alleging a violation of free speech under the First Amendment. Though the United States Supreme Court and the Eighth Circuit Court of Appeals have not yet addressed this type of First Amendment claim, other district courts in the Eighth Circuit and in this district have examined similar claims. *See Tanner v. Ziegenhorn*, No.

4:17-cv-780-DPM, 2019 WL 2344094 (E.D. Ark. May 31, 2019); *Hyman v. Kirksey*, No. 3:18-cv-230-DPM, 2019 WL 2323864 (E.D. Ark. May 30, 2019); *Campbell v. Reisch*, 367 F. Supp. 3d 987 (W.D. Mo. 2019).  Though it was decided at the motion to dismiss stage, the Court finds *Campbell* instructive here because, like the case at bar, the plaintiff in that case claimed that a state representative from Missouri violated the plaintiff's First Amendment freedom of speech by blocking the plaintiff on Twitter.  367 F. Supp. 3d at 989.  After resolving the motion to dismiss and conducting a full bench trial, the district court entered judgment in favor of plaintiff on his claims.  *Campbell v. Reisch*, No. 2:18-CV-4129-BCW, 2019 WL 3856591 (Aug. 16, 2019). Likewise, a district court in the Western District of Wisconsin has examined a § 1983 claim filed by an advocacy group alleging that state legislators violated the First Amendment by blocking the advocacy group from their respective accounts on online social media platforms.  *See One Wis. Now v. Kremer*, 354 F. Supp. 3d 940 (W.D. Wis. 2019) (examining the First Amendment claim and ruling in favor of the advocacy group); *see also One Wis. Now v. Kremer*, No. 17-cv-820-WMC, 2019 WL 2162231 (W.D. Wis. May 17, 2019) (examining appropriate relief).

In addition, the Second Circuit, Fourth Circuit, and Fifth Circuit Courts of Appeal have decided similar claims brought pursuant to actions taken by government officials on social media. *Knight First Amendment Inst. at Columbia Univ. v. Trump*, 928 F.3d 226 (2nd Cir. 2019); *Robinson v. Hunt County, Texas.*, 921 F.3d 440 (5th Cir. 2019); *Davison v. Randall*, 912 F.3d 666 (4th Cir. 2019).  The district court's decision in *Knight First Amendment Institution at Columbia University v. Trump* is instructive because the plaintiff in that case also brought § 1983 claims under the First Amendment based on an elected official blocking the plaintiff on Twitter.  302 F. Supp. 3d 541 (S.D.N.Y. 2018), *aff'd*, 928 F.3d 226 (2nd Cir. 2019).

### a.    Committed Under Color Of State Law

The Court will first determine whether State Senator Rapert's actions about which plaintiffs complain were taken under color of state law.

State Senator Rapert contends that the actions he takes on social media are not done under color of state law (Dkt. No. 18, at 10).  He specifically points to the factors relied upon by the Fourth Circuit Court of Appeals in *Davison* to examine whether a government official acted under color of state law in blocking the plaintiffs on social media.  912 F.3d at 680-81.  State Senator Rapert contends that his actions on social media were not committed under color of state law because several of the *Davison* factors are not present in this case, including the categorization of his page as "Politician," that the website included on his social media accounts is the campaign website, his using his social media accounts for other business ventures, and that he limits the topics of discussion and issues that he posts about, which include personal topics (Dkt. No. 18, at 7-10).

To determine whether an official is acting under the color of state law, courts "look to see whether a sufficient nexus exists between the official's public position and the official's harmful conduct." *Ramirez–Peyro v. Holder*, 574 F.3d 893, 900 (8th Cir. 2009).  "This nexus inquiry is necessarily fact intensive . . . ." *Id.* at 901.  The sufficient nexus is determined based on the totality of the circumstances.  *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 614-15 (1989). "[G]enerally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law." *Roe v. Humke*, 128 F.3d 1213, 1215 (8th Cir. 1997) (internal quotation marks omitted).  "The [color of state law] element is satisfied if the defendant acts or purports to act in the performance of official duties, even if he oversteps

his authority and misuses power." *Johnson v. Phillips*, 664 F.3d 232, 240 (8th Cir. 2011). Purely personal pursuits are not attributable to the state. *Screws v. United States*, 325 U.S. 91, 111 (1945).

In *Davison*, the district court applied the totality of the circumstances test and found that a government official, who served as Chair of the Loudoun County Board of Supervisors, acted under color of state law when she created and operated a Facebook page. 267 F. Supp. 3d 702, 711-14 (E.D. Va. 2017). The district court acknowledged that several facts regarding the government official's Facebook page were "entirely private," specifically that the official's duties "do not include the maintenance of a social media website," "[t]he website in question will not revert" to the State when the official leaves office, the official did not use government-issued electronic devices to post on social media, and "much of [the official's] social media activity takes place outside of both her office and normal working hours." *Id.* at 712.

Despite these "entirely private" factors, the district court in *Davison* found the following factors dispositive when applying the totality of the circumstances analysis: that the official created and administered the social media account "to further her duties as a municipal official" and that she used the social media account "as a tool of governance," by "provid[ing] information to the public about her and the Loudoun Board's official activities and solicit[ing] input from the public on policy issues she and the Loudoun Board confront," such as "inform[ing] the public about serious public safety events" and "keep[ing] her constituents abreast of the County's response to a snowstorm and to coordinate snow removal activities." *Davison*, 912 F.3d at 680 (citing *Davison*, 267 F. Supp. 3d at 713). In addition, in *Davison*, the district court noted record evidence that the defendant used government resources, including government employees, to maintain the page and that the page had a connection with defendant's official newsletters. *Davison*, 267 F. Supp.3d at 712-14. The district court held that the totality of the circumstances

weighed in favor of finding that the official acted under color of state law when she created and operated the social media page. *Davison*, 267 F. Supp. 3d at 712.

The Fourth Circuit, with respect to defendant's efforts to "swathe" the page "in the trappings of her office," quoted favorably the district court's findings that the official:

> swathe[d] the [social media account] in the trappings of her office. Among other things, (1) the title of the page includes [her] title; (2) the page is categorized as that of a government official; (3) the page lists as contact information [her] official County email address and the telephone number of [her] County office; (4) the page includes the web address of [her] official County website; (5) many—perhaps most—of the posts are expressly addressed to "Loudoun," [her] constituents; (6) [she] has submitted posts on behalf of the [Loudoun Board] as a whole; (7) [she] has asked her constituents to use the [Page] as a channel for "back and forth constituent conversations"; and (8) the content posted has a strong tendency toward matters related to [her] office.

*Id.* at 680-81 (citing *Davison*, 267 F. Supp. 3d at 714). In affirming the district court's decision, the Fourth Circuit also identified several factors to be considered when determining whether purportedly private action bears a sufficiently close nexus with the State to constitute action under color of state law. 912 F.3d at 680-81. These factors include: (1) whether defendant's actions are linked to events arising out of his or her official status; (2) whether defendant's "status" as a public official enabled defendant to act in a manner that a private citizen could not have done; (3) whether the defendant's action occurred in the course of performing an actual or apparent duty of his or her office; and (4) whether defendant used the power and prestige of his or her state office to damage the plaintiff. *Id.*

The Fourth Circuit agreed with the district court's decision and concluded that the official "clothed the . . . [social media account] in the power and prestige of her state office[ ] and created and administered the page to perform actual or apparent duties of her office." *Id.* at 681 (citations, internal quotation marks, and brackets omitted).

The Court notes that several factors in this case suggest that State Senator Rapert's use of his social media accounts is private.  In his declaration, State Senator Rapert states that he does "not have an official government social media account or page." (Def. Ex. 1, ¶ 4).  Regarding his @JasonRapert Twitter account, State Senator Rapert states that it is his "personal Twitter account," that he does "not have an 'official' government Twitter account," and "no government staff have ever managed it." (*Id.*, ¶ 10).  He further states in his declaration that the social media accounts at issue in this case are his own "personal accounts" and have "nothing to do with [his] official status as a legislator." (*Id.*, ¶ 16).  He contends that "very little of what is posted has anything to do with the Arkansas legislature" and that he uses "social media as a platform to discuss important local, state, national, and global issues, just as any other public figure or civic-minded citizen would, as well as [his] Christian faith." (*Id.*, ¶ 16).  He also states in his declaration that he created his Twitter account and Facebook page in 2010, before he was elected to the Arkansas State Senate. (*Id.*, ¶ 10).

State Senator Rapert maintains several Twitter accounts:  @RapertSenate, @ChristLawmakers, @HGM_Evangelism, and @JasonRapert (Dkt. No. 22-1, at 20-23).  He also maintains several Facebook pages:  "Holy Ghost Ministries," "National Association of Christian Lawmakers," "American History & Heritage Foundation, Inc.," and "Sen. Jason Rapert." (*Id.*, at 25-28).  In addition to the public Facebook pages, he maintains a private "Jason Rapert" Facebook profile (*Id.*, at 24).

State Senator Rapert has posted on his Twitter account regarding his personal beliefs about religion (Dkt. No. 5, at 25, 27).  He has posted on Twitter regarding his church ministry, Holy Ghost Ministries, and the projects he undertakes as a part of that ministry (Dkt. No. 25-3, at 41-

42, 49).  State Senator Rapert has also tweeted regarding his personal business, Rapert Financial & Associates, Inc. (*Id.*, at 35-36).

State Senator Rapert argues that plaintiffs have failed to show that he acted under color of state law because his Twitter and Facebook accounts are for personal use.  Specifically, State Senator Rapert argues that he does not list his official, government contact information on his social media profiles; he has not invited users that follow him on social media to engage in a back-and-forth conversation because he chooses to limit the topics of discussion; and he discusses a variety of personal matters on his page that are not related to his office (Dkt. No. 18, at 8).

While considering the facts stated above that suggest that State Senator Rapert's social media accounts are private, the totality of the circumstances in this case based on the limited record before the Court at this stage show that plaintiffs have a fair chance of prevailing on their claim that State Senator Rapert's accounts rely on "the power and prestige of . . . state office" and were "created and administered . . . to perform actual or apparent duties of [his] office."  *Davison*, 912 F.3d at 681.

With regard to his @JasonRapert Twitter account at issue in this case, State Senator Rapert registered the account as "Sen. Jason Rapert." (Dkt. No. 22-1, at 23).  The Court does not find dispositive the date that State Senator Rapert created the account or that he created it as a candidate. *See Knight*, 302 F. Supp. 3d at 552, 569 (observing that Donald Trump established @realDonaldTrump in March 2009, before his election and inauguration and analyzing that fact). In the description section of the account, State Senator Rapert describes himself as "AR State Senator," "Past President of ncoil.org," and "Founder of National Association of Christian Lawmakers," which appears to include a link to the corresponding Facebook account for the National Association of Christian Lawmakers (Dkt. No. 22-1, at 23).  His Twitter account also

includes a link to the Arkansas State Legislature website, which is maintained by the Arkansas Bureau of Legislative Research, Information Systems Dept., and is the official website of the Arkansas General Assembly.[5]  (*Id.*).  *See One Wis. Now*, 354 F. Supp. 3d at 951-53 (describing the accounts and observing that two of them include a link to official legislative websites).  The account also includes a picture of State Senator Rapert and a wooden gavel with what appears to be the words "Arkansas Senate" written on the side of the gavel (Dkt. No. 22-1, at 23).

As the Court discussed in more detail above, State Senator Rapert has tweeted on his account regarding a variety of issues.  He has tweeted about national political issues, including tweeting at Arkansas Senators John Boozman and Tom Cotton to either create "major reform" or end the EPA based on concerns from his "[c]onstituents." (*Id.*, at 29).  He has also tweeted about local political issues, including the naming of the Little Rock National Airport after Bill and Hillary Clinton (*Id.*, at 30).  State Senator Rapert used his account to create a public poll on Twitter asking his followers if they would support a bill removing the names of Bill and Hillary Clinton from the airport in Little Rock, Arkansas (*Id.*).  He said he posted the public poll on Twitter because "[c]onstituents asked me & I asked constituents." (*Id.*, at 31).  He further explained that he posted the public poll on Twitter because "responding to constituents is part of the job description." (*Id.*, at 29).  He also said that he posted the public poll on Twitter because "gathering public input on issues raised to my attention is part of the job description." (*Id.*, at 30).  State Senator Rapert has also tweeted about various subjects relating to abortion policy including his support for a rally held

---

[5]  The copy of the State Senator Rapert's Twitter page provided by plaintiffs does not include the full webpage link, but the Court determines that it is a link to the Arkansas General Assembly's official website for the 2019 session.  *See* http://www.arkleg.state.ar.us/assembly/2019/2019R/Pages/Home.aspx.

at the Arkansas State Capitol for the Arkansas March for Life and advocating for various laws related to abortion (*Id.*, at 36-39).

With regard to his "Sen. Jason Rapert" Facebook page, State Senator Rapert classified his page as "Politician." (*Id.*, at 28).  His Facebook page includes a link to his campaign website, www.jasonrapertforsenate.com (*Id.*).  The account also includes pictures of State Senator Rapert and the United States Capitol Building (*Id.*).  State Senator Rapert has posted on his Facebook page regarding a variety of issues.  First, he has posted alerts concerning public health and safety (Dkt. No. 5, at 6).  Specifically, he posted about a level three sex offender moving to Faulkner County, Arkansas; warnings from Faulkner County Sheriff's Office regarding phone scams; and a public health alert for an outbreak of Hepatitis A in Northeast Arkansas, which is not in the Arkansas senate district that he represents (*Id.*).  He has also posted about the Perry County, Arkansas, Sherriff's Office taking applications for part time dispatchers and detention center officers (*Id.*).

State Senator Rapert has also used his Facebook page to post concerning his work as a state legislator.  He posted a "State Capitol Week in Review" where he discussed recent bills and political issues relating to the Arkansas state legislature (Dkt. No. 22-1, at 37-40).  He also posted a question on his Facebook page "for local constituents in Conway, Faulkner County and Perry County" asking, "What are the top three issues you believe need to be addressed in our community or state at this time by the legislature?"  (*Id.*, at 42).

Plaintiffs have also submitted screenshots taken of live videos posted by State Senator Rapert on his "Sen. Jason Rapert" Facebook account (*Id.*, at 44-72).  In many of these screenshots, State Senator Rapert can be seen sitting at a desk in what appears to be an unidentified government-like office (*Id.*).  The screenshots show other Facebook users making live comments on State

Senator Rapert's video while he discusses issues relating to the Arkansas State Legislature (*Id.*). According to the screen shots, State Senator Rapert and the other Facebook users are discussing various issues that relate to politics and current events in Arkansas and across the country (*Id.*).

The case at bar is similar to *One Wisconsin Now*, where the district court granted a plaintiff political advocacy group's motion for summary judgment against defendant state legislators who blocked plaintiff on social media.  354 F. Supp. 3d 940.  In that case, the district court cited to *Davison* in its application of the totality of the circumstances test and held that the state legislators acted under the color of state law.  *Id.* at 950-53.  The district court reasoned that the "essential purpose and function" of the defendants' social media accounts was to "perform actual and apparent duties as state assemblyperson[s] using the power and prestige of that office to communicate legislative matters and other issues with the public."  *Id.* at 953.

In its reasoning, the district court pointed to several facts that showed defendants acted under the color of state law.  *Id.* at 951.  Specifically, the district court noted that the defendants created the social media accounts while in office; all defendants "use their accounts to share information on legislative matters, policies, political appearances, and events"; and government resources were used to maintain the accounts to some extent.  *Id.* at 951-52.  Even though the parties disputed whether one of the defendants used state resources to maintain his social media account, the district court reasoned that his account was "still sufficiently linked to public circumstances and swathed in the trappings of his office to constitute state action under a totality of the circumstances test."  *Id.* at 952.  The district court also found relevant that the defendants' social media profiles included pictures of the state capitol, the American flag, and one defendant standing in front of a political campaign sign because "[t]hese . . . facts alone show that the account still represents [the defendant] in his official, not personal, capacity."  *Id.* at 952-53.

31

Here, even though some facts weigh in favor of finding that State Senator Rapert's use of his social media accounts was personal, based on the totality of the circumstances and considering the precedents, the Court determines that plaintiffs have a fair chance of prevailing on their argument that State Senator Rapert acted and continues to act under color of state law when operating the relevant social media accounts.  In terms of his private use of the relevant social media accounts, State Senator Rapert's official duties do not include maintenance of his social media accounts, and his social media accounts do not revert back to the State legislature when he leaves office.  Additionally, the record is not clear regarding whether State Senator Rapert uses government issued devices to post on social media.  Plaintiffs have attached screen shots of several live Facebook videos that State Senator Rapert has posted.  In several, but not all, of the videos, State Senator Rapert is shown at a desk in what appears to be an official, government office, including the United States flag and the State of Arkansas flag located behind him.  It is not clear if State Senator Rapert created those Facebook live videos with government issued devices, or if he used his own video recording device.  Further, the record is also not clear whether State Senator Rapert posted on social media during work hours.  He recorded at least some of the Facebook live videos in what appears to be his government office, but it is not clear whether these videos were recorded during work hours.  Although State Senator Rapert denies using government staff or resources to maintain these accounts, he suggests otherwise with respect to staff, and perhaps government staff, on occasion in his posts and through his conduct based on record evidence.

In terms of the other relevant factors for this analysis, State Senator Rapert posted several times on Facebook regarding public safety alerts, such as the Hepatitis A outbreak in Northeast Arkansas and a level three sex offender moving into Faulkner County.  Further, he posted on Facebook regarding some events that he would be attending.  State Senator Rapert also made

several posts on Twitter where he specifically asked constituents to tell him their three most important policy issues.  In addition, he created social media polls in order to determine the interest of his constituents regarding the name of a local airport.  When asked on social media why he posted the polls, he responded that "gathering public input on issues raised to my attention is part of the job description."  (Dkt. No. 22-1, at 30).

The district court in *Davison* outlined eight additional factors relevant to this analysis, to which the Fourth Circuit cited on appeal.  *See Davison*, 912 F.3d at 680-81 (citing *Davison*, 267 F. Supp. 3d at 714).  Certain, but not all, of those factors are present based on the record evidence currently before the Court at this stage of the litigation.  As to the first *Davison* factor, State Senator Rapert has indicated on both social media accounts his official title as an Arkansas state senator, either in the title of the account or in the account's description.  For the second *Davison* factor, in terms of categorizing his accounts as a government official, he indicated on his Facebook page that it is a "Politician" page, and the title of the page is "Sen. Jason Rapert."  Further, though his Twitter account is not described based on a specific category, that account also indicates that he is an Arkansas state senator.  For the third *Davison* factor related to official government contact information, State Senator Rapert does not include such information on either of his social media accounts.

As for the fourth *Davison* factor, on his Twitter account, State Senator Rapert includes a link to the official Arkansas State Legislature for the 2019 legislative session, which is a website created by the state of Arkansas.  On his Facebook account, State Senator Rapert includes a link to his official campaign website.  While not a website created by the state of Arkansas, his campaign website does indicate his title as a State Senator and allows visitors to contribute to his political campaign.

The fifth *Davison* factor is whether most of State Senator Rapert's posts are addressed to constituents.  While the Court only has a sample of his social media posts in the record, at least some of State Senator Rapert's social media posts are directed to his constituents.  Through his Twitter account, State Senator Rapert has conducted polls on local political issues and stated that "gathering public input . . . is part of the job description."  (Dkt. No. 22-1, at 30).  Through his Facebook page, State Senator Rapert has specifically asked constituents about policy issues that are important to them, posted about public safety issues in his district, and conducted live video chats where viewers are allowed to ask him questions on a variety of policy topics.  Based on the record before the Court, as for the sixth *Davison* factor, State Senator Rapert has not made posts on social media on behalf of the entire government body that he is a part of, the Arkansas State Senate.

With respect to the seventh *Davison* factor, even though State Senator Rapert argues that he has not explicitly invited his constituents to use his social media accounts as a space for a back-and-forth dialogue, he has used both his Twitter and Facebook accounts for such a purpose.  He has used both social media accounts to conduct polls and live video chats where viewers are allowed to ask him questions, and he regularly comments on his posts in response to what others have posted on social media.  Finally, as for the eighth *Davison* factor, State Senator Rapert's social media content has a strong tendency towards matters related to his office, namely policy concerns related to state and local issues.  Even though he does post about his personal business and ministry on the relevant social media accounts, based on the Court's review of the limited record before it, State Senator Rapert appears to post often on social media regarding issues related to his position as State Senator of Arkansas.

In response, State Senator Rapert specifically argues that his social media accounts are private because government employees or staff do not use his social media account and because he posts about personal topics.  There is record evidence that, although State Senator Rapert maintains he is the only person who posts on his account, besides the occasional campaign staff member who is not a government employee according to State Senator Rapert, he suggests in his posts on occasion that staff assists him (Dkt. No. 1, ¶ 64; Def. Ex. 1, ¶ 5).  Now, State Senator Rapert admits that he does not have his own personal staff as a state senator.  Even if State Senator Rapert is the only person who posts on or maintains his account, this fact alone is not conclusive when compared to the weight of the other factors discussed above in the totality of the circumstances analysis, which weigh in favor of finding that State Senator Rapert acted under color of state law.

Although State Senator Rapert argues that he uses the social media accounts at issue in this case to post about personal issues and his personal business and ministry, the vast majority of his social media posts in the record evidence submitted to the Court concern issues that are related to his position as a state senator, including state and local policy issues and updates regarding the Arkansas General Assembly.  State Senator Rapert has multiple social media accounts on both Twitter and Facebook, several of which are for a particular private business or ministry.  He has separate Twitter accounts for his campaign, the National Association of Christian Lawmakers, and Holy Ghost Ministries (Dkt. No. 22-1, at 1-3).  State Senator Rapert also has separate Facebook pages for his campaign, the National Association of Christian Lawmakers, Holy Ghost Ministries, and the American History & Heritage Foundation, Inc. (*Id.*, at 6-9).  These accounts do not include his title or the trappings of his office, and these accounts are not at issue in this litigation.

State Senator Rapert also argues that his personal social media accounts are owned by private corporations, Twitter and Facebook, and that he "exercises at most limited control over those accounts in his capacity as a private citizen." (Dkt. No. 18, at 11).  The Court finds that the fact that Twitter and Facebook are privately owned does not preclude a finding that these social media platforms are susceptible to the public doctrine analysis.  The Supreme Court has held that "to evoke First Amendment concerns," "a speaker must seek access to public property or *to private property dedicated to public use* to evoke First Amendment concerns." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 788 (1985) (emphasis added); *see also Columbia Broad. Sys., Inc. v. Democratic Nat. Comm.*, 412 U.S. 94, 134 (1973) ("The First Amendment has also been held applicable where private parties control essentially public forums.").  Most other courts presented with this argument have been unpersuaded by it, opting to apply First Amendment analysis.

Similar to the district court's finding in *One Wisconsin Now*, State Senator Rapert has included pictures and titles that make his social media accounts appear "swathed in the trappings of [his] office."  354 F. Supp. 3d at 952 (quoting *Davison*, 267 F. Supp. 3d at 714).  On his Twitter account, State Senator Rapert includes a picture of himself as well as a gavel with the words "Arkansas Senate" written on the gavel.  His name on Twitter is "Sen. Jason Rapert," and he describes himself as "AR State Senator" and "Founder of National Association of Christian Lawmakers."  On his Facebook page, he includes a picture of himself and of the United States Capitol Building.  His name on the Facebook page is also "Sen. Jason Rapert."  All of these factors taken together, when considering the record evidence before the Court, tend to show that State Senator Rapert has "swathed" his relevant social media accounts "in the trappings of [his] office." *Id.*

For these reasons, the Court finds that plaintiffs have demonstrated that they have a fair chance of prevailing on the question of whether State Senator Rapert acted under color of state law when using his relevant Twitter and Facebook accounts.

### b.      Deprivation Of First Amendment Right

The determination of whether State Senator Rapert deprived plaintiffs of their First Amendment free speech right involves a three-step analysis:  (1) whether the speech "is speech protected by the First Amendment"; (2) "whether the putative forum is susceptible to forum analysis at all"; and (3) if susceptible to forum analysis, the forum's classification.  *Knight*, 302 F. Supp. 3d at 564 (citing *Cornelius*, 473 U.S. 788 (1985)) (other citations omitted).

State Senator Rapert argues that his social media accounts are personal accounts and not government controlled, which means they are not a public forum that is susceptible to forum analysis (Dkt. No. 18, at 10-12).  State Senator Rapert further argues that, based on the facts of this case, he did not intentionally create a public forum (*Id.*, at 12-15).  State Senator Rapert also maintains that, even if his social media accounts are considered some type of public forum, plaintiffs have failed to show that he engaged in viewpoint discrimination (*Id.*, at 15-17).

### (i)      Protected Speech

The first step in this analysis is determining whether plaintiffs' speech is protected by the First Amendment.  As the Court discussed above, plaintiffs in this case seek to engage in speech on matters of public concern through their discussions on State Senator Rapert's social media accounts, including discussions on national and local current events and the role of religion in government.  "[T]he First Amendment protects . . . speech only when it falls within the core of First Amendment protection—speech on matters of public concern."  *Engquist v. Or. Dep't. of Agric.*, 553 U.S. 591, 600 (2008).  Further, the record before the Court does not indicate, and State

Senator Rapert does not argue, that the speech in which plaintiffs engaged, and seek to engage, falls within the "well-defined and narrowly limited classes of speech," such as obscenity, defamation, fraud, incitement, and speech integral to criminal conduct, "the prevention and punishment of which have never been thought to raise any Constitutional problem." *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 791 (2011) (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72 (1942)); *see also United States v. Stevens*, 559 U.S. 460, 468 (2010). State Senator Rapert does not dispute that plaintiffs have engaged in speech protected by the First Amendment. Further, the record evidence supports that plaintiffs have engaged in protected speech. For these reasons, the Court finds that plaintiffs have a fair chance of prevailing on the question of whether they engaged in protected speech.

### (ii)       Susceptible To Forum Analysis

The next step in the analysis for determining whether a deprivation of First Amendment free speech rights occurred is examining whether the putative forum is susceptible to forum analysis at all. *Knight*, 302 F. Supp. 3d at 564. "[F]or a space to be susceptible to forum analysis, it must be owned or controlled by the government." *Id.* at 565 (citing *Cornelius*, 473 U.S. at 801). "[T]he application of forum doctrine must be consistent with the purpose, structure, and intended use of the space." *Id.* The space may be "a forum more in a metaphysical than in a spatial or geographic sense." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 820 (1995). It may "lack[ ] a physical situs." *Cornelius*, 473 U.S. at 801.

As for the issue of government ownership or control, the "under color of state law" requirement from § 1983 has been treated as equivalent to the Fourteenth Amendment's "state action" requirement. *United States v. Price*, 383 U.S. 787, 794 n.7 (1966); *see also Campbell*, 367 F. Supp. 3d at 994 (comparing the requirements for "under color of state law" with the "state

action" requirement in the context of alleged First Amendment free speech violation by a government official).

In *Knight*, the district court looked at the following factors when determining whether the President's Twitter account was under government ownership or control: (1) the Twitter account was presented as being "registered to Donald J. Trump, '45th President of the United States of America, Washington, D.C.,'"; (2) the President's tweets were considered "official records that must be preserved under the Presidential Records Act"; and (3) the President's Twitter account was used in the course of the appointment and removal of officers and for conducting foreign policy. 302 F. Supp. 3d at 567. The *Knight* court determined that "the President presents the [Twitter] account as being a presidential account as opposed to a personal account and, more importantly, uses the account to take actions that can be taken only by the President as President." *Id.*

As stated above, the Court finds that plaintiffs have a fair chance of prevailing on their argument that State Senator Rapert acted under color of state law when he used his relevant Twitter and Facebook accounts. In addition, based on the factors outlined by the district court in *Knight*, plaintiffs have a fair chance of prevailing on their argument that State Senator Rapert's relevant social media accounts are under government ownership or control. First, State Senator Rapert's social media accounts clearly describe him as an Arkansas state senator. For his Twitter account, State Senator Rapert calls himself a State Senator of Arkansas and includes a picture that is related to the Arkansas State Senate. His Facebook page is similarly identifiable and includes the same types of pictures. These facts show that State Senator Rapert is holding himself out in his official capacity as a state senator on the relevant social media accounts.

As for the second factor, there is no record evidence that State Senator Rapert's tweets or Facebook posts are preserved under any Federal or state act.

For the third factor, even though State Senator Rapert cannot remove officers or conduct foreign policy like the President of the United States, he has used the relevant social media accounts to conduct business related to his office. As discussed above, State Senator Rapert has used his social media accounts for public safety alerts, to take polls on policy issues, to ask constituents about their policy preferences, and to discuss policy issues with his Facebook followers on multiple live videos. State Senator Rapert has said on social media that "gathering public input . . . is part of the job description." (Dkt. No. 22-1, at 30).

For the final factor, State Senator Rapert uses his accounts to discuss a wide variety national, state, and local policy issues and actively responds to comments made by other users on social media. Even though he argues that he uses the relevant social media accounts for personal use, the Court has discussed several facts that weigh in favor of finding that he uses the relevant accounts for actions that could only be taken by an Arkansas state senator, such as conducting public polls on the name of a local airport, publishing public safety alerts that affect his district, posting updates on the legislative session, and recording and posting live videos where he responds to other users' questions while sitting at what appears to be an official, government desk in what appears to be an official, government office.

For these reasons, and because the Court concludes that plaintiffs have a fair chance of prevailing on their argument that he acted under color of state law, the Court finds that plaintiffs have a fair chance of prevailing on their argument that State Senator Rapert's relevant social media accounts were under government control or ownership.

When evaluating whether the President violated plaintiffs' free speech rights by blocking the plaintiffs from following or commenting on his Twitter account, the *Knight* court determined that there are three components within each Twitter account:  (i) the content of the tweets; (ii) the timeline comprised of those tweets and the comment threads those tweets initiate; and (iii) the "interactive space" associated with each tweet, in which other users may directly interact with the content of the tweets.  302 F. Supp. 3d at 566.  The *Knight* court held that the content of the tweets sent by the president and "the account's timeline, which 'displays all tweets generated by the [account]'" are not subject to the forum analysis because these components represent government speech, which "is one category of speech that falls outside the domain of forum analysis."  *Id.* at 571-72.  However, the court further concluded that, although forum analysis does not apply to the President's Twitter account as a whole, it applies to "the 'interactive space' associated with each tweet in which other users may directly interact with the content of the tweets."  *Id.* at 566.  In so concluding, the *Knight* court noted that the President and his staff exercised sufficient control over the account to satisfy the government-control requirement.  *Id.* at 566.

Other courts that have examined alleged First Amendment violations in the context of social media accounts and pages or their components have treated portions of such accounts and pages as public spaces susceptible to the public forum doctrine.  *See, e.g.*, *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017) (comparing social media to traditional public fora such as parks and streets); *Hyman*, 2019 WL 2323864, at *2 (holding that the defendant police department "provided a public space for citizens to speak, and they spoke.  [Defendant's] handling of the interactive part of its Facebook page is therefore subject to some form of constitutional scrutiny.") (internal citations omitted); *Campbell*, 367 F. Supp. 3d at 992 (holding that "the public forum doctrine applies to [defendant's] Twitter account . . . [and] that the interactive space following

41

each tweet in which other users may directly interact with the content of the tweets is subject to forum analysis."); *Price v. City of New York*, No. 15 Civ. 5871 (KPF), 2018 WL 3117507, at *15 (S.D.N.Y. June 25, 2018) ("the City's official Twitter pages share many characteristics of public forums [. . .]": Twitter is "generally open to the public"; appears to be "designed for and dedicated to expressive activities"; and appears to have "as a principal purpose . . . the free exchange of ideas"); *Davison*, 267 F. Supp. 3d at 716 ("When one creates a Facebook page, one generally opens a digital space for the exchange of ideas and information."); *Davison v. Plowman*, No. 1:16CV180 (JCC/IDD), 2017 WL 105984, at *3 (E.D. Va. Jan. 10, 2017) ("the Commonwealth's Attorney's Facebook page qualifies as a limited public forum for First Amendment purposes") (citation omitted).

As the Court has discussed above, other users comment on posts, public polls, and live videos that State Senator Rapert posts on his relevant social media accounts. State Senator Rapert also replies and answers comments made by other users on his social media posts. For these reasons, the Court finds that plaintiffs have shown a fair chance of prevailing on the issue of public forum analysis because other social media users may directly interact with the content of State Senator Rapert's social media posts through the interactive space below each of his tweets and Facebook posts.

### (iii)    Forum Classification

The final step in the analysis for determining whether a deprivation of First Amendment free speech rights occurred is determining the classification of State Senator Rapert's social media accounts as a forum. *Knight*, 302 F. Supp. 3d at 564. There are three types of public fora: traditional public fora, designated public fora, limited public fora, and nonpublic fora. *See, e.g.*, *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 469-70 (2009).

42

Not all courts that have addressed the issue of forum classification for social media accounts have reached the same conclusion. However, almost every court to examine the issue has found that the "interactive space" on a government official's social media accounts is classified as some type of public forum. *See Campbell*, 367 F. Supp. 3d at 992-93 (finding that the public forum doctrine applied to the "interactive space" on the government official's social media account but declining to classify the forum); *Knight*, 302 F. Supp. 3d at 575 (holding that "the interactive space of a tweet from the [President's] account constitutes a designated public forum"); *Davison*, 227 F. Supp. 3d at 609 (finding that plaintiffs plausibly alleged that a government official's Facebook page creates a limited public forum); *but see Morgan v. Bevin*, 298 F. Supp. 3d 1003, 1012 (E.D. Ky. 2018) (finding "that forum analysis is inappropriate" regarding the Governor of Kentucky's social media accounts and declining to classify the forum).

Plaintiffs argue that State Senator Rapert has created a public forum with both his Twitter account and Facebook page, but they do not argue which classification of public fora applies in this case. Plaintiffs further contend that State Senator Rapert engaged in viewpoint discrimination when he blocked them on his Twitter account and Facebook page, which plaintiffs maintain is a violation of their First Amendment speech rights no matter the classification of the public forum. State Senator Rapert argues that his social media accounts are, at a minimum, a limited public forum and that he did not engage in viewpoint discrimination.

As the Court will discuss below, the Court determines that plaintiffs have a fair chance of prevailing on their argument that State Senator Rapert engaged in viewpoint discrimination when he blocked plaintiffs on his Twitter account and Facebook page. Accordingly, for purposes of the currently pending preliminary injunction motion, the Court need not decide which type of forum was created, because "[r]egardless of whether it occurs in a public, designated, or nonpublic forum,

viewpoint discrimination that results in the intentional, targeted expulsion of individuals from these forums violates the Free Speech Clause of the First Amendment." *Price*, 2018 WL 3117507, at *16 (citing *Rosenberger*, 515 U.S. at 829); *see also Davison*, 912 F.3d at 687-88 (4th Cir. 2019) (refusing to decide whether a Facebook page is a traditional or a designated public forum and stating that "viewpoint discrimination" is "prohibited in all forums").

For these reasons, and because this case is at the preliminary injunction stage, the Court declines to classify the type of public forum that applies to the forum created by State Senator Rapert with his relevant social media accounts.

### c.       Viewpoint Discrimination

The Court will now address the issue of viewpoint discrimination. Even for the purposes of a limited public forum, the State is forbidden from exercising viewpoint discrimination. *Rosenberger*, 515 U.S. at 829. "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Id.* "Viewpoint discrimination is thus an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id.* Viewpoint discrimination is also prohibited in the context of social media. *See Davison*, 912 F.3d at 687-88. The Supreme Court has recognized social media as one of "the most important places . . . for the exchange of views . . . ." *Packingham*, 137 S. Ct. at 1735. Further, "[v]iewpoint discrimination is apparent, for example, if a government official's decision to take a challenged action was 'impermissibly motivated by a desire to suppress a particular point of view.'" *Davison*, 912 F.3d at 687 (quoting *Cornelius*, 473 U.S. at 812-13). "Official censorship based on a state actor's subjective judgment that the content of protected speech is offensive or inappropriate is viewpoint

discrimination." *Robinson*, 921 F.3d at 447 (citing *Matal v. Tam*, — U.S. —, 137 S. Ct. 1744, 1763 (2017); *see also id.* at 1766 (Kennedy, J., concurring)).

Plaintiffs argue that State Senator Rapert has engaged in viewpoint discrimination because they were blocked based on the political and religious speech they posted on his social media posts. Specifically, plaintiffs contend that State Senator Rapert blocked them for posting critical responses on his social media posts.   In response, State Senator Rapert argues that he has not engaged in viewpoint discrimination by blocking plaintiffs because he has "placed restrictions on the content of what may be posted on his page."   (Dkt. No. 18, at 13).   In his declaration, State Senator Rapert states that his Facebook page includes the following statement:

> Anyone who engages in bullying, intimidation, personal attacks, uses profanity or attempts to mislead others with false information, will find their privilege to post on this page revoked.   Thank you for respecting others.   This page is not paid for or administered by a government entity.

(Def. Ex. 1, ¶ 7).   There is no evidence in the record before the Court that State Senator Rapert has a similar declaration posted on his Twitter account.

State Senator Rapert further states in his declaration that he "take[s] action against anyone who engages in bullying, intimidation, personal attacks, uses profanity, or attempts to mislead others with false information." (*Id.*, ¶ 14).   He also declares, "I obviously do not block people simply because they disagree with me." (*Id.*).   According to his declaration, State Senator Rapert's social media posts can "garner hundreds of comments, and some even have had thousands of comments," making it impossible to see everyone who violates his social media rules (*Id.*, ¶ 15). He also states, "If there are currently comments on my social media profiles that violate these standards, it does not mean that I have chosen to leave them there." (*Id.*).   Further, according to his declaration, if State Senator Rapert did not enforce his social media rules, "then large amount

of harassing and disruptive comments and replies would render [his] social media profiles totally unusable." (*Id.*).

Based on the record before the Court, State Senator Rapert has used the @JasonRapert Twitter account on several occasions to discuss his reasons for blocking Twitter users who follow him.  State Senator Rapert has Tweeted that he blocks "very few people" and that one user "just happened to be one of the liberal extremists that made the list . . . ." to be blocked (Dkt. No. 6, at 14).  He has also posted that he blocks "those who engage in ad hominem attacks, defamation or threatening communications." (*Id.*).  In a different post on his Twitter account, State Senator Rapert stated to another user that "if you keep lying I might block you too.  You've been on the watch list for blocking of course." (*Id.*).  In response to another user, he also posted, "I actually suppose I should have blocked you for spreading false information in the first place." (*Id.*, at 15).  State Senator Rapert tweeted these statements to Twitter users who are not plaintiffs in this case.

During the hearing on the preliminary injunction request, several of the plaintiffs in this case discussed their social media interactions with State Senator Rapert before he blocked them.  According to Ms. Dempsey, who is supportive and involved in the American Atheists in Arkansas organization, she commented on several of State Senator Rapert's posts to discuss the relationship between government and religion.  After she messaged State Senator Rapert directly on Facebook in August 2018, Ms. Dempsey testified that she realized State Senator Rapert blocked her.  In her final messages, Ms. Dempsey asked State Senator Rapert if he wanted "to keep the government secular or [for] America to become a Christian nation?" (Pls Ex. 8).  In a later message on the same thread, Ms. Dempsey also asked State Senator Rapert not to dictate his "personal religious beliefs into our secular government."  (Pls. Ex. 10).

Ms. Shoshone testified that State Senator Rapert also blocked her on Twitter at least ten days after she commented on his posts.  In one post, Ms. Shoshone asked State Senator Rapert for the sources he used in a speech that he delivered regarding same-sex marriage that she attended (Pls. Ex. 11).  In another post, Ms. Shoshone asked State Senator Rapert if it was "[h]ypocritical" for him to tweet about his political opponent accepting campaign contributions from "baby-killers" while he allegedly accepted campaign contributions from "the tobacco industry." (Pls. Ex. 12).  Ms. Shoshone also replied to a tweet from State Senator Rapert regarding campaign contributions from "abortion doctors" asking him to "support easy access to" birth control.  (Pls. Ex. 13).  In a different post, Ms. Shoshone replied to one of State Senator Rapert's tweets with a picture of State Senator Rapert, which included the words "Jason Rapert Selfie." (Pls. Ex. 15).  Ms. Shoshone testified that ten days after she posted the picture of him, she learned that State Senator Rapert blocked her on Twitter.  Ms. Shoshone further testified that she follows multiple politicians and public officials on social media and replies to their tweets in the same manner as she did to State Senator Rapert.  She testified that she has not been blocked on social media by another other politician or elected official.

Mr. Barringer also testified that State Senator Rapert blocked him on Facebook after he commented on one of State Senator Rapert's posts.  Mr. Barringer testified that he commented on one of State Senator Rapert's posts where State Senator Rapert indicated his support for more restrictive abortion regulations.  Mr. Barringer's comment criticized State Senator Rapert's post and discussed verses from the Bible that Mr. Barringer asserted were relevant to the issue of abortion.  According to Mr. Barringer, after he made this comment, he learned that State Senator Rapert blocked him on Facebook.

Ms. Fernau did not testify at the preliminary injunction hearing, but plaintiffs and State Senator Rapert have submitted social media posts and emails from Ms. Fernau.  According to those documents, Ms. Fernau posted on State Senator Rapert's page in May 2014 regarding a recent Arkansas case involving same-sex marriage (Dkt. Nos. 1, ¶¶ 86-87; 6, at 18).  Ms. Fernau's response was critical of State Senator Rapert's original Facebook post regarding same-sex marriage and included quotes from Bible verses that Ms. Fernau argues is "conduct that the Bible prohibits but which [State Senator] Rapert and others do not oppose." (Dkt. Nos. 1, ¶ 88; 6, at 19).  After Ms. Fernau made a different Facebook post that was critical of State Senator Rapert, plaintiffs allege that Ms. Fernau was blocked on Facebook by State Senator Rapert within 24 hours (Dkt. Nos. 1, ¶ 91; 6, at 21).  After she was blocked on Facebook, Ms. Fernau sent a tweet that was critical of State Senator Rapert's decision to block her on Facebook (Dkt. Nos. 1, ¶ 94; 6, at 21).  Plaintiffs allege that State Senator Rapert then blocked Ms. Fernau on Twitter the next day (Dkt. Nos. 1, ¶ 96; 6, at 21).

Even though State Senator Rapert includes a policy on his Facebook page that states what users are not allowed to post on his page, he has failed to show how that policy applies to his blocking of Ms. Fernau, Ms. Shoshone, Mr. Barringer, and Ms. Dempsey, the individual plaintiffs. The limited evidence before the Court indicates that State Senator Rapert blocked each of the individual plaintiffs in this case soon after they posted comments critiquing his political positions. Further, in defense of blocking these individuals, State Senator Rapert does not argue that any of the individual plaintiffs engaged in bullying, intimidation, personal attacks, used profanity, or attempted to mislead others with false information.

The individual plaintiffs posted on State Senator Rapert's social media posts regarding a variety of political issues.  Ms. Fernau posted a comment on Facebook critiquing State Senator

Rapert's views on same-sex marriage and the relationship between religion and government.  Ms. Shoshone posted comments on Twitter critiquing who State Senator Rapert took campaign donations from and a picture with the caption "Jason Rapert Selfie."  Mr. Barringer posted a Facebook comment that was critical of State Senator Rapert's position on abortion policy and quoted from the Bible.  Ms. Dempsey posted comments on Facebook critical of State Senator Rapert's positions regarding the relationship between government and religion.  Even though it is not clear exactly when State Senator Rapert blocked each plaintiff after they made these posts, each of the individual plaintiffs assert that State Senator Rapert blocked them on social media soon after they posted about these issues on his respective social media pages.  There is no contrary evidence in the record before the Court at this stage.

Further, State Senator Rapert stated in tweets directed toward users who are not parties to this case that he intends to block other users on social media because of their political viewpoints (Dkt. No. 6, at 14).  In these posts, State Senator Rapert states that he has a "watch list for blocking" and addresses one user who is on his "list" as a "liberal extremist[]."  (*Id.*).  In his declaration, State Senator Rapert maintains that he follows the social media policy posted on his Facebook account (Def. Ex. 1, ¶ 14).  Based on the record before the Court, State Senator Rapert does not explain why, under his policy or not, he blocked Ms. Fernau, Ms. Shoshone, Mr. Barringer, and Ms. Dempsey on social media.

State Senator Rapert argues that this case is similar to *Davison v. Plowman*, where the district court found that defendant county's social media policy was viewpoint neutral because it banned "off topic" comments.  247 F. Supp. 3d 767, 776-77 (E.D. Va. 2017).  In that case, the defendant's social media policy specifically allowed for the removal of "clearly off topic" comments because the purpose of the "Loudoun County social media sites is to present matters of

public interest in Loudoun County." *Id.* at 771-72.  Unlike in *Davison v. Plowman*, State Senator Rapert's social media policy does not state that his account is solely for the purpose of presenting matters of public interest to his constituents.  In fact, the record shows that State Senator Rapert posts about a variety of topics.

Further, State Senator Rapert's social media policy does not address deleting or banning comments that are off topic, regardless of the speaker's viewpoint.  Instead, under his own social media policy, State Senator Rapert may delete comments or block any user who, in his view, "engages in bullying, intimidation, personal attacks, uses profanity or attempts to mislead others with false information . . . ."  The record evidence does not suggest that State Senator Rapert followed a viewpoint neutral social media policy; instead, the record evidence suggests that he blocked plaintiffs on social media after each plaintiff posted comments that were critical of State Senator Rapert's policy positions.  Plaintiffs have shown a fair chance on prevailing on the issue of viewpoint discrimination because they have shown that State Senator Rapert blocked plaintiffs on social media based on particular views taken by plaintiffs contrary to State Senator Rapert's views on matters of public concern.

Based on the evidence before the Court at this time, the Court finds that plaintiffs have shown a fair chance of prevailing on the merits of their First Amendment free speech claim against State Senator Rapert.

### 2.      Right To Petition The Government

Plaintiffs also argue that State Senator Rapert has violated their right to petition the government pursuant to the First Amendment.  The First Amendment guarantees every citizen's right "to petition the Government for a redress of grievances."  U.S. Const. amend. I.  The right "allows citizens to express their ideas, hopes, and concerns to their government and their elected

representatives . . . [and is] generally concerned with expression directed to the government seeking redress of a grievance." *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 388 (2011). "Petitions to the government assume an added dimension when they seek to advance political, social, or other ideas of interest to the community as a whole." *Id.* at 395. "Interpretation of the Petition Clause must be guided by the objectives and aspirations that underlie the right. A petition conveys the special concerns of its author to the government . . . ." *Id.* at 388-89.

"The right to petition is cut from the same cloth as the other guarantees of that Amendment, and is an assurance of a particular freedom of expression." *McDonald v. Smith*, 472 U.S. 479, 482 (1985). The First Amendment right to speech and petition "are inseparable," and generally "there is no sound basis for granting greater constitutional protection" to one over the other. *Id.* at 485. The Supreme Court has acknowledged that "[t]here may arise cases where the special concerns of the Petition Clause would provide a sound basis for a distinct analysis" but has not yet ruled on the issue. *Borough of Duryea, Pa.*, 564 U.S. at 389; *see also Knight*, 302 F. Supp. 3d at 577 n.24 (declining to analyze separately plaintiffs' claims based on the right to petition because the case did not present "special concerns" regarding the right to freedom of speech and the right to petition).

State Senator Rapert argues that plaintiffs' claims based on the right to petition fail because they have no constitutional right to be heard on his social media accounts and that he has chosen to "ignore" the "vulgar and harassing messages in response to his posts." (Dkt. No. 18, at 17). He further argues that, even though he blocked plaintiffs on social media, they may contact him by other means such as email, telephone, letter, or by creating a new social media account, which several of the individual plaintiffs have done by alternative social media accounts and email (*Id.*).

State Senator Rapert is correct that there is "no constitutional right as members of the public to a government audience for their policy views." *Minn. State Bd. for Cmty. Colleges v. Knight*, 465 U.S. 271, 286 (1984).  "Nothing in the First Amendment or in this Court's case law interpreting it suggests that the rights to speak, associate, and petition require government policymakers to listen or respond to individuals' communications on public issues." *Id.* at 285. State Senator Rapert may choose to "ignore" those on social media he deems are not following the line of conversations he has decided to start. *Smith v. Ark. State Highway Emp., Local 1315*, 441 U.S. 463, 466 (1979) (holding, in part, that "the First Amendment does not impose any affirmative obligation on the government to listen [or] to respond.").  State Senator Rapert does not explain how blocking plaintiffs on social media equates to ignoring their petitions.  Even though State Senator Rapert is not obligated to listen, read, or respond to plaintiffs' posts on his social media pages, his action to block plaintiffs from his Twitter and Facebook pages stopped plaintiffs from the ability to petition on his social media pages. *See Knight*, 302 F. Supp. 3d at 576 ("Nonetheless, when the government goes beyond merely amplifying certain speakers' voices and not engaging with others, and actively restricts 'the right of an individual to speak freely [and] to advocate ideas,' it treads into territory proscribed by the First Amendment." (quoting *Minn. State Bd. for Cmty. Colls.*, 465 U.S. at 286)).

Further, even though plaintiffs may petition State Senator Rapert by other means while he has blocked plaintiffs on social media, State Senator Rapert cites no authority in support of his argument that plaintiffs' claims based on the right to petition fail because alternative channels for petition exist. *See Leuthy v. LePage*, Case No. 1:17-cv-00296-JAW, 2018 WL 4134628, at *17 (D. Me. Aug. 29, 2018) (finding that plaintiff's claims against defendant governor based on right to petition were proper and that the availability of alternative channels for petition did not "render

a claim for violation of the Petition Clause nonviable").  For these reasons, the Court rejects State Senator Rapert's challenges to this claim.

At least at this stage of the litigation, the Court declines to analyze separately plaintiffs' claims based on the right to petition because the Court concludes that this case does not present "special concerns" regarding the right to freedom of speech and the right to petition.  The Court has already concluded that plaintiffs have a fair chance of prevailing on the merits of their claims based on freedom of speech under the First Amendment, and the Court will not separately analyze at this time plaintiffs' claims based on the right to petition under the First Amendment.

### 3.    Right To Remonstrate Under The Arkansas State Constitution

Plaintiffs also bring claims against State Senator Rapert under Article 2, Section 4 of the Constitution of the State of Arkansas, which states in pertinent part that "[t]he right of the people . . . to petition, by address or remonstrance, the government, or any department thereof, shall never be abridged."  The parties do not address the differences between the First Amendment of the United States Constitution and Article 2, Section 4 of the Arkansas State Constitution and only cite cases analyzing claims brought under the First Amendment.  Because the parties have not briefed the issue, to resolve the pending motion, the Court declines to consider this claim and will not resolve any dispute that may exist between the First Amendment and the Arkansas State Constitution.  *See Graham v. Cawthorn*, 427 S.W. 3d 34, 46 (Ark. 2013) (acknowledging that the Arkansas Supreme Court has never addressed whether Article 2, Section 4 of the Arkansas State Constitution provides more protection than the First Amendment and declining to decide the issue).

### 4.      Free Exercise Of Religion Under The First Amendment

Plaintiffs also argue that State Senator Rapert's decision to block them on social media violated their First Amendment right to exercise freely their religion.  Specifically, plaintiffs argue that State Senator Rapert burdened their ability to exercise their religion and their ability to express their sincerely held beliefs, as atheists and supporters of separation between church and state, by "speaking out in opposition to policies which impose particular religious beliefs on others." (Dkt. No. 6, at 43).  Plaintiffs further assert that State Senator Rapert specifically blocked them on social media because of their religious beliefs.  State Senator Rapert argues that he has never blocked a social media user because he or she was an atheist.

The First Amendment's Free Exercise Clause, applicable to the states through the Fourteenth Amendment, prohibits states from making any "law respecting an establishment of religion, or prohibiting the free exercise thereof."   U.S. Const. amends. I, XIV; *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940).  The Free Exercise Clause "protect[s] religious observers against unequal treatment" and subjects to the strictest scrutiny laws that target the religious for "special disabilities" based on their "religious status."  *Church of Lukumi Babalu Aye, Inc. v. Hialeah,* 508 U.S. 520, 533, 542 (1993) (internal quotation marks omitted).  Applying that basic principle, the Supreme Court has repeatedly confirmed that denying a generally available benefit solely on account of religious identity imposes a penalty on the free exercise of religion that can be justified only by a state interest "of the highest order."  *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2019 (2017).

Further, adverse action by a government official violates the Free Exercise Clause if that action is motivated by religious hostility, even where the action is otherwise facially neutral and of general applicability.  *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, — U.S. —,

138 S. Ct. 1719, 1732 (2018).  The Constitution "commits government itself to religious tolerance, and upon even slight suspicion that proposals for state intervention stem from animosity to religion or distrust of its practices, all officials must pause to remember their own high duty to the Constitution and to the rights it secures." *Masterpiece Cakeshop*, 138 S. Ct. at 1731 (quoting *Church of Lukumi Babalu Aye*, 508 at 547).

To establish that their free exercise rights have been violated, plaintiffs "must first show 'that the government action complained of substantially burdened their religious activities.'" *Altman v. Minn. Dep't of Corr.*, 251 F.3d 1199, 1204 (8th Cir. 2001) (quoting *Brown v. Polk County*, 61 F.3d 650, 658 (8th Cir. 1995) (en banc)).  "Government significantly burdens the exercise of religion if it significantly constrains conduct or expression that manifests a central tenet of a person's religious beliefs, meaningfully curtails the ability to express adherence to a particular faith, or denies reasonable opportunities to engage in fundamental religious activities." *Id.* (citation omitted).

Laws burdening the free exercise of religion, as opposed to neutral, generally-applicable laws incidentally burdening religious exercise, must be narrowly tailored to advance a compelling government interest. *Church of the Lukumi Babalu Aye*, 508 U.S. at 531-32.  "A law is not neutral if its object is 'to infringe upon or restrict practices because of their religious motivation.'" *Olsen v. Mukasey*, 541 F.3d 827, 832 (8th Cir. 2008) (quoting *Church of the Lukumi Babalu Aye*, 508 U.S. at 533).  A law is not generally applicable if "in a selective manner[, it] impose[s] burdens only on conduct motivated by religious belief." *Church of the Lukumi Babalu Aye*, 508 U.S. at 543.

Ms. Fernau, Ms. Shoshone, Mr. Barringer, and Ms. Dempsey state that they are atheists (Dkt. No. 6, at 16, 24, 28, 29).  Each of the individual plaintiffs also asserts that he or she feels "a

moral imperative to oppose any and all government actions that compel [them] or other individuals to conform to the religious beliefs of others." (*Id.*).   Based on the record before the Court, Ms. Dempsey is the only individual plaintiff who identified herself as an atheist in a comment to State Senator Rapert on his Facebook page (*Id.*, at 31).   Ms. Dempsey posted several additional comments on his Facebook page and also sent private messages to State Senator Rapert (Pls. Exs. 1-10).   State Senator Rapert sent two response messages to Ms. Dempsey, who sent two longer responses discussing the issue of separation between church and state (Pls. Exs. 8-10).   In his private messages to Ms. Dempsey, State Senator Rapert states, "I have seen your posts and know you are an atheist.   That is your right.   You must also respect the rights and values of the vast majority of people who believe in God in our nation." (Pls. Ex. 8).   The Court does not find any other social media comment or message where State Senator Rapert acknowledges that another individual plaintiff is an atheist nor does the Court find record evidence that any individual plaintiff identified himself or herself as an atheist in a social media comment or message to State Senator Rapert, although the Court acknowledges that in at least one email to State Senator Rapert Ms. Fernau referenced atheists (Def. Ex. 2., at 2-3).

The Court has previously discussed State Senator Rapert's social media policy, which was posted on his Facebook page but not on his Twitter page.   His social media policy states that users who engage in "bullying, intimidation, personal attacks, . . . profanity or attempts to mislead others with false information, will find their privilege to post on this page revoked." (Def. Ex. 1, ¶ 7). State Senator Rapert's policy does not specifically mention religious beliefs.   According to his declaration, State Senator Rapert has "never banned or blocked anyone from any social media account because he or she is an atheist." (*Id.*, ¶ 13).   He further states that he is "grateful for every atheist or other non-believer who follows [his] social media posts because they present an

opportunity to share [his] faith." (*Id.*).  He finally states that he "would never ban or block someone from social media merely because they do not share [his] faith." (*Id.*).

At this stage, based on the limited record before the Court, the Court determines that plaintiffs have failed to show that they have a fair chance of prevailing on the merits of their free exercise claim based on State Senator Rapert's action to block them on social media.  Regarding the social media policy, State Senator Rapert's policy is neutral and generally applicable with regard to the free exercise of religion.  The policy appears on its face to be neutral because it does not appear to regulate religious worship.  Based on the record, Ms. Fernau, Ms. Shoshone, and Mr. Barringer have not shown that State Senator Rapert knew that they were atheists at the time they were blocked because there are no social media posts by them in the limited record before the Court discussing their religious beliefs as atheists.  Ms. Fernau, Ms. Shoshone, and Mr. Barringer discussed a variety of issues related to religion in their comments to State Senator Rapert on social media, but their comments did not state what, if any, religious beliefs they hold.

Even though plaintiffs argue that State Senator Rapert singled out plaintiffs because they are atheist, the Court finds insufficient evidence in the limited record before it to determine that plaintiffs have a fair chance of prevailing on this point.  Based on the limited record before the Court, it is unclear whether State Senator Rapert was aware that Ms. Fernau, Ms. Shoshone, or Mr. Barringer were atheist before he blocked them on social media.  Further, State Senator Rapert was aware that Ms. Dempsey was atheist, but the limited record does not sufficiently demonstrate that he blocked her for that reason.  Plaintiffs have failed to show through record evidence at this stage of the litigation that they have a fair chance of prevailing on their claim that State Senator Rapert applied his social media policy in a selective manner that imposes a burden on plaintiffs' conduct that was motivated by their religious beliefs.

For these reasons, the Court finds that plaintiffs have not shown a fair chance of prevailing on the merits of their free exercise claim pursuant to the First Amendment.

### 5.      Arkansas Religious Freedom Restoration Act

Plaintiffs also claim that State Senator Rapert's actions violate the ARFRA.  Arkansas adopted the ARFRA to apply "in all cases in which free exercise of religion is substantially burdened . . . ."  Ark. Code Ann. 16-123-402(1).  The ARFRA is to be interpreted consistent with the Religious Freedom Restoration Act, 42 U.S.C. §2000bb *et seq.*, "federal case law, and federal jurisprudence . . . ."  Ark. Code Ann. 16-123-402(2).

The ARFRA states, in pertinent part:

> A government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except that a government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person is:  (1) In furtherance of a compelling governmental interest; and (2) The least restrictive means of furthering that compelling governmental interest.

Ark. Code Ann. § 16-123-404(a)(1)-(2).  A cause of action under the ARFRA is conferred on "[a] person whose religious exercise has been burdened in violation of this section."  Ark. Code Ann. § 16-123-404(b)(1).

When analyzing whether a state action implicates a burden on the free exercise of religion under the ARFRA, other courts have applied generally the same analysis as applied to free exercise claims under the First Amendment.  *See Brown v. Jordan*, No. 5:18-CV-05199, 2019 WL 637720, at *10 (W.D. Ark. Feb. 14, 2019) (finding that plaintiff failed to state a claim under the ARFRA when plaintiff also failed to show a burden on the free exercise of religion under the First Amendment).  Because the Court previously determined that plaintiffs failed to show a fair chance of prevailing on the merits of their claim for free exercise pursuant to the First Amendment, the

Court also determines that plaintiffs have failed to show a fair chance of prevailing on their claim under the ARFRA.

### 6.    Equal Protection Under The Fourteenth Amendment

Plaintiffs further argue that State Senator Rapert violated their right to equal protection under the law pursuant to the Fourteenth Amendment to the United States Constitution. Specifically, plaintiffs assert that State Senator Rapert "selectively targeted" them based on their expressed viewpoints and/or atheist religious beliefs (Dkt. No. 6, at 44-45).

In response, State Senator Rapert argues that plaintiffs have not satisfied the two-prong test for a class-of-one equal protection claim (Dkt. No. 18, at 19-21).  First, State Senator Rapert argues that plaintiffs have not met the high burden required to show that similarly situated comparators were given preferential treatment compared to plaintiffs.  State Senator Rapert also contends that plaintiffs have failed to show that there was not a rational basis for State Senator Rapert's treatment of them on social media.

The Fourteenth Amendment requires that states afford all citizens the equal protection of the laws. U.S. Const. amend. XIV.  "As a threshold matter, in order '[t]o state an equal protection claim, [a plaintiff] must have established that he was treated differently from others similarly situated to him.'"  *Carter v. Arkansas,* 392 F.3d 965, 968 (8th Cir. 2004) (quoting *Johnson v. City of Minneapolis,* 152 F.3d 859, 862 (8th Cir. 1998)).  If state action treats citizens differently based on a suspect classification or involves a fundamental right, the challenged state action receives heightened scrutiny.  All other classifications will be upheld "if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose."  *Heller v. Doe by Doe,* 509 U.S. 312, 320 (1993).

This case involves state action purportedly directed at First Amendment free speech rights and First Amendment free exercise and religious classifications.  Where a regulation or state action implicates a fundamental right, such as the rights conferred by the First Amendment, a court may under certain circumstances be required by controlling law to review the challenged conduct under heightened scrutiny.  *See Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 101 (1972) ("The Equal Protection Clause requires that statutes affecting First Amendment interests be narrowly tailored to their legitimate objectives."); *Clements v. Fashing,* 457 U.S. 957, 963 (1982); *Peeper v. Callaway Cnty. Ambulance Dist.,* 122 F.3d 619, 622 (8th Cir. 1997).  Only if no suspect classification or fundamental right is implicated do traditional Equal Protection principles apply.  *Peeper*, 122 F.3d at 622; *Linc-Drop, Inc. v. City of Lincoln*, 996 F. Supp. 2d 845, 860 (D. Neb. 2014).  The Court is unwilling to skip to a class-of-one equal protection analysis without examining first the type of claim involved.

At this stage of the proceeding, however, the Court declines to examine further plaintiffs' Equal Protection claims, at least to the extent they may be based on alleged suspect classifications or fundamental rights.  The Court has determined that plaintiffs have a fair chance of prevailing on their First Amendment free speech claim and do not have a fair chance of prevailing on their First Amendment free exercise claim.  Given the Court's analysis of those issues, at this stage of the litigation, the Court determines that it need not go farther in assessing plaintiffs' Equal Protection claims to the extent those claims are based on alleged suspect classifications or fundamental rights.  *See Child Evangelism Fellowship of Minn. v. Minneapolis Special Sch. Dist. No. 1,* 690 F.3d 996, 1004 n. 4 (8th Cir. 2012); *Linc-Drop, Inc.*, 996 F. Supp. 2d at 860.

If plaintiffs are not members of a protected class and if the challenged action does not implicate a fundamental right, then plaintiffs must prove that they were "treated differently from

others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (stating that, to allege a "class-of-one" equal protection claim, the plaintiff must assert that he had been "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment"); *see also Nolan v. Thompson*, 521 F.3d 983, 989-90 (8th Cir. 2008).   Absent a showing that other similarly situated persons received preferential treatment, plaintiffs do not have a viable equal protection claim.   *Robbins v. Becker*, 794 F.3d 988, 995 (8th Cir. 2015) (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam)).

"To be similarly situated for purposes of a class-of-one equal-protection claim, the persons alleged to have been treated more favorably must be identical or directly comparable to the plaintiff in all material respects." *Id.* (quoting *Reget v. City of La Crosse*, 595 F.3d 691, 695 (7th Cir. 2010)).   "Identifying the disparity in treatment is especially important in class-of-one cases." *Barstad v. Murray Cnty.*, 420 F.3d 880, 884 (8th Cir. 2005).   "A class-of-one plaintiff must therefore 'provide a specific and detailed account of the nature of the preferred treatment of the favored class,' especially when the state actors exercise broad discretion to balance a number of legitimate considerations." *Nolan*, 521 F.3d at 990 (quoting *Jennings v. City of Stillwater*, 383 F.3d 1199, 1214-15 (10th Cir. 2004)).

If the allegations do not support a suspect class or fundamental right analysis, plaintiffs' claim is subject to rational basis review. *Hawkeye Commodity Promotions, Inc. v. Vilsack*, 486 F.3d 430, 442 (8th Cir. 2007) ("When an equal protection claim is neither based on a 'suspect class' or grounded in a fundamental right, it is subject to a rational basis review.") (quoting *Gilmore v. County of Douglas*, 406 F.3d 935, 937 (8th Cir. 2005)).   Under the rational basis test, State Senator Rapert's social media policy carries a presumption of rationality that can only be

61

overcome "by a clear showing of arbitrariness and irrationality." *Bannum, Inc. v. City of St. Charles, Mo.*, 2 F.3d 267, 270 (8th Cir. 1993); *see also F.C.C. v. Beach Communications*, 508 U.S. 307, 314 (1993) ("On rational-basis review, a classification in a statute . . . comes to us bearing a strong presumption of validity."). The challenged conduct or policy will not be overturned "unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [the court] can only conclude that the [challenged] actions were irrational." *Bannum*, 2 F.3d at 271. Accordingly, in challenging the governmental action on Equal Protection grounds, it is plaintiffs' burden to "negate 'every conceivable basis which might support the classification.'" *Hawkeye Commodity Promotions*, 486 F.3d at 443 (quoting *Gilmore*, 406 F.3d at 939).

The Eighth Circuit limits "class-of-one" actions from applying to "forms of state action . . . which by their nature involve discretionary decisionmaking." *Robbins v. Becker*, 794 F.3d 988, 995 (8th Cir. 2015) (quoting *Engquist*, 553 U.S. at 602-04). Applying the rationale from *Engquist* to a "police officer's decisions regarding whom to investigate and how to investigate," the Eight Circuit held "that while a police officer's investigative decisions remain subject to traditional class-based equal protection analysis, they may not be attacked in a class-of-one equal protection claim" because investigative decisions "necessarily involve discretion." *Flowers v. City of Minneapolis, Minn.*, 558 F.3d 794, 799-800 (8th Cir. 2009).

Plaintiffs argue that they did not violate State Senator Rapert's social media policy and that there is no justifiable rationale for State Senator Rapert's decision to block plaintiffs on Twitter and Facebook. Reviewing all controlling authorities and the limited record evidence at this stage of the proceedings, the Court determines that plaintiffs have failed to show a fair chance of prevailing on their class-of-one equal protection claim.

### D.  Irreparable Harm

The Court next considers whether plaintiffs have shown a threat of irreparable harm.  "To succeed in demonstrating a threat of irreparable harm, 'a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief.'"  *S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 778 (8th Cir. 2012) (quoting *Roudachevski v. All-Am. Care Ctrs., Inc.*, 648 F.3d 701, 706 (8th Cir. 2011)).  "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see Phelps-Roper v. Nixon*, 509 F.3d 480, 485 (8th Cir. 2007), *modified on reh'g*, 545 F.3d 685 (8th Cir. 2008) ("If [appellant] can establish a substantial likelihood of success on the merits of her First Amendment claim, she will also have established irreparable harm as the result of the deprivation.").

### 1.  Impact Of Delay In Seeking Relief

According to the record before the Court, State Senator Rapert blocked Ms. Fernau on Twitter and Facebook in May 2014, blocked Ms. Shoshone on Twitter in February 2015, blocked Mr. Barringer on Facebook in 2015, and blocked Ms. Dempsey on Facebook in August 2018. Plaintiffs originally filed this lawsuit October 2, 2018, before filing a notice of voluntary dismissal on January 3, 2019.  *American Atheists, Inc. v. Rapert*, 4:18-cv-00729-KGB, (Dkt. Nos. 1, 10) (E.D. Ark. Oct. 2, 2018).  These same plaintiffs filed the earlier suit, and although plaintiffs requested injunctive relief in that complaint, plaintiffs did not file a separate motion for temporary restraining order or preliminary injunction at any point during the pendency of their first case.

State Senator Rapert argues that plaintiffs' request for a preliminary injunction should be denied because most plaintiffs waited years to bring the current action, which weighs against the

Court granting plaintiffs' motion (Dkt. No. 18, at 4-5).  State Senator Rapert further argues that plaintiffs did not include a preliminary injunction request in their first lawsuit (*Id.*, at 4).

Plaintiffs assert that State Senator Rapert cites cases that discuss laches, despite State Senator Rapert not directly raising the issue of laches (Dkt. No. 22-1, at 12-14).  Plaintiffs contend that laches does not apply to the present case because State Senator Rapert has not shown undue prejudice to himself.

Regarding the application of laches in this case, "[l]aches applies when a claimant inexcusably delays in asserting its claim and thereby unduly prejudices the party against whom the claim ultimately is asserted."  *Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.,* 182 F.3d 598, 602 (8th Cir. 1999).  State Senator Rapert argues that plaintiffs delayed by several years or at least several months in seeking a preliminary injunction.  State Senator Rapert has failed to show, and the Court is not aware of any record evidence that demonstrates, how he was unduly prejudiced by plaintiffs waiting to bring the current suit.  For this reason, on the limited record before it, the Court determines that laches does not apply to the current case.

However, though laches may be inapplicable in the instant case, courts in this Circuit routinely consider plaintiffs' delays in bringing actions when deciding whether to grant a preliminary injunction.  *See, e.g.*, *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 895 (8th Cir. 2013) ("At a minimum, [plaintiff's] failure to seek injunctive relief for a period of seventeen months after [defendant] quit paying royalties vitiates much of the force of [plainitff's] allegations of irreparable harm." (internal quotations and citation omitted)); *Safety-Kleen Sys., Inc. v. Hennekens*, 301 F.3d 931, 936 (8th Cir. 2002) (stating that "[t]he issue" regarding a delay in seeking a preliminary injunction "is whether the length of delay was unreasonable, an issue that turns on the facts of each case" (internal quotations and citation omitted)); *TrueNorth Cos., L.C.*

*v. TruNorth Warranty Plans of N. Am., LLC*, 353 F. Supp. 3d 788, 804 (N.D. Iowa 2018) ("While delay does not preclude relief, it does suggest that the harm is not imminent or great."); *Minn. Vikings Football Stadium, LLC v. Wells Fargo Bank*, 157 F. Supp. 3d 834, 840 (D. Minn. 2016) ("[A] moving party's long delay after learning of the threatened harm may indicate that the harm is neither great nor imminent."); *Club v. U.S. Army Corps of Eng'rs*, No. 4:10CV04017-WRW, 2010 WL 11484334, at *6 (W.D. Ark. Oct. 27, 2010) ("While a delay in bringing a motion for preliminary injunction does militate against a finding of irreparable harm, it is not a conclusive bar to such a finding." (footnote omitted)), *aff'd sub nom. Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d 978 (8th Cir. 2011); *Monarch Prods., LLC v. Zephyr Grafix, Inc.*, No. 4:09CV02049 ERW, 2010 WL 1837711, at *5 (E.D. Mo. May 4, 2010) ("Defendants are correct that a presumption of irreparable harm is negated if the plaintiff unreasonably delayed in seeking relief."); *U.S. v. Arkansas*, No. 4:09CV00033 JLH, 2010 WL 1408818, at *4 (E.D. Ark. Apr. 7, 2010) ("By its own delay in requesting a preliminary injunction, the United States has tacitly shown that it does not believe the threat of irreparable harm is so great as to warrant preliminary injunctive relief."); *Crow Creek Sioux Tribal Farms, Inc. v. U.S. I.R.S.*, 684 F. Supp. 2d 1152, 1159 (D.S.D. 2010) ("Also relevant, though not dispositive, to determining whether there would be irreparable harm is a party's delay in seeking injunctive relief from the Court."). The Supreme Court has suggested that delay should be a consideration, stating that when "plaintiffs could have sought a preliminary injunction much earlier . . . [an] unnecessary, years-long delay in asking for preliminary injunctive relief weighed against their request." *Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018). Thus, it seems clear that plaintiffs' delay merits consideration.

The Court acknowledges that no bright line divides permissible delay from impermissible delay. Great inconsistency pervades "existing case law regarding precisely how much time

amounts to an unreasonable delay." *Monarch Prods.*, 2010 WL 1837711, at *5. Delays as short as three months have been deemed unreasonable, *Gowan Co. v. Aceto Agric. Chems.*, No. CV-09-1124-PHX-JAT, 2009 WL 2028387, at *5 (D. Ariz. July 10, 2009), and delays as long as two years have been deemed reasonable, *Straights and Gays for Equality (SAGE) v. Osseo Area School Dist. No. 279*, No. 05-cv-2100JNE/FLN, 2006 WL 983904 (D. Minn. April 4, 2006), *aff'd sub nom. Straights & Gays for Equal. (SAGE) v. Osseo Area Sch.-Dist. No. 279*, 471 F.3d 908 (8th Cir. 2006). As *Safety-Kleen* instructs, the reasonableness of the delay turns on the facts of the case. 301 F.3d at 936.

The Court is aware that, with specific regard to the First Amendment context, the Supreme Court has stated that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod*, 427 U.S. at 373. However, multiple courts have denied injunctive relief pertaining to alleged First Amendment violations due, in part, to delay on behalf of the plaintiffs. *See, e.g.*, *Crookston v. Johnson*, 841 F.3d 396, 398 (6th Cir. 2016) (plaintiff's unreasonable delay in filing action claiming Michigan's ballot selfie ban violated his First Amendment rights was "[t]he first and most essential reason" that justified staying a preliminary injunction); *Human Rights Def. Ctr. v. Baxter County, Ark.*, No. 5:17-cv-3070, 2017 WL 6028468, at *8 (W.D. Ark. Dec. 5, 2017) (concluding that plaintiff's decision to wait for over a year to seek a preliminary injunction weighed against finding irreparable harm for a preliminary injunction in the First Amendment context); *Prison Legal News v. Cty. of Cook, Ill.*, No. 16-cv-6862, 2016 WL 6833977, at *11 (N.D. Ill. Nov. 21, 2016) ("[P]laintiff's main argument related to irreparability [regarding the loss of First Amendment freedoms] is severely undermined by the fact that plaintiff waited over a year to file its complaint following the first alleged instance of censorship."); *Equity in Athletics, Inc. v. Dep't of Ed.*, 504 F. Supp. 2d 88, 100-01 (W.D. Va.

2007) (weighing period of delay between defendant's actions and plaintiff's seeking injunctive relief against plaintiff in a First Amendment associational rights [among other claims] context); *Wine and Spirits Retailers, Inc. v. State of Rhode Island and Providence Plantations*, 364 F. Supp. 2d 172, 182 (weighing plaintiffs' delay in case regarding Speech and Association claims); *Wallikas v. Harder*, 78 F. Supp. 2d 36 (N.D.N.Y. 1999) (weighing plaintiffs' delay against claims that defendant's retaliatory acts chilled plaintiff's First Amendment rights); *Boczar v. Kingen*, No. IP 99-0141-C-T/G, 1999 WL 33109074, at *11 (S.D. Ind. July 2, 1999) (holding that "[p]laintiffs' own inaction or delayed action in seeking a preliminary injunction" in relation to free exercise claims "repudiates their claims of irreparable injury"); *Costello v. McEnery*, 767 F. Supp. 72, 78 (S.D.N.Y. 1991) (holding that allegations of a chill against employee's First Amendment rights did not show irreparable harm necessary to entitle employee to preliminary injunction, particularly in light of one-year delay in bring action); *cf. California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018) (finding states prompt action weighed in their favor in case involving APA, Due Process, and Establishment Clause claims); *Cal. Justice Comm. v. Bowen*, No. CV 12-3956 PA (AGRx), 2012 WL 2861349, at *2 (C.D. Cal. May 21, 2012) (finding plaintiff's delay justifiable in case regarding election law under the First Amendment).

Admittedly, there is at least one case of which the Court is aware where plaintiffs were deemed to have shown irreparable injury despite a years-long delay between the alleged harm and the filing of the action. *See, e.g., SAGE*, 2006 WL 983904, at *6 (finding that irreparable harm would exist if the injunction was not granted despite plaintiffs waiting over two years to file the suit because plaintiffs "took active steps to resolve this matter without resort[ing] to litigation during the two years preceding the filing of this lawsuit.").

In an attempt to rebut the delay, plaintiffs argue that they have continued to work against State Senator Rapert since they were blocked by petitioning him directly to remove the block, sought other users who were also blocked to put pressure on State Senator Rapert, and pursued litigation against State Senator Rapert after a national advocacy group offered to bring the current case (Dkt. No. 22-1, at 13-14).  After she was blocked, Ms. Fernau sent a tweet to State Senator Rapert and emailed him because she was blocked on Twitter (Dkt. No. 6, at 22-23).  According to plaintiffs, on July 12, 2018, American Atheists sent a demand letter to State Senator Rapert on behalf of Ms. Fernau, Ms. Shoshone, Mr. Barringer, and Ms. Dempsey requesting that State Senator Rapert remove his social media blocks of the plaintiffs (*Id.*, at 31-32).  Plaintiffs' demand letter was sent more than four years after Ms. Fernau was blocked, more than three years after Ms. Shoshone was blocked, and at least three years after Mr. Barringer was blocked.  Further, the demand letter was sent to State Senator Rapert before the date when Ms. Dempsey was blocked, August 2018.  Plaintiffs present limited evidence, at best, that certain plaintiffs attempted to contact State Senator Rapert regarding his decision to block them on social media.  Plaintiffs have not presented any evidence in support of their argument that they sought other users who were blocked to put pressure on State Senator Rapert.

Though Ms. Dempsey sought a preliminary injunction sooner than the other plaintiffs once she was blocked, the Court determines that fact simply weighs in her favor just as Ms. Fernau, Ms. Shoshone, and Mr. Barringer's delays weigh against them.  Further, it remains true that despite Ms. Dempsey's swifter action neither she nor the other plaintiffs pursued this relief in their earlier filed suit.  *See American Atheists, Inc. v. Rapert*, 4:18-cv-00729-KGB (E.D. Ark. Oct. 2, 2018).

## 2.      Other Available Channels To Communicate

The Court is mindful that:

> If restrictions on access to a limited public forum are viewpoint discriminatory,
> the ability of a group to exist outside the forum would not cure the constitutional
> shortcoming. But when access barriers are viewpoint neutral, our decisions have
> counted it significant that other available avenues for the group to exercise its
> First Amendment rights lessen the burden created by those barriers . . . .

*Christian Legal Soc. Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*, 561 U.S.

661, 690 (2010) (citing cases).

Here, there is some record evidence that plaintiffs retain access to essentially the same

forums.   On cross examination, Ms. Shoshone stated that she has two twitter accounts:

"@cshoshone" and "Reese's Queen."  Ms. Shoshone testified that State Senator Rapert blocked

her Twitter account @cshoshone but did not block her "Reese's Queen" account.  Ms. Shoshone

stated that she has interacted with State Senator Rapert on Twitter by using her "Reese's Queen"

account within the last six months leading up to the preliminary injunction hearing on this matter.

On re-direct examination, Ms. Shoshone testified that she created the "Reese's Queen" Twitter

account in order to follow State Senator Rapert after she was blocked and that she did not use it

differently than how she used the @cshoshone Twitter account.  In other words, by creating a new

account, Ms. Shoshone gained access to the same forum even after being blocked initially.  The

Court does not understand Facebook to be different from Twitter in this regard.

Even if the Court agreed that the ability to contact State Senator Rapert through email,

telephone, or in-person contact was insufficient to remedy being blocked, this method of creating

a second account appears to provide similar, and perhaps the same, access to the forum at issue.

The Court acknowledges that the "identity" of the individual blocked may not align with the

creation of a second account under a different "name" on these social media platforms, but

"identity" seems to be a malleable concept on these platforms.  The Court also is mindful that

record evidence establishes that this has been the experience of only one plaintiff, but there is no explanation offered for why this could not be the experience of all plaintiffs in this matter.

In *Knight*, the court examined arguments related to alternate access.  The district court observed:  "To be sure, we do not suggest that the impact on the individual plaintiffs . . . is of the highest magnitude.  It is not.  But the law is also clear:  the First Amendment recognizes, and protects against, even de minimis harms."  302 F. Supp. 3d at 577.  The district court determined that, because the alleged conduct restricted "a real, albeit narrow, slice of speech," it was sufficient to violate the Constitution.  *Id.*

> The Second Circuit Court of Appeals agreed, stating:
>
> When the government has discriminated against a speaker based on the speaker's viewpoint, the ability to engage in other speech does not cure that constitutional shortcoming.  Similarly, the fact that the Individual Plaintiffs retain some ability to 'work around' the blocking does not cure the constitutional violation.  Neither does the fact that the Individual Plaintiffs can post messages elsewhere on Twitter.

928 F.3d 226, 239 (2d. Cir. 2019) (citation omitted).  The alternate channels of communication analysis seems more appropriate for a content-neutral restriction on speech.  Here, the Court determines that plaintiffs have a fair chance of prevailing on their claim that State Senator Rapert's social media policy is not neutral regarding free speech.

Taking all of these factors into account, the Court finds that the factor of irreparable harm weighs slightly in State Senator Rapert's favor when determining whether to grant preliminary injunctive relief for all plaintiffs.

### E.        Balance Of The Equities And Public Interest

Regarding the balance of the equities, "[a]t base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined."  *Dataphase*, 640 F.2d at 113.  The Court must examine this case

in the context of the relative injuries to the parties and to the public. *Dataphase*, 640 F.2d at 114. The public interest unequivocally favors protecting First Amendment liberties. *Emineth v. Jaeger*, 901 F. Supp. 2d 1138, 1143 (D.N.D. 2012) (quoting *Iowa Right to Life Comm., Inc. v. Williams*, 187 F.3d 963, 970 (8th Cir. 1999)). Also, because the protection of a constitutional right is always in the public interest, the grant of a preliminary injunction generally depends on the movant's likelihood of success on the merits. *Edwards v. Beck*, 946 F. Supp. 2d 843, 850 (E.D. Ark. 2013) (citing *Phelps-Roper*, 509 F.3d at 485).

Although the Court finds that plaintiffs have shown a fair chance of prevailing on the merits of their First Amendment free speech claim, because the individual plaintiffs waited to request this relief and given that, under the unique facts of this case the Court questions the scope and magnitude of the harm, this presents a difficult case. Further, the Court is aware that other courts have determined that, in these contexts, the appropriate form of the remedy is not a permanent injunction but instead declaratory relief, with the understanding that the judiciary is charged with determining what the law is and all government officials are presumed to follow the law once the judiciary has said what the law is. *See One Wis. Now*, 2019 WL 2162231, at *2; *Knight*, 302 F. Supp. 3d at 578-80. For these reasons, the Court determines that the balance of the equities weighs against the Court granting plaintiffs' request for preliminary injunction at this stage of the litigation.

Considering the record evidence, the authorities cited, and the factors the Court is required to consider, the Court denies plaintiffs' motion for temporary restraining order and preliminary injunction (Dkt. No. 5).

### F.      Litigation Hold

In their moving papers, plaintiffs request that the Court "require Senator Rapert to maintain records documenting the basis for any future decision to restrict a Facebook or Twitter user's ability to interact with his official social media accounts and therein engage in public speech . . . ." (Dkt. No. 6, at 47).  The Court reminds all counsel to inform their clients of their obligations to institute a litigation hold.  "Once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents."  *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 218 (S.D.N.Y. 2003); *see Stevenson v. Union Pac. R.R. Co.*, 354 F.3d 739, 746 (8th Cir. 2004); *E*Trade Securities LLC v. Deutsche Bank AG*, 230 F.R.D. 582, 587 (D. Minn. 2005).  This Court takes an expansive view of the meaning of "documents" as used in reference to the litigation hold in this matter and extends that term to include, but not be limited to, all electronic information in whatever form it existed, exists, or may exist.  The Court instructs counsel and the parties involved in this dispute to consider broadly documents and information that may be relevant.  Further, under the doctrine of spoliation, parties have a duty to preserve, including but not limited to a duty not to destroy, evidence when litigation is filed or becomes reasonably anticipated.  *See Burris v. Gulf Underwriters Ins. Co.*, 787 F.3d 875 (8th Cir. 2015) (examining application of the spoliation of evidence doctrine in diversity cases).  The Court reminds the parties of these obligations.

### III.     Motion To Dismiss

State Senator Rapert, in his individual capacity, has also filed a motion to dismiss plaintiffs' complaint and an attendant brief (Dkt. Nos. 11, 12).  Specifically, State Senator Rapert argues that plaintiffs' claims against him in his individual capacity should be dismissed because "it would be illogical to find [State Senator Rapert] was acting under color of state law and then hold him

individually liable." (Dkt. No. 12, at 2).  He further argues that he is entitled to protection under

the doctrine of qualified immunity (*Id.*).  Plaintiffs filed a response to the motion to dismiss, and

State Senator Rapert filed a motion for leave to file a reply (Dkt. Nos. 20, 24).  Plaintiffs have not

filed a response to State Senator Rapert's motion for leave to file a reply, and the time to do so has

passed.  For this reason, the Court grants State Senator Rapert's motion for leave to file a reply,

directs State Senator Rapert to file his reply within 14 days from the entry of this Order, and has

considered the reply in deciding the motion to dismiss.

### A.     Sufficiency Of The Complaint

#### 1.     Legal Standard

The Court understands that State Senator Rapert seeks to dismiss pursuant to Federal Rule

of Civil Procedure 12(b)(6) plaintiffs' claims.  To survive a motion to dismiss under Rule 12(b)(6),

"a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that

is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v.

Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  "While a complaint attacked

by a [Federal] Rule [of Civil Procedure] 12(b)(6) motion to dismiss does not need detailed factual

allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires

more than labels and conclusions, and a formulaic recitation of the elements of a cause of action

will not do."  *Twombly*, 550 U.S. at 555 (alteration in original) (citations omitted).  "[T]he

complaint must contain facts which state a claim as a matter of law and must not be conclusory."

*Briehl v. Gen. Motors Corp.*, 172 F.3d 623, 627 (8th Cir. 1999).  "When ruling on a motion to

dismiss, the district court must accept the allegations contained in the complaint as true and all

reasonable inferences from the complaint must be drawn in favor of the nonmoving party." *Young v. City of St. Charles*, 244 F.3d 623, 627 (8th Cir. 2001). The Court may, however, "consider the pleadings themselves, materials embraced by the pleadings, exhibits attached to the pleadings, and matters of public record." *Roe v. Nebraska*, 861 F.3d 785, 788 (8th Cir. 2017). A reviewing court "may consider these materials without converting the defendant's request to a motion for summary judgment." *Id.* (citations and quotation marks omitted); *see Lustgraaf v. Behrens*, 619 F.3d 867, 885-86 (8th Cir. 2010) ("[W]hen considering a motion to dismiss . . . , [a court] may take judicial notice (for the purpose of determining what statements the documents contain and not to prove the truth of the documents' contents) of relevant public documents . . . .") (alterations in original) (emphasis omitted).

## 2.    Analysis

State Senator Rapert first argues that plaintiffs' claims should be dismissed for failure to state a claim. To resolve this motion to dismiss, the Court confines its review to the allegations in plaintiffs' operative complaint. The Court examined the law that controls the analysis of these claims elsewhere in this Order. The Court determines that plaintiffs have sufficiently stated their claims upon which relief can be granted and, therefore, denies State Senator Rapert's Rule 12(b)(6) motion to dismiss plaintiffs' complaint.

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ." 42 U.S.C.A. § 1983. "The Eleventh Amendment does not bar such suits, nor are state officers absolutely immune from

personal liability under § 1983 solely by virtue of the 'official' nature of their acts." *Hafer v. Melo*, 502 U.S. 21, 31 (1991); *see also Egerdahl v. Hibbing Comm. Coll.,* 72 F.3d 615, 619 (8th Cir. 1995) ("The Eleventh Amendment does not prevent a plaintiff from seeking damages from a state official if she sues the official in his personal capacity.").   Further, public officials in their individual capacities may be sued for injunctive relief and monetary damages.   *Kentucky v. Graham*, 473 U.S. 159, 165 (1985).   To the extent State Senator Rapert asserts that personal capacity liability is incompatible with state action or the type of relief plaintiffs seek under §1983, the Court rejects his arguments.

To the extent their claims depend on State Senator Rapert acting under color of state law, plaintiffs have pleaded sufficient facts in their complaint on the question of whether State Senator Rapert acted under color of state law.   Regarding the relevant Twitter account, plaintiffs allege State Senator Rapert created the account a few months before he took office in the Arkansas State Senate and that he also created a separate campaign Twitter account.   Plaintiffs also included pictures of State Senator Rapert's Twitter posts that relate to local community events.   Plaintiffs further allege that State Senator Rapert tweets regarding public policy issues that garner dozens of comments and responses.   On his Twitter account, State Senator Rapert has included his official title and a link to his profile on the Arkansas State Senate website.   Plaintiffs have alleged that State Senator Rapert uses his Twitter account as a channel for communicating with his constituents.

Regarding State Senator Rapert's Facebook page, plaintiffs include a picture of State Senator Rapert Facebook page showing his name on the page as "Sen. Jason Rapert."   His Facebook page is described as being "for communication with constituents and citizens . . . ." (Dkt. No. 1, ¶ 34).  Plaintiffs included pictures of State Senator Rapert's Facebook posts regarding

public safety alerts.  Plaintiffs allege that State Senator Rapert's Facebook posts can generate dozens of comments and shares.  Plaintiffs also assert that State Senator Rapert posts information about Arkansas government and that users are allowed to exchange their views on matter of public concern on his page.

Even though State Senator Rapert argues that he only uses his social media accounts in his personal capacity, based on the totality of the circumstances, plaintiffs' complaint states a claim that State Senator Rapert was acting under color of state law when he blocked plaintiffs on Twitter and Facebook.

To the extent plaintiffs' claims depend on forum analysis, plaintiffs have pled sufficient facts in their complaint to show that State Senator Rapert created a type of public forum on his Twitter and Facebook pages when he invited his constituents and other users to engage with him through social media.  According to the complaint, State Senator Rapert's social media posts can generate dozens of responses and comments, and the individual plaintiffs all engaged in speaking with him and other users on his social media pages.  Because State Senator Rapert's followers are able to speak and interact with him and each other on his social media posts, State Senator Rapert has created a type of public forum that is subject to forum analysis and protection under the First Amendment.

Plaintiffs have also sufficiently pled facts that show State Senator Rapert blocked plaintiffs from speaking in the public forum created on his social media posts because of the viewpoints discussed by plaintiffs.  Based on the facts alleged in the complaint, each of the individual plaintiffs sent messages to State Senator Rapert on social media that were critical of his policy and political positions shortly before he blocked them on social media.  For this reason, plaintiffs have pled sufficient facts in the complaint for their claim that State Senator Rapert engaged in viewpoint

discrimination by blocking them on social media.  At the motion to dismiss stage, the Court need not decide which type of forum was created because viewpoint discrimination that results in intentional expulsion from a public forum violates the First Amendment.  *See Campbell*, 367 F. Supp. 3d at 993.

Other district courts in similar cases at the motion to dismiss stage have made similar findings.  *See Hyman*, 2019 WL 2323864, at *2 (finding that defendant government official's actions regarding "the interactive part of its Facebook page is therefore subject to some form of constitutional scrutiny."); *Campbell*, 367 F. Supp. 3d at 992 (finding that the public forum doctrine applied to defendant government official's social media page because "the interactive space following each tweet in which other users may directly interact with the content of the tweets is subject to forum analysis.").

To the extent State Senator Rapert challenges the sufficiency of plaintiffs' allegations with respect to stating any other claim plaintiffs allege, the Court denies his motion.  Having reviewed plaintiffs' complaint, the arguments made, and the authorities cited, the Court denies State Senator Rapert's Rule 12(b)(6) motion to dismiss with respect to all of plaintiffs' claims against him.

### B.      Qualified Immunity

State Senator Rapert also argues that he is entitled to qualified immunity in his personal capacity as to plaintiffs' claims (Dkt. No. 12, at 2).  Qualified immunity "will be upheld on a 12(b)(6) motion only when the immunity is established on the face of the complaint."  *Weaver v. Clarke*, 45 F.3d 1253, 1255 (8th Cir. 1995).  Qualified immunity shields state officials from suits against them in the individual capacity for monetary damages unless a plaintiff pleads facts showing:  (1) that the official violated a statutory or constitutional right, and (2) that the right was "clearly established" at the time of the challenged conduct.  *Harlow v. Fitzgerald*, 457 U.S. 800,

818 (1982); *Foster v. Mo. Dep't of Health & Senior Servs.*, 736 F.3d 759, 762 (8th Cir. 2013) (quoting *Winslow v. Smith*, 696 F.3d 716, 731 (8th Cir. 2012)).  "If the answer to either question is no" then a defendant is entitled to qualified immunity.  *Doe v. Flaherty*, 623 F.3d 577, 583 (8th Cir. 2010).  The doctrine of qualified immunity only applies to monetary damages, not to prospective injunctive relief.  *Pearson v. Callahan,* 555 U.S. 223, 242-43 (2009); *Grantham v. Trickey,* 21 F.3d 289, 295 (8th Cir. 1994).  Accordingly, qualified immunity would only shield State Senator Rapert from plaintiffs' request for nominal and punitive damages, not their request for prospective injunctive relief.

State Senator Rapert makes little mention of qualified immunity.  State Senator Rapert states that, "[t]o the extent that Plaintiffs would prevail and be due damages, it would be an issue of first impression in this Circuit, and Defendant certainly should be entitled to protection under the doctrine of qualified immunity." (Dkt. No. 12, at 2) (citing *Harlow*, 457 U.S. at 818).  He ties this argument to no specific claim raised by plaintiffs, and plaintiffs assert multiple claims.

For the first factor, because the Court determines that plaintiffs have sufficiently pleaded facts stating their claims, the Court finds the first factor has been established for the purpose of the qualified immunity analysis at the motion to dismiss stage.

"[F]or a right to be clearly established, 'existing precedent must have placed the statutory or constitutional question beyond debate.'"  *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)).  Though a case directly on point is not required, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).  Courts should not "define clearly established law at a high level of generality."  *Id.* at 742.  The Eighth Circuit "applies a flexible standard, requiring some, but not precise factual correspondence with precedent, and demanding that officials apply

generally, well-developed legal principles." *Coates v. Powell*, 639 F.3d 471, 477 (8th Cir. 2011) (quoting *J.H.H. v. O'Hara*, 878 F.2d 240, 243 (8th Cir. 1989)).   The law is clear if it gives the official "fair warning" that his conduct violated an individual's rights when the officer acted.   *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).   Moreover, the Eighth Circuit has held that, "[i]n the absence of binding precedent, a court should look to all available decisional law, including decision of state courts, other circuits and district courts." *Buckley v. Rogerson,* 133 F.3d 1125, 1129 (8th Cir. 1998) (quoting *Norfleet v. Ark. Dep't of Human Servs.,* 989 F.2d 289, 291 (8th Cir. 1993)).

At least one other court in this district, when addressing free speech claims alleging viewpoint discrimination, has found that "[n]o binding precedent notified [defendant government official] that selectively deleting citizens' posts from the interactive part of a Facebook page that invited public commentary clearly violated the First Amendment." *Hyman*, 2019 WL 2323864, at *2; *see also Tanner*, 2019 WL 2344094, at *1-2 (finding that "[n]o precedent informed [defendant government officials] in 2016 that deleting comments or blocking users from posting on the interactive part of a State agency's Facebook page violated free speech rights.").   As the district court in *Hyman* and *Tanner* noted, the United States Supreme Court has not yet spoken on this issue, and only three United States Courts of Appeals have been presented with this Frist Amendment issue, all of which were decided this year.   *Knight*, 928 F.3d at 226; *Davison*, 912 F.3d at 666; *Robinson*, 921 F.3d at 440.   The only other district court within the Eighth Circuit Court of Appeals to address this type of First Amendment claim is *Campbell*. 367 F. Supp. 3d at 990-92.   This Court concurs and grants State Senator Rapert qualified immunity on plaintiffs' First Amendment free speech claim and First Amendment right to petition claim to the extent those claims seek monetary damages against State Senator Rapert in his personal capacity.

Because State Senator Rapert is not specific on which of plaintiffs' claims he seeks qualified immunity, the Court declines to rule further on State Senator Rapert's motion to dismiss on the basis of qualified immunity.  The Court directs State Senator Rapert to supplement his motion to the extent he seeks the Court's consideration on the issue of qualified immunity with respect to any but plaintiffs' First Amendment free speech and right to petition claims (Dkt. No. 11).  The Court grants State Senator Rapert qualified immunity on plaintiffs' First Amendment free speech and right to petition claims to the extent those claims seek monetary damages against State Senator Rapert in his personal capacity.

## IV.    Conclusion

For these reasons, the Court grants plaintiffs' motion for leave to file a reply (Dkt. No. 22); grants State Senator Rapert's motion to file his proposed reply in order to respond to the arguments and evidence included in plaintiffs' reply (Dkt. No. 25); and grants State Senator Rapert's motion filed in his individual capacity for leave to file a reply (Dkt. No. 24).  Plaintiffs and State Senator Rapert will have 14 days from the date of this Order to file their proposed reply briefs.  The Court has considered the parties' proposed reply briefs in ruling on the pending motion for temporary restraining order and preliminary injunction.

The Court denies plaintiffs' motion for temporary restraining order and preliminary injunction (Dkt. No. 5).  The Court denies State Senator Rapert's Federal Rule of Civil Procedure 12(b)(6) motion to dismiss filed in his personal capacity with respect to whether plaintiffs state claims upon which relief can be granted (Dkt. No. 11).  The Court grants State Senator Rapert qualified immunity on plaintiffs' First Amendment free speech and right to petition claims to the extent those claims seek monetary damages against State Senator Rapert in his personal capacity (Dkt. No. 11).  The Court directs State Senator Rapert to supplement his motion to the extent he

seeks the Court's consideration on the issue of qualified immunity with respect to any but plaintiffs' First Amendment free speech and right to petition claims (Dkt. No. 11).

So ordered this the 30th day of September, 2019.

Kristine G. Baker
United States District Judge